

1  MORGAN, LEWIS & BOCKIUS LLP
   CARRIE A. GONELL, SBN 257163
2  cgonell@morganlewis.com
   MARIA O. GUTIERREZ, SBN 209995
3  maria.gutierrez@morganlewis.com
   5 Park Plaza, Suite 1750
4  Irvine, CA  92614
   Tel:  949.399.7000
5  Fax:  949.399.7001

6  Attorneys for Defendant
   COGNIZANT TECHNOLOGY SOLUTIONS
7  U.S. CORPORATION

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  JOHN THOMAS, an individual          Case No.     SACV11-1123 JST(ANx)
    California resident, on behalf of himself
12  and all others similarly situated,     **DEFENDANT COGNIZANT
                                           TECHNOLOGY SOLUTIONS U.S.
13                    Plaintiff,           CORPORATION'S NOTICE OF
                                           REMOVAL TO THE UNITED
14          vs.                            STATES DISTRICT COURT FOR
                                           THE CENTRAL DISTRICT OF
15  COGNIZANT TECHNOLOGY              CALIFORNIA**
    SOLUTIONS U.S. CORPORATION, a
16  Delaware corporation and DOES 1        Diversity Jurisdiction Under The Class
    through 100, inclusive,                Action Fairness Act
17
                    Defendants.            [28 U.S.C. §§ 1332, 1441, 1446 AND
18                                         1453]

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

Case No. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/22581659.1

1   **TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT**

2   **COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA:**

3       PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1332, 1441, 1446

4   and 1453, Defendant COGNIZANT TECHNOLOGY SOLUTIONS U.S.

5   CORPORATION ("Defendant" or "Cognizant") hereby removes the above-entitled

6   action from the Superior Court of the State of California, in and for the County of

7   Orange, to the United States District Court for the Central District of California.

8   Removal is based on the following grounds:

9   **I.**    **SUMMARY OF THE COMPLAINT**

10       On or about June 16, 2011, Plaintiff John Thomas ("Plaintiff") filed a class

11   action complaint on behalf of himself and a putative class of current or former

12   Cognizant employees in California who held the testing analyst position. Ex. A,

13   Complaint ("Compl.")¶¶ 1-3. Plaintiff alleges that Defendant violated the

14   provisions of the California Labor Code by allegedly misclassifying its testing

15   analysts as exempt and: (1) failing to pay overtime pay for hours worked in excess

16   of 8 per day and 40 per week in violation of California Labor Code § 1194 (first

17   cause of action. Ex. A, Compl. ¶¶ 16-21); (2) failing to provide meal periods in

18   violation of California Labor Code §§226.7 and 512 (second cause of action. Ex. A,

19   Compl. ¶¶ 22-27); (3) failing to provide rest periods in violation of California Labor

20   Code §226.7 (third cause of action. Ex. A, Compl. ¶¶ 28-32); (4) failing to pay all

21   wages upon termination of employment in violation of California Labor Code §§

22   201, 202, and 203 (fourth cause of action. Ex. A, Compl. ¶¶ 33-37); (5) failure to

23   furnish itemized wage statements in violation of California Labor Code §§ 226(b),

24   1174, and 1175 (fifth cause of action. Ex. A, Compl. ¶¶ 38-42); and (6) violation of

25   California Unfair Competition Law as codified at California Business and

26   Professions Code §17200 *et seq.* (sixth cause of action. Ex. A, Compl. ¶¶ 43-51).

27   **II.**    **THE REMOVAL IS TIMELY**

28       This Notice of Removal is timely filed, pursuant to 28 U.S.C. § 1446(b),

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

Case No. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/ 22581659.1

because it is filed within thirty days from June 27, 2011, the date upon which Defendant received service of Plaintiff's Complaint and Summons.  No previous Notice of Removal has been filed or made with this Court for the relief sought herein.

## III.  THIS COURT HAS ORIGINAL SUBJECT MATTER JURISDICTION

This Court has original subject matter jurisdiction based on diversity of citizenship under the Class Action Fairness Act of 2005 ("CAFA"), because Plaintiff alleges a class action, he is diverse from Defendant, and the amount in controversy exceeds $5 million.  28 U.S.C. § 1332(d)(2).

Plaintiff brings this action as a class action under Cal. Code Civ. Proc. Section 282.  Ex. A, Compl. ¶ 14.  Plaintiff alleges he is a citizen of California.  Ex. A, Compl. ¶ 6.  Defendant is not a citizen of California.  *See* Ex. A, Compl. ¶ 7; Pederson Decl.[1] ¶ 3, Exs. A, B.  In addition, Plaintiff's class claims, when aggregated for potential class members, put into controversy an amount in excess of $5 million.  Removal under diversity jurisdiction is, therefore, proper pursuant to 28 U.S.C. §§ 1446 and 1453.

### A.  Diversity Exists Between The Parties

The parties meet the diversity requirements of CAFA because Plaintiff is a citizen of a different state from Defendant.  28 U.S.C. § 1332(d)(2)(A) (providing that diversity is met under CAFA where "any member of a class of plaintiffs is a citizen of a State different from any defendant").  Diversity therefore exists between the parties under CAFA.

### 1.  Plaintiff and the Members of the Putative Class Are Citizens of California.

At the time Plaintiff filed this action, he alleged that he is "a resident of California."  Ex. A, Compl. ¶ 3.  Plaintiff also seeks to represent a putative class of

---

[1] "Pederson Decl." refers to the Declaration of Misty Pederson attached as Exhibit B to this Notice of Removal.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

3

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/22581659.1

1   testing analysts who were employed in California. Ex. A, Compl. ¶¶ 1-2. For

2   diversity purposes, Plaintiff is therefore considered a citizen of California.

3            2.      Defendant Is Not a Citizen of California.

4        For diversity determination purposes, Defendant is diverse from Plaintiffs

5   because, as expressly pled by Plaintiff, Defendant is not a citizen of California. *See*

6   Ex. A, Compl. ¶ 1. Defendant is, and at all pertinent times was, a Delaware

7   corporation with Teaneck, New Jersey designated in its articles of incorporation as

8   the locus of its main office. *See* Pederson Decl. ¶ 3, Ex. B. Defendant maintains its

9   headquarters in Teaneck, New Jersey, and their officers direct, control, and

10   coordinate its business activities from Teaneck, New Jersey. Pederson Decl. ¶3,

11   Ex. A, Cognizant Form 10-Q Report March 31, 2011. Accordingly, Teaneck is the

12   "nerve center" for diversity purposes, and Defendant is not now, and was not at the

13   time this action was instituted, a citizen of the State of California. *See Hertz Corp.*

14   *v. Friend*, 559 U.S. __, 130 S. Ct. 1181, 1186, 1192, 175 L. Ed. 2d 1029 (2010) (a

15   corporation's principal place of business for diversity purposes is its "nerve center"

16   -- the location where the corporation's officers direct, control, and coordinate the

17   corporation's activities).

18        Although Plaintiff has named 100 fictitiously-named "Doe" defendants, the

19   citizenship of these "Doe" defendants is disregarded for purposes of removal. 28

20   U.S.C. § 1441(a); *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 690-91 (9th Cir.

21   1998) (for removal purposes, the citizenship of defendants sued under fictitious

22   names shall be disregarded).

23        Accordingly, Defendant is not a resident of California for diversity

24   jurisdiction purposes, and is therefore diverse from Plaintiff and the putative class

25   he purports to represent.

26   **B.     The Amount Plaintiff Places in Controversy Exceeds $5 Million**

27        Pursuant to CAFA, the amount in controversy component of diversity

28   jurisdiction is satisfied when the aggregated claims of the individual members in a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 22581659.1

4

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

1   class action exceed the sum or value of $5 million.  *See* 28 U.S.C. § 1332(d)(6).

2   Furthermore, Congress intended for federal jurisdiction to be appropriate under

3   CAFA "if the value of the matter in litigation exceeds $5,000,000 either from the

4   viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the

5   type of relief sought (e.g., damages, injunctive relief, or declaratory relief.)."

6   Senate Judiciary Report, S. REP. 109-14, at 42.

7        Where, as here, a plaintiff does not expressly plead a specific amount of

8   damages, a removing defendant need only show that it is more likely than not that

9   the amount in controversy exceeds $5 million.  *Singer v. State Farm Mut. Auto. Ins.*

10  *Co.*, 116 F.3d 373, 376 (9th Cir. 1997).  "Said burden is not 'daunting,' as courts

11  recognize that under this standard, a removing defendant is not obligated to

12  'research, state, and prove the plaintiff's claims for damages.'"  *Korn v. Polo Ralph*

13  *Lauren Corp.*, 536 F. Supp. 2d 1199, 1204-05 (E.D. Cal 2008).  The ultimate

14  inquiry is what amount is put "in controversy" by the plaintiff's complaint, not

15  what a defendant will actually owe.  *Rippee v. Boston Market Corp.*, 408 F. Supp.

16  2d 982, 986 (S.D. Cal. 2005); *Scherer v. Equitable Life Assurance Society of the*

17  *United States*, 347 F.3d 394, 397-99 (2d Cir. 2003) (recognizing that the ultimate or

18  provable amount of damages is not what is considered when determining the

19  amount in controversy; rather, it is the amount put in controversy by the plaintiff's

20  complaint).

21       Although Defendant denies Plaintiff's factual allegations and denies that he

22  or the class that he purports to represent are entitled to the relief for which it has

23  prayed, Plaintiff's allegations and prayer for relief have put into controversy an

24  amount that exceeds the $5 million threshold when aggregating the claims of the

25  potential class members as set forth in 28 U.S.C. § 1332(d)(6).

26       A removing party seeking to invoke CAFA jurisdiction may use reasonable

27  estimates and assumptions when they are based on evidence and/or Plaintiff's

28  allegations.  *Behrazfar v. Unisys Corp.*, 687 F. Supp 2d 999, 1004 (C.D. Cal.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
Irvine

5

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/22581659.1

1    2009). (finding in wage and hour class action that Defendant established the

2    amount in controversy by a preponderance of the evidence where Defendant's

3    calculations were "relatively conservative" and based on Plaintiff's statements).

4    Such estimates may be calculated by presenting evidence of the number of putative

5    class members or class claims. *Korn v. Polo Ralph Lauren*, 536 F. Supp. 2d 1199,

6    1206 (E.D. Cal. 2008) (plaintiff's motion for remand denied). The number of

7    putative class claims can then be multiplied by the damages alleged per claim to

8    determine the amount in controversy. *Id.* In *Korn*, for example, plaintiff brought a

9    class action alleging violations of California Civil Code section 1747.08, which

10   carries a maximum civil penalty of $1,000 per claim. To establish the $5 million

11   amount in controversy for CAFA jurisdiction purposes, the defendant offered

12   evidence that more than 5,000 potential claims (credit card transactions) took place

13   during the class period. The court found this evidence sufficient to prove, by a

14   preponderance of the evidence, that the amount in controversy under CAFA was

15   met, by multiplying the number of claims by the statutory penalty. *Id.* In

16   addressing the defendant's evidentiary burden, the court held, "defendant need only

17   demonstrate that there are at least 5,001 putative class claims." *Id.* Because the

18   5,001 putative class claims multiplied by the $1,000 statutory penalty resulted in an

19   amount in controversy greater than $5 million, the district court found the amount

20   in controversy satisfied, and denied plaintiff's motion to remand.

21          In this case, as in *Korn* and *Behrazfar*, Plaintiff has put more than $5 million

22   in controversy. Plaintiff seeks to represent a putative class of all testing analysts in

23   California "at any time within the four years prior to the date of the filing of this

24   Complaint through the date of the final disposition of this action." Ex. A, Compl.

25   ¶ 13. Plaintiff's Complaint alleges five causes of action under the California Labor

26   Code and one cause of action under the Unfair Competition Law of the California

27   Business and Professions Code via which he alleges: failure to pay overtime pay,

28   failure to provide meal periods, failure to provide rest periods, failure to provide

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
Irvine

6

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/22581659.1

1    itemized wage statements, and failure to pay all wages at the time of termination.

2    Ex. A  Compl. ¶¶ 16-51.

3              As discussed below, when the claims of these putative class members are

4    aggregated, their claims put into controversy well over $5 million in damages.

5                    1.      Plaintiff's Overtime Claim Puts Into Controversy More than
                             $1.2 million.

6

7              Plaintiff's First Cause of Action alleges that Defendant systematically failed

8    to pay overtime compensation to putative class members in violation of California

9    law.  Ex. A, ¶¶ 16-21.  Plaintiff alleges that he and putative class members "worked

10   in excess of forty (40) hours per week and/or in excess of . . . eight (8) hours per

11   day" "[t]hroughout the period applicable to this cause of action."  Ex. A, ¶ 17.

12             Taking these allegations to be true, then the amount in controversy arising

13   from Plaintiff's overtime claim alone is over $1 million.  If, as Plaintiff contends,

14   putative class members worked more than 40 hours per week and/or 8 hours per

15   day throughout the class period, then they would arguably be entitled to at least 1

16   hour of overtime pay for each *work week* (12 minutes per day).  There are at least

17   551 putative class members of the class alleged by Plaintiff.  The Chart Attached as

18   Exhibit C to the Declaration of Misty Pederson identifies, for each of the 551

19   putative class members, their annual start rate of pay, and the dates during which

20   they worked for Defendant in California during the statute of limitations period.

21   Assuming just one hour per week of overtime for each week these putative class

22   members worked in California, there is **$1,287,769.94**[2] in controversy on Plaintiff's

23   first cause of action.

24

25

26   [2] This figure is computed by taking the weekly salary rate at which each of these 551 class
         members started working in California, dividing by 40 hours per week, and multiplying by 1.5
27       to get the overtime rate.  Next, the number of weeks each employee worked in California is
         multiplied by that employee's overtime rate, and these products are summed to yield a total of
28       $1,287,769.94.  Pederson Decl. ¶5, Ex. C; Gonell Decl. ¶ 5.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 22581659.1

7

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

2.     Plaintiff's Meal Period Claim Puts into Controversy More Than $850,000.

Plaintiff's Second Cause of Action alleges that Defendant failed to provide putative class members with meal breaks in violation of California law. Ex. A, Compl. ¶¶ 22-27. More specifically, he alleged that "Throughout the period applicable to this cause of action, Defendants required Plaintiff and THE CLASS Members to work during meal period mandated by the applicable orders of the Industrial Welfare Commission." Ex. A, Compl. ¶ 25. Even if each putative class member was not provided with a meal period on just one day per week (despite allegations that the putative class members were not provided with meal periods throughout the statute of limitations period), the amount in controversy arising from Plaintiff's meal period claim is more than $858,513.29.

If, as Plaintiff contends, putative class members were not provided with meal breaks, they would be entitled to one hour of premium pay for each missed meal period per day at the employee's regular hourly rate. *Murphy v. Kenneth Cole Productions*, 40 Cal. 4th 1094 (2007). Class members typically work at least five days a week, and work shifts longer than five hours. Pederson Decl. ¶5. Thus, taking as true Plaintiff's claim that Defendant did not provide meal breaks (as Plaintiff's Second Cause of Action alleges), putative class members would be eligible for one hour of premium pay for each day worked. *See Muniz v. Pilot Travel Centers LLC*, No. CIV.S-07-0325 FCD EFB, 2007 WL 1302504 (E.D. Cal. May 1, 2007) (where plaintiff does not allege facts specific to the circumstances of allegedly missed meal and/or rest periods, defendant may use 100% violation rate in calculating the amount in controversy).

Although Defendant would be entitled for purposes of this Petition to estimate that putative class members missed a meal five times per week, here Defendant estimates claimed damages of just one missed meal period per week. The Chart Attached as Exhibit C to the Declaration of Misty Pederson identifies,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

8

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/22581659.1

1  for each of the 551 putative class members, their annual start rate of pay and the

2  number of weeks they worked for Defendant in California during the statute of

3  limitations period.  Utilizing the pay rate each putative class member received when

4  he or she started working in California (converted to an hourly rate) and

5  multiplying by the number of workweeks that individual worked in California

6  yields **$858,513.29** in damages in controversy.  Pederson Decl. ¶ 5, Ex. C; Gonell

7  Decl.[3] ¶ 6.

8          3.    Plaintiff's Rest Period Claim Puts into Controversy More Than
9                $850,000.

10         Plaintiff's Third Cause of Action alleges that Defendant failed to provide

11  putative class members with rest breaks in violation of California law.  Ex. A,

12  ¶¶ 28-32.  Even if each putative class member was not provided with a rest break

13  on just one day per week (despite allegations that the putative class members were

14  not provided with rest periods throughout the statute of limitations period), the

15  amount in controversy arising from Plaintiff's rest break claim is more than

16  $858,513.29.

17         If, as Plaintiff contends, putative class members were not provided with rest

18  breaks, they would be entitled to one hour of premium pay for each missed rest

19  break per day at the employee's regular hourly rate.  *Murphy v. Kenneth Cole*

20  *Productions*, 40 Cal. 4th 1094 (2007); *United Parcel Service Wage and House*

21  *Cases v. Superior Court*, 196 Cal. App 4th 57, 65-59 (2011).  Class members

22  typically work five or more days a week, and work shifts longer than five hours.

23  Pederson Decl. ¶ 5.  Thus, taking as true Plaintiff's claim that Defendant did not

24  provide rest breaks (as Plaintiff's Third Cause of Action alleges), putative class

25  members would be eligible for one hour of premium pay for each day worked.  *See*

26  *Muniz v. Pilot Travel Centers LLC*, No. CIV.S-07-0325 FCD EFB, 2007 WL

27  1302504 (E.D. Cal. May 1, 2007) (where plaintiff does not allege facts specific to

28

[3] "Gonell Decl." refers to the Declaration of Carrie Gonell attached hereto as Exhibit D.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

9

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

1   the circumstances of allegedly missed meal and/or rest periods, defendant may use

2   100% violation rate in calculating the amount in controversy).

3       For purposes of this calculation Defendant estimates claimed damages of just

4   one rest period penalty per week. The Chart Attached as Exhibit C to the

5   Declaration of Misty Pederson identifies, for each of the 551 putative class

6   members, their annual start rate of pay and the number of weeks they worked for

7   Defendant in California during the statute of limitations period. Utilizing the pay

8   rate each putative class member received when he or she started working in

9   California (converted to an hourly rate) and multiplying by the number of

10  workweeks that individual worked in California yield **$858,513.29** in controversy

11  in Plaintiff's rest break claim. Pederson Decl. ¶5, Ex. C; Gonell Decl. ¶ 6.

12      4.    Plaintiff's Waiting Time Claim Puts into Controversy More

13           Than $1.0 million.

14      In Plaintiff's Fourth Cause of Action for waiting time penalties pursuant to

15  Labor Code § 203, Plaintiff alleges that Defendant failed to pay Plaintiff and

16  members of the putative class all earned and unpaid wages upon termination. Ex.

17  A, Complaint ¶¶ 33-37. He seeks waiting time penalties equal to their daily wage

18  for 30 days. *Id.* ¶ 36 ([E]ach of said employees is entitled to thirty days' wages.").

19  This claims puts into controversy nearly $1,081,483.56.

20      Of the 551 putative class members, 102 are former employees. Ex. B,

21  Pederson, Decl. ¶ 5, Ex. C . For each, their annual salary was converted into a daily

22  rate of pay and multiplied by 30 – or the actual number of days since termination

23  for those whose employment ended within the last month – and then summed.

24  Gonell Decl. ¶ 7. This calculation yields an amount in controversy of

25  $1,081,483.56. Although Defendant disputes the merits of Plaintiff's waiting time

26  penalty claims, based on these figures, this claims puts at least an additional

27  $1,081,483.56 into controversy.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/22581659.1

5.    Plaintiff's Wage Statement Claim Puts into Controversy More
Than $1.0 million.

In this Fifth Cause of Action, Plaintiff alleges that Defendant failed to comply with Labor Code § 226: "[t]hroughout the period applicable to this cause of action, Defendant[] intentionally failed to furnish Plaintiff and THE CLASS Members, upon each payment of wages, itemized statements . . ." Ex. A, Complaint, ¶ 39.  He further alleges that Plaintiff and the class he purports to represent are thus entitled to damages as provided for in Labor Code section 226(e). Ex. A, Complaint, ¶41.

Labor Code section 226(e) provides that an employee is entitled to recover the greater of all actual damages or $50 for the initial violation and $100 for each subsequent violation, up to a maximum of $4,000, plus costs and reasonable attorneys' fees, if an employer knowingly and intentionally fails to provide an accurate, itemized wage statement.  Cal. Labor Code § 226(e).  Such an award may be granted for each wage statement issued that fails to comply with section 226's requirements.  Thus, according to Plaintiff's theory, he would be entitled to no less than $50 for the first violation, plus $100 for each subsequent violation, for every pay period during the class period where he allegedly did not receive an accurate statement of wages, subject to a maximum award of $4,000.  This maximum award of $4,000 would be reached if he (or employees similarly situated) received 41 or more allegedly inaccurate wage statements ($50 first alleged violation + 40 alleged subsequent violations x $100 = $4,050, in excess of the statutory maximum); or, in other words, was employed for at least 41 pay periods.  In addition, under Plaintiff's alleged claim, each member of the putative class that he purports to represent would also be entitled to such an award, up to a maximum award of $4,000 for each putative class member.

Defendant pays Analysts on a semi-monthly basis, for a total of 24 pay periods per year.  Pederson Decl., ¶ 4.  As alleged in the Complaint, the class period

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

11

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/ 22581659.1

1  began four years prior to the filing of the original action, or June 16, 2007.[4]

2  Between June 16, 2007 and July 20, 2011, 551 current or former Analysts were

3  employed by Defendant. One hundred and fifteen (115) of the 551 potential class

4  members received 41 or more pay checks. Each of these employees has a potential

5  claim of $4,000, for a total of $460,000. For the remaining 436 potential claims

6  members, there are 436 initial pay periods at $50 each for a total of $21,800.

7  Using the potential class member start and end dates, there are 5984 subsequent pay

8  periods, for a total of $598,400. In total, these number yield $1,080,200 at issue on

9  the wage statement claim. Ex. C, Pederson Decl., ¶ 7; Gonell ¶8. Cal. Lab. Code

10  § 26(e).

11          6.   Plaintiff's Claim for Attorney's Fees Puts Into Controversy an
                 Additional More Than $1.3 million.
12

13          The Complaint also seeks attorneys' fees. Ex. A, Compl. ¶¶ 20, 24, 31, 41,

14  50; Prayer for Relief ¶ 12. Attorneys' fees are properly included in determining the

15  amount in controversy. *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 698

16  (9th Cir. 2007); *Sanchez v. Wal-Mart Stores, Inc.*, No. Civ. S-06-cv-2573 DFL

17  KJM, 2007 WL 1345706, *2 (E.D. Cal. May 8, 2007) ("Attorney's fees, if

18  authorized by statute or contract, are also part of the calculation.").

19          Although Defendant denies Plaintiff's claim for attorney's fees, for purposes

20  of removal, the Ninth Circuit uses a benchmark rate of 25% of the potential

21  damages as the amount of attorney's fees. *In re Quintus Securities Litigation*, 148

22  F. Supp. 2d 967, 973 (N.D. Cal. 2001) (benchmark for attorneys' fees is 25% of the

23  common fund). Given the $5,166,480.09 amount in controversy discussed above,

24  an award of 25% attorney's fees would increase the amount in controversy by

25  $1,291,620.02. Thus, adding these statutory attorney's fees further increases

26  Plaintiff's alleged amount in controversy well in excess of $5 million.

27

28

[4] Defendant contends that a one-year limitations period applies to this claim. As pleaded,
   however, the Complaint alleges a four-year limitations period.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

12

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/22581659.1

7. The Amount in Controversy Is Satisfied for Diversity Jurisdiction Purposes.

Thus, although Defendant denies Plaintiff's allegations and denies that Plaintiff or the class that he purports to represent are entitled to the relief for which he has prayed, based on Plaintiff's allegations, theories, and prayer for relief, he has placed at least $6,458,100.11 controversy, which exceeds the $5 million threshold set forth under CAFA. Because there is diversity between the parties and the amount in controversy threshold has been satisfied in this Action, this Court has original subject matter jurisdiction to hear this dispute.

**IV.   VENUE**

This action was originally filed in the Superior Court for the County of Los Angeles. Venue is therefore proper in this district, pursuant to 28 U.S.C. § 1441(a), because it encompasses the county in which this action has been pending.

**V.   NOTICE**

Defendant will promptly serve this Notice of Removal on all parties and will promptly file a copy of this Notice of Removal with the clerk of the state court in which the action is pending, as required under 28 U.S.C. § 1446(d).

A true and correct copy of Plaintiff's original Complaint is attached hereto as Exhibit A.

A true and correct copy of the Declaration of Misty Pederson in support of removal is attached hereto as Exhibit B.

A true and correct copy of Cognizant's Answer, filed in the Superior Court, is attached hereto as Exhibit C.

A true and correct copy of the Declaration of Carrie Gonell is attached hereto as Exhibit D.

**VI.   CONCLUSION**

Based on the foregoing, Defendant respectfully requests that this action be removed to this Court. If any question arises as to the propriety of the removal of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

13

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/ 22581659.1

1 | this action, Defendant requests the opportunity to present a brief and oral argument

2 | in support of its position that this case is removable.

3

4 | Dated:        July 27, 2011                    MORGAN, LEWIS & BOCKIUS LLP

5

6 | By _____

             Carrie A. Gonell

7

8 | Attorneys for Defendant
COGNIZANT TECHNOLOGY
SOLUTIONS U.S. CORPORATION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

14

CASE NO. _____
DEFENDANT'S NOTICE OF REMOVAL

DB2/22581659.1

# EXHIBIT A

1  Jose R. Garay, Esq., SBN 200494.
2  **JOSE GARAY, APLC**
   2030 Main Street, Suite 1300
3  Irvine, COGNIZANT 92614
   TEL:   (949) 260-9193
4  FAX:   (949) 260-9194
   jgaray@computerovertime.com
5
   Christopher J. Hamner, Esq. (SBN 197117)
6  **HAMNER LAW OFFICES, LP**
   15760 Ventura Blvd., Suite 860
7  Encino, California 91436
   Telephone:    (818) 386-0444
8  Facsimile.:   (818) 386-0050
   chamner@hamnerlaw.com
9
10 Attorneys for Plaintiff, John Thomas, on behalf of
   himself and all other similarly situated
11
12
13
14

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**06/16/2011** at 09:17:13 AM
Clerk of the Superior Court
By Maarit H Nordman,Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR ORANGE COUNTY

Judge Ronald L. Bauer

| | |
|---|---|
| 15  John Thomas, an individual California resident, on behalf of himself and all others similarly situated, | Case No.  30-2011-00484761-CU-OE-CXC |
| 16 | ASSIGNED FOR ALL PURPOSES TO: |
| 17 | **CLASS ACTION COMPLAINT FOR** |
| 18             Plaintiff | |
| 19 | 1.   **Failure to Pay Overtime Wages** |
|    vs. | 2.   **Failure to Provide Meal periods** |
| 20 | 3.   **Failure to Provide Rest Periods** |
|    | 4.   **Labor Code § 203 Penalties** |
| 21 | 5.   **Failure to Provide Itemized** |
| 22  COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, a Delaware corporation and DOES 1 through 100, inclusive, | **Statements** |
| 23 | 6.   **Unfair Business Practices (B&P §** **17200)** |
| 24             Defendants. | **DEMAND FOR JURY TRIAL** |

25
26    Plaintiff, John Thomas (hereinafter, "Plaintiff") alleges, on behalf of himself and classes
27 of those similarly situated, as follows:
28

1

CLASS ACTION COMPLAINT                                                              *Cognizant*

# I.

## INTRODUCTION

1.      This is an action by and on behalf of current and former employees of COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, a Delaware Corporation (hereinafter "Defendant(s)" or "COGNIZANT"), who are or were employed in Defendants' locations in California and held titles or positions in Analyst positions in both Information Technology and Engineering.   The matrix of titles implemented by COGNIZANT were misnomers lacking the exercise of discretion and independent judgment in the performance of their primary duties, and in performing such duties should have been classified as non-exempt pursuant to Wage Order 4 and, therefore, paid overtime.

2.      Plaintiff and the class he seeks to represent were given titles that were inconsistent and unrealistic with the "job requirements and expectations" as defined by COGNIZANT. Plaintiff, and the class he seeks to represent within either title reference above, were misclassified and are owed overtime and other remedies under California law (hereinafter, "the CLASS" or "CLASS MEMBER(S)").  Such jobs, titles, and positions were categorically posted online as requiring the design, development, creation, and implementation of engineering duties but were in fact not realistic and the expectations were inconsistent with the duties performed.  As such, COGNIZANT did not satisfy the legally required minimum to unilaterally designate this CLASS of employees as exempt from overtime. These job titles were, are, and continue to be a misnomer, because the majority of the work performed by this class of employees is not, and was not, exempt in nature.  Furthermore, the titles do not reflect the true nature of the duties performed by these employees.   In fact, the CLASS was engaged in duties that did not involve design, development, documentation, analysis, creation, testing, or modification design, that was creative or intellectual in nature.  The primary duties of the CLASS consisted of routine, rote, and repetitive non-exempt testing procedures requiring supervision and micro-management.   While these employees rely(ied) on their education, training, skill and experience to do their jobs, they are subject to considerable constraint and

2

supervision, must obtain approval to complete basic job tasks, and regularly deploy rigid and institutional fixes rather than engage in original/creative thought in the implementation of duties required by COGNIZANT. The culmination of each of these factors demonstrates that none of the employees in the class definition fall into any of the recognized exemptions. They are trouble-shooting and production driven workers who have wrongfully been deprived of premium compensation for hours worked in excess of eight (8) per day or forty (40) per week throughout the relevant class period.

3.      COGNIZANT characterizes its IT and engineering job families into a multitude of different job descriptions which perform essentially the same duties or overlap significantly in their exempt duties. Analysts and related titles functions and daily tasks focus on routine and repetitive tasks that primarily include standardized configuration, routine troubleshooting, automated debugging, and systematic testing of software within COGNIZANT's pre-defined parameters. Furthermore, there is a consistent lack of commensurate hourly pay based on Labor Code section 515.5 to meet the threshold exemption requirement, and a litany of job duties and functions that are significantly devoid of the exercise of discretion and/or independent judgment. COGNIZANT employs a system of categorization and titles purely for promotion and pay grade purposes. The categorization, titles, and level of pay grade designated to employees do not correspond to primary duties and overlap overwhelmingly such that titles are not dispositive of the exempt or non-exempt status.

4.      These employees thus are and were entitled to overtime and other protections as non-exempt employees. It is *Defendants' burden* of pleading, evidence and proof to show that these employees are and were exempt under California wage and hour law. These employees have spent an insignificant amount of work time doing anything that constitutes "exempt," and for that reason and others, they are and always have been entitled to overtime pay and non-exempt treatment under California wage and hour law.

5.      Plaintiff' duties and those of THE CLASS he seeks to represent were routine in nature and relied on the use of templates and other automated processes. Although, the job titles

3

suggest the performance of high level job duties for the positions described herein, the actual job duties are limited to performing routing production work, not requiring special expertise, and involving little or no exercise of discretion.

## II.

## JURISDICTION AND VENUE

### Plaintiff

6.      Plaintiff is a resident of California.

### Defendants

7.      The Superior Court of the State of California for ORANGE COUNTY has jurisdiction over COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, a Delaware Corporation, because it has qualified with the California Secretary of State to do business and is doing business in Irvine, Orange County, California.

8.      Venue as to each defendant is proper in this judicial district, pursuant to California Code of Civil Procedure section 395.

9.      The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants sued herein as DOES 1 to 100, inclusive, are currently unknown to Plaintiff, who therefore sue Defendants by such fictitious names under California Code of Civil Procedure § 474.  Plaintiff are informed and believe, and based thereon alleges, that each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the defendants designated hereinafter as DOES when such identities become known.

10.      Plaintiff are informed and believe, and based thereon alleges, that each Defendant acted in all respects pertinent to this action as the agent of the other defendants, carried out a joint scheme, business plan or policy in all respects pertinent hereto, and the acts of each defendant are legally attributable to the other defendants. Furthermore, Defendants in all respects acted as the employer and/or joint employer of Plaintiff and THE CLASS.  Plaintiff are informed

4

and believe and thereon alleges that at all times relevant to this action, the named defendant and defendants DOES 1 through 100 were affiliated and were an integrated enterprise.

11.     Plaintiff are informed and believe and thereon alleges that at all relevant times each defendant, directly or indirectly, or through agents or other persons, employed Plaintiff and the other Class Members, and exercised control over the wages, hours, and working conditions of Plaintiff and the other Class Members.  Plaintiff are informed and believe and thereon alleges that, at all relevant times, each defendant was the principal, agent, partner, joint venturer, officer, director, controlling shareholder, subsidiary, affiliate, parent corporation, successor in interest and/or predecessor in interest of some or all of the other Defendants, and was engaged with some or all of the other Defendants in a joint enterprise for profit, and bore such other relationships to some or all of the other Defendants so as to be liable for their conduct with respect to the matters allegesd below.  Plaintiff are informed and believe and thereon alleges that each defendant acted pursuant to and within the scope of the relationships allegesd above, that each defendant knew or should have known about, authorized, ratified, adopted, approved, controlled, aided and abetted the conduct of all other Defendants; and that each defendant acted pursuant to a conspiracy and agreement to do the things allegesd herein.

## III.

## SUMMARY OF CLAIMS

12.     Plaintiff are former COGNIZANT employees whose primary duties were non-exempt and who were misclassified by COGNIZANT as exempt from the overtime provisions of the applicable state wage and hour laws of California, as described in this complaint.

13.     Plaintiff held the title of Analyst and was misclassified in the performance of his primary duties under that title.  Plaintiff bring this action on behalf of all persons who were, are, or will be employed by COGNIZANT in California under either title and as defined in the complaint at any time within the four years prior to the date of the filing of this Complaint through the date of the final disposition of this action (the "California Class Period"), and who

5

were, are, or continue to be improperly misclassified as exempt from overtime pay under California law.

## IV.

## CLASS ALLEGATIONS

14.     Plaintiff brings this cause of action on behalf of himself and on behalf of the CLASS of all persons similarly situated, as more fully explained below and above.  This action is brought and may properly be maintained as a class action pursuant to the provisions of California Code of Civil Procedure section 382 and other applicable law pertaining to class actions.

15.     The proposed Class Plaintiff seeks to represent, sometimes referred to herein as the "Class Members" or "Class Members" is presently defined as follows: all employees of any of the Defendants who are, have been, or will be employed in any California location owned or operated by any of the Defendants in any job whose title is or was referred to by any of the Defendants as defined above and who held an "Analyst" positing in Information Technology or Engineering or any similar derivative title that is better defined by a "skill set" that describes realistic descriptions and expectations of the duties performed by THE CLASS or sub-classes; and, that were so employed during the period of time covered by the statute of limitations applicable to the particular cause of action in which the terms "Class Members" or "the Class" appear, including periods of time during which the statute of limitations was or may have been tolled or suspended.  There is a well defined community of interest in the litigation and THE CLASS is ascertainable.

A.     **Numerosity:** THE CLASS is so numerous that individual joinder of all members is impractical under the circumstances of this case. While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff are informed and believe and thereon alleges that it is several thousand employees or more.

B.     **Common Questions Predominate:** Common questions of law and fact exist as to all Class Members, and predominate over any questions that affect only individual members of **THE CLASS.**  The common questions of law and fact include, but are not limited to:

6

*Cognizan*

(A)     What were and are the policies, programs, practices, procedures and protocols of Defendants regarding Class Members' actual work and tasks, and their job duties irrespective of job titles;

(B)     Whether Defendants are and were subject to overtime requirements contained in the California IWC Wage Orders and other California law with respect to THE CLASS Members pursuant to Labor Code Section 510, and Wage Order, No. 4, for the period commencing four years prior to the date of the filing of this complaint and continuing through the date of judgment;

(C)     Whether Defendant's policy and practice of classifying Class Members as exempt from overtime entitlement under California law and Defendant's policy and practice of failing to pay overtime to the California Class members violate applicable provisions of California law, including applicable statutory and regulatory authority;

(D)     Whether Defendant unlawfully failed to pay overtime compensation in violation of the California Unfair Competition Law, Cal. Bus. t& Prof. Code §17200 et seq., and the California Labor Code and related regulations, Cal. Labor Code §§ 201, 202, 203, 226, 510, 515.5, 1174, 1174.5, and 1194, the applicable Cal. Wage Orders;

(E)     Whether Defendants violated California law by their policies, programs, practices, procedures and protocols regarding rest periods for Class Members;

(F)     Whether Defendants violated California law by their policies, programs, practices, procedures and protocols regarding meal periods for Class Members;

(G)     What were and are the policies, programs, practices, procedures and protocols of Defendants regarding furnishing to THE CLASS Members, upon each payment of wages, itemized statements required by Labor Code section 226;

(H)     Whether Defendants violated California law by their policies, programs, practices, procedures and protocols regarding furnishing to THE CLASS Members, upon each payment of wages, itemized statements required by Labor Code section 226;

(I)     Whether Defendants violated Business & Professions Code sections 17200 et seq. by their policies, programs, practices, procedures and conduct referred to in this cause of action;

7

   (J) Whether Defendants obtained voluntarily waivers with consent and full disclosure, and whether a written signed waiver is effective as to all future meal and rest periods;

   (K) The proper *measure of* damages sustained and the proper measure of restitution recoverable by members of the California Class; and,

   (L) Additional common questions of law and fact may develop as the litigation progresses.

  C. **Typicality:** Plaintiff's claims are typical of the claims of THE CLASS Members. Plaintiff and other Class Members sustained losses, injuries and damages arising out of the Defendants' common policies, programs, practices, procedures, and course of conduct referred to in each cause of action and throughout this Complaint, which were applied uniformly to Class Members as well as Plaintiff. Plaintiff seeks recoveries for the same types of losses, injuries, and damages as were suffered by the other Class Members as well as Plaintiff.

  D. **Adequacy:** Plaintiff and their counsel will fairly and adequately protect the interests of THE CLASS Members. Plaintiff has no interest that is adverse to the interests of the other Class Members.

  E. **Superiority:** A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all Class Members is impractical. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender. Also, because the losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public of adjudication of individual litigation and claims would be substantial, and substantially more than if the claims are treated as

8

CLASS ACTION COMPLAINT                  *Cognizan*

EXHIBIT A - Page 9

class action.  Individual litigation and claims would also present the potential for inconsistent or contradictory results.

  **F.** **Public Policy Considerations**: Defendants, such as COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, routinely violate wage and hour laws. Their employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Their former employees are fearful of bringing claims because doing so can harm their employment and future employment and future efforts to secure employment.  This reality is of particular concern in the high technology industry where employees are misled or are misinformed about the practical consequence of filing individualized claims.  In recent lawsuits, Plaintiff' counsel surveyed a broad spectrum of Silicon Valley employees and confirmed a strong fear of retaliation in high-tech companies.  The surveys uncovered an overwhelming resistance by high tech employees to assert claims for misclassification (primarily, for fear of being "black-listed").  However, the same individuals were willing to assist litigation when a colleague asserted typical claims, such as overtime.  Class actions provide Class Members who are not named in the complaint a degree of anonymity that allows for vindication of their rights while eliminating these risks, or at least enormously reducing them.  This dynamic is particularly true in the high-tech industry where the perception of retaliation is measured against the cost of obtaining a bona fide professional degree in a bona fide professional position.  The risk of litigation-related consequences to prospective employment virtually assures defendants in Silicon Valley a safe-haven to violate California's overtime laws.

<div align="center">

**V.**

**CAUSES OF ACTION**

**First Cause of Action**
*Failure to Pay Wages at Overtime Rate*
(Lab. Code §§ 510, 515.5, 1194 and 1199, IWC Wage Orders, and Related Violations)

</div>

CLASS ACTION COMPLAINT                   *Cognizant*

16.     Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

17.     Throughout the period applicable to this cause of action Plaintiff and the proposed CLASS MEMBERS worked in excess of forty (40) hours per week and/or in excess of excess of eight (8) hours per day more than 50% of the time in non-exempt duties lacking the requisite discretion and independent judgment in matters of significance, as required by California law.

18.     Throughout the period applicable to this cause of action, Defendants did not pay Plaintiff or Class Members at the required overtime rates for the work described in the preceding paragraphs.

19.     Pursuant to California Labor Code section 1194, Plaintiff and THE CLASS Members are entitled to recover unpaid overtime compensation, and other unpaid wages, plus interest, plus attorneys' fees and costs.

20.     As a direct and proximate result of Defendant's unlawful conduct, as set forth herein, the California Plaintiff and the California Class members have sustained damages, including loss of earnings for hours of overtime worked on behalf of Defendant in an amount to be established at trial, prejudgment interest, and costs and attorneys' fees, pursuant to statute and other applicable law.

21.     WHEREFORE, Plaintiff and THE CLASS Members he seeks to represent request relief as described herein and below.

### Second Cause of Action
*Failure to Provide Meal Periods*
(Lab. Code §§ 226.7 and 512)

22.     Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

23.     Throughout the period applicable to this cause of action, California law, as set forth in relevant part by the Industrial Welfare Commission Wage Orders at section (11), provided as follows:

(A)     No employer shall employ any person for a work

10

period of more than five (5) hours without a meal period of not less than 30 minutes . . .

> (B)    If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this Order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the meal period is not provided.

24.    Similarly, Labor Code section 226.7 requires payment of one (1) hour of pay in lieu of meal periods not provided by the employer. Throughout the period applicable to this cause of action, Defendants failed to consistently allow and provide the meal periods required by California law. Therefore, Plaintiff and THE CLASS Members are entitled to compensation as stated above, plus interest, attorneys' fees, costs and other applicable relief.

25.    Throughout the period applicable to this cause of action, Defendants required Plaintiff and THE CLASS Members to work during meal periods mandated by the applicable orders of the Industrial Welfare Commission. Therefore Plaintiff and THE CLASS Members are entitled to be paid as stated in Labor Code section 226.7, plus interest, attorneys' fees, costs and other applicable relief.

26.    On information and belief, Plaintiff alleges that THE CLASS Members did not voluntarily or willfully waive rest and/or meal periods and were regularly required to work through rest and meal periods. Defendants failed to meet the requirements for lawful on-duty rest and/or meal periods and/or instituted a course of conduct that created a working environment in which non-exempt employees were incapable of taking rest and/or meal periods. As such, non-exempt employees were intimidated or coerced into waiving rest and/or meal periods, and any written waivers were obtained without full disclosure and are thus involuntarily and without consent.

27.    WHEREFORE, Plaintiff and THE CLASS he seeks to represent request relief as described herein and below.

//

//

11

**Third Cause of Action**
*Failure to Provide Rest Periods*
(Lab. Code § 226.7)

28.     Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

29.     By their failure to provide rest periods for every four (4) hours or major fraction thereof worked per workday by non-exempt employees, and failing to provide one (1) hour's pay in lieu thereof, as allegesd above and herein, Defendants willfully violated the provisions of Labor Code sections 226.7 and IWC Wage Orders at section (12).

30.     By failing to keep adequate time records required by sections 226 and 1174(d) of the Labor Code and IWC Wage Order at section (7), Defendants have injured Plaintiff and Class Members and made it difficult to calculate the unpaid rest and meal period compensation due Plaintiff and members of the Plaintiff Class. On information and belief, Plaintiff alleges that Defendants' failure to maintain accurate records was willful.

31.     As a result of the unlawful acts of Defendants, Plaintiff and THE CLASS he seeks to represent have been deprived of premium wages in amounts to be determined at trial, and are entitled to an accounting and recovery of such amounts, plus interest and penalties thereon, attorneys' fees, and costs, under Labor Code sections 201, 202, 203, 218.5, 226, 226.7, 1194 and 1199, and the applicable IWC Wage Orders.

32.     WHEREFORE, Plaintiff and THE CLASS he seeks to represent request relief as described herein and below.

**Fourth Cause of Action**
*Failure to Pay All Wages Upon Termination of Employment*
(Lab. Code §§ 201, 202, and 203)

33.     Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

34.     Plaintiff and many of the other Class Members quit or were discharged from their employment within the statute of limitations period applicable to this cause of action. As of the

12

filing of the Complaint, Defendants failed to timely pay wages due, and Plaintiff and Class Members are owed penalties pursuant to Labor Code sections 201, 202, 203.

35.     Defendants failed to pay said employees, without abatement, all wages (as defined by applicable California law) within the time required by applicable California law. Among other things, these employees were never paid any of the overtime compensation referred to in this Complaint, nor were they paid the other unpaid wages referred to in this Complaint. Defendants' failure to pay said wages within the required time was willful within the meaning of Labor Code section 203.

36.     Therefore, each of these employees is entitled to one day's wages for each day he or she was not timely paid all said wages due, up to a maximum of thirty days' wages for each employee. Because none of said employees were ever paid the overtime wages to which they were entitled, and were never paid other unpaid wages referred to in this Complaint, each of said employees is entitled to thirty days' wages.

37.     WHEREFORE, Plaintiff and THE CLASS he seeks to represent request relief as described herein and below.

### Fifth Cause of Action

*Failure to Furnish Itemized Statements*
(Lab. Code §§ 226(b), 1174, 1175)

38.     Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

39.     Throughout the period applicable to this cause of action, Defendants intentionally failed to furnish to Plaintiff and THE CLASS Members, upon each payment of wages, itemized statements accurately showing, among other matters: total hours worked, the applicable hourly rates in effect during the pay period, and the corresponding number of hours worked at each hourly rate.

40.     Plaintiff and THE CLASS Members were damaged by these failures because, among other things, the failures led them to believe that they were not entitled to be paid

13

CLASS ACTION COMPLAINT

*Cognizant*

EXHIBIT A - Page 14

overtime, even though they were so entitled, and because the failures hindered them from determining the amounts of overtime wages owed to them.

41.    Plaintiff sand THE CLASS Members are entitled to the amounts provided for in Labor Code section 226(e), plus costs and attorneys' fees.

42.    WHEREFORE, Plaintiff and THE CLASS he seeks to represent request relief as described herein and below.

### Sixth Cause of Action
*Violation of Unfair Competition Law*
(Bus. and Prof. Code § 17200 *et seq.*)

43.    Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

44.    Plaintiff bring this action on behalf of each and all members of the general public, including THE CLASS Members and Plaintiff himself, pursuant to Business and Professions Code sections 17200 *et seq.*  Defendants' conduct allegesd above constitutes unlawful business acts and practices in violation of Business & Professions Code sections 17200 *et seq.*  Defendant engaged in unfair competition in violation of the UCL by violating, *inter alia*, each of the following laws:  each of these violations constitutes an independent and separate violation of the UCL:

        a.      California applicable Wage Orders

        b.      California Labor Code § 1194;

        c.      California Labor Code §§ 201, 202, 203, 204, and 226;

        d.      California Labor Code § 1174; and

        e.      California Labor Code § 510, which provides in relevant part:

> (B)    Any work in excess of eight hours in one workday and any work in excess of 40 hours in anyone workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee, Any work in excess of 12 hours in one day shall be compensated at the rate of no less than

14

*twice the regular rate of pay for an employee, In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee.*

45.   Defendant's course of conduct, acts, and practices in violation of the California laws mentioned in the above paragraph constitute a separate and independent violation of the UCL. Defendant's conduct described herein violates the policy or spirit of such laws or otherwise significantly threatens or harms competition.  The harm to California Plaintiff and the California Class in being wrongfully denied lawfully earned wages outweighs the utility, if any, of Defendant's policies or practices and, therefore, Defendant's actions described herein constitute an unfair business practice or act within the meaning of the UCL.

46.   The unlawful and unfair business practices and acts of Defendant, described above, have injured the California Class members in that they were wrongfully denied the payment of earned overtime wages.

47.   The California Plaintiff, on behalf of himself and THE CLASS, seek restitution in the amount of the respective unpaid wages earned and due at a rate not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a work week, or eight hours in a day, and double the regular rate of pay for work performed in excess of twelve hours per day and such other legal and equitable relief from Defendant's unlawful and willful conduct as the Court deems just and proper.

48.   Pursuant to Business and Professions Code sections 17200 *et seq.*, for the statute of limitations period covered by this cause of action Plaintiff and THE CLASS Members, are entitled to restitution for at least the following:  the unpaid overtime earnings and other unpaid earnings withheld and retained by Defendants referred to above.

49.   Plaintiff and THE CLASS Members and the general public are also entitled to permanent injunctive and declaratory relief prohibiting COGNIZANT from engaging in the violations and other misconduct referred to above.

15

CLASS ACTION COMPLAINT                                                                                              *Cognizan*

EXHIBIT A - Page 16

50.     Defendants are also liable to pay attorneys' fees pursuant to California Code of Civil Procedure section 1021.5 and other applicable law, and costs.  The Plaintiff, on behalf of himself and Class members, also seek recovery of attorneys' fees and costs of this action to be paid by COGNIZANT, as provided by the UCL and California Labor Code §§ 218, 218.5, and 1194.

51.     WHEREFORE, Plaintiff and **THE CLASS** he seeks to represent request relief as described herein and below.

## VI.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff on behalf of himself and all members of THE CLASS, pray for relief as follows:

1.     That the Court determine that this action may be maintained as a class action;

2.     That Plaintiff be appointed the representative of THE CLASS;

3.     That the attorneys of record for Plaintiff whose names appear in this Complaint be appointed Class counsel;

4.     For unpaid wages at overtime rates for all overtime work and unpaid wages for all work for which they were not paid;

5.     For such general and special damages as may be appropriate;

6.     For waiting time penalties and civil penalties for all Class Members no longer in Defendants' employ at the time of Judgment;

7.     For pre-judgment interest;

8.     For the amounts provided for in Labor Code §§ 226(b), 226.7,

9.     For restitution as described in the cause of action under Business & Professions Code §§ 17200 *et seq.* above;

16

10.     For permanent injunctive and declaratory relief described in the cause of action under Business & Professions Code §§ 17200 *et seq.* above.

11.     A declaratory judgment that the practices complained of herein are unlawful under California state law;

12.     Attorney's fees and costs of suit, including expert fees pursuant to Ca. Lab. Code §§218.5, 1194, and Calif. Code Civ. Proc. §1021.5;

13.     Such other injunctive and equitable relief as the Court may deem proper.


DATED:  June 13, 2011                 JOSE GARAY, *APLC*

                                      &

                                      HAMNER LAW OFFICES, LP


                                      By: Jose Garay, Esq., Co-Counsel for Plaintiff,
                                      John Thomas, on behalf of himself and all others
                                      similarly situated.

17

CLASS ACTION COMPLAINT                                              *Cognizan*

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jose R. Garay, Esq., SBN 200494<br>JOSE GARAY, A PROFESSIONAL LAW CORPORATION<br>9900 Irvine Center Drive<br>Irvine, CA 92618<br>TELEPHONE NO.: (949)208-3400   FAX NO.: (949)713-0432<br>ATTORNEY FOR *(Name):* John Thomas | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange<br>**06/16/2011** at 09:17:13 AM<br>Clerk of the Superior Court<br>By Maarit H Nordman, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 751 W. Santa Ana Blvd.
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Civil Complex Center

| CASE NAME:<br>John Thomas vs. Cognizant Technology Solutions U.S. Corporation | |
|---|---|

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER:<br>30-2011-00484761-CU-OE-CXC |
|---|---|---|---|
| ☑ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: Judge Ronald L. Bauer |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☑ Wrongful termination (36)
- ☑ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition *(not specified above)* (43)

2. This case ☑ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☑ Large number of separately represented parties
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☑ Substantial amount of documentary evidence
   d. ☑ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☑ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):* Six (6)
5. This case ☑ is ☐ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 16, 2011
Jose Garay, Esq.
_____(TYPE OR PRINT NAME)_____                    ►_____(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)_____

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov<br>American LegalNet, Inc. |
|---|---|---|

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

<div align="right">CM-010</div>

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

<div align="center"><b>CASE TYPES AND EXAMPLES</b></div>

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

<div align="center"><b>CIVIL CASE COVER SHEET</b></div>

<div align="right">EXHIBIT A - Page 20</div>

 **CT Corporation**

**Service of Process
Transmittal**
06/27/2011
CT Log Number 518740542

**TO:** Lynn Paulison
Cognizant Technology Solutions Corporation
500 Frank W. Burr Blvd., Suite 50
Teaneck, NJ 07666

**RE:** **Process Served in California**

**FOR:** Cognizant Technology Solutions U.S. Corporation (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | John Thomas, etc., Pltf. vs. Cognizant Technology Solutions U.S. Corporation, etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Cover Sheet |
| **COURT/AGENCY:** | Orange County - Superior Court - Santa Ana, CA<br>Case # 30201100484761CUOECXC |
| **NATURE OF ACTION:** | Employee Litigation - Labor Code 203 Penalties and Unfaire Business Practices - Failure to pay overtime wages, provide meal periods, provide rest periods, and to provide itemized statements |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/27/2011 at 08:00 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | 30 calendar days |
| **ATTORNEY(S) / SENDER(S):** | Jose Garay<br>Jose Garay, APLC<br>9900 Irvine Center Dr.<br>Irvine, CA 92618<br>949-260-9193 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day , 797245923487<br>Image SOP<br>Email Notification, Lynn Paulison LPaulison@cognizant.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Page 1 of 1 / TH

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

EXHIBIT A - Page 21

6-27-11   8am

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Cognizant Technology Solutions U.S. Corporation, a Delaware
corporation and DOES 1 through 100, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

John Thomas, an individual California resident, on behalf of himself and
all others similarly situated,

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**06/16/2011** at 09:17:13 AM

Clerk of the Superior Court
By Maarit H Nordman,Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Civil Complex Center

751 W. Santa Ana Blvd.
Santa Ana, CA 92701

CASE NUMBER:
*(Número):* 30-2011-00484761-CU-OE-CXC

Judge Ronald L. Bauer

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jose Garay, Esq. JOSE GARAY, APLC 9900 Irvine Center Dr., Irvine, CA 92618

DATE: 06/16/2011 ALAN CARLSON, Clerk of the Court      Clerk, by _____, Deputy
*(Fecha)* *(Secretario)*                                                    *(Adjunto)*
Maarit H Nordman

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. [  ] as an individual defendant.
2. [  ] as the person sued under the fictitious name of *(specify):*

3. [X] on behalf of *(specify):* Cognizant Technology Solutions U.S. Corporation, a Delaware Corporation

under: [X] CCP 416.10 (corporation)         [  ] CCP 416.60 (minor)
       [  ] CCP 416.20 (defunct corporation)  [  ] CCP 416.70 (conservatee)
       [  ] CCP 416.40 (association or partnership) [  ] CCP 416.90 (authorized person)
       [  ] other *(specify):*
4. [  ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
American LegalNet, Inc.

SUPERIOR COURT OF CALIFORNIA COUNTY OF ORANGE

Jose R. Garay, Esq., SBN 200494
**JOSE GARAY, APLC**
2030 Main Street, Suite 1300
Irvine, COGNIZANT 92614
TEL: (949) 260-9193
FAX: (949) 260-9194
jgaray@computerovertime.com

Christopher J. Hamner, Esq. (SBN 197117)
**HAMNER LAW OFFICES, LP**
15760 Ventura Blvd., Suite 860
Encino, California 91436
Telephone: (818) 386-0444
Facsimile,: (818) 386-0050
chamner@hamnerlaw.com

Attorneys for Plaintiff, John Thomas, on behalf of
himself and all other similarly situated

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

06/16/2011 at 09:17:13 AM
Clerk of the Superior Court
By Maarit H Nordman, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR ORANGE COUNTY

Judge Ronald L. Bauer

| | |
|---|---|
| John Thomas, an individual California resident, on behalf of himself and all others similarly situated, <br><br> Plaintiff <br><br> vs. <br><br> COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, a Delaware corporation and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No. 30-2011-00484761-CU-OE-CXC <br><br> ASSIGNED FOR ALL PURPOSES TO: <br><br> **CLASS ACTION COMPLAINT FOR** <br><br> 1. Failure to Pay Overtime Wages <br> 2. Failure to Provide Meal periods <br> 3. Failure to Provide Rest Periods <br> 4. Labor Code § 203 Penalties <br> 5. Failure to Provide Itemized Statements <br> 6. Unfair Business Practices (B&P § 17200) <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff, John Thomas (hereinafter, "Plaintiff") alleges, on behalf of himself and classes of those similarly situated, as follows:

1

CLASS ACTION COMPLAINT                                                                 *Cognizant*

# I.

## INTRODUCTION

1.     This is an action by and on behalf of current and former employees of COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, a Delaware Corporation (hereinafter "Defendant(s)" or "COGNIZANT"), who are or were employed in Defendants' locations in California and held titles or positions in Analyst positions in both Information Technology and Engineering.   The matrix of titles implemented by COGNIZANT were misnomers lacking the exercise of discretion and independent judgment in the performance of their primary duties, and in performing such duties should have been classified as non-exempt pursuant to Wage Order 4 and, therefore, paid overtime.

2.     Plaintiff and the class he seeks to represent were given titles that were inconsistent and unrealistic with the "job requirements and expectations" as defined by COGNIZANT.  Plaintiff, and the class he seeks to represent within either title reference above, were misclassified and are owed overtime and other remedies under California law (hereinafter, "the CLASS" or "CLASS MEMBER(S)").  Such jobs, titles, and positions were categorically posted online as requiring the design, development, creation, and implementation of engineering duties but were in fact not realistic and the expectations were inconsistent with the duties performed.   As such, COGNIZANT did not satisfy the legally required minimum to unilaterally designate this CLASS of employees as exempt from overtime.  These job titles were, are, and continue to be a misnomer, because the majority of the work performed by this class of employees is not, and was not, exempt in nature.  Furthermore, the titles do not reflect the true nature of the duties performed by these employees.   In fact, the CLASS was engaged in duties that did not involve design, development, documentation, analysis, creation, testing, or modification design, that was creative or intellectual in nature.  The primary duties of the CLASS consisted of routine, rote, and repetitive non-exempt testing procedures requiring supervision and micro-management.   While these employees rely(ied) on their education, training, skill and experience to do their jobs, they are subject to considerable constraint and

CLASS ACTION COMPLAINT                                                             Cognizant

supervision, must obtain approval to complete basic job tasks, and regularly deploy rigid and institutional fixes rather than engage in original/creative thought in the implementation of duties required by COGNIZANT. The culmination of each of these factors demonstrates that none of the employees in the class definition fall into any of the recognized exemptions. They are trouble-shooting and production driven workers who have wrongfully been deprived of premium compensation for hours worked in excess of eight (8) per day or forty (40) per week throughout the relevant class period.

3. COGNIZANT characterizes its IT and engineering job families into a multitude of different job descriptions which perform essentially the same duties or overlap significantly in their exempt duties. Analysts and related titles functions and daily tasks focus on routine and repetitive tasks that primarily include standardized configuration, routine troubleshooting, automated debugging, and systematic testing of software within COGNIZANT's pre-defined parameters. Furthermore, there is a consistent lack of commensurate hourly pay based on Labor Code section 515.5 to meet the threshold exemption requirement, and a litany of job duties and functions that are significantly devoid of the exercise of discretion and/or independent judgment. COGNIZANT employs a system of categorization and titles purely for promotion and pay grade purposes. The categorization, titles, and level of pay grade designated to employees do not correspond to primary duties and overlap overwhelmingly such that titles are not dispositive of the exempt or non-exempt status.

4. These employees thus are and were entitled to overtime and other protections as non-exempt employees. It is *Defendants' burden* of pleading, evidence and proof to show that these employees are and were exempt under California wage and hour law. These employees have spent an insignificant amount of work time doing anything that constitutes "exempt," and for that reason and others, they are and always have been entitled to overtime pay and non-exempt treatment under California wage and hour law.

5. Plaintiff' duties and those of THE CLASS he seeks to represent were routine in nature and relied on the use of templates and other automated processes. Although, the job titles

CLASS ACTION COMPLAINT                                                          *Cognizant*

suggest the performance of high level job duties for the positions described herein, the actual job duties are limited to performing routing production work, not requiring special expertise, and involving little or no exercise of discretion.

## II.

## JURISDICTION AND VENUE

### Plaintiff

6.      Plaintiff is a resident of California.

### Defendants

7.      The Superior Court of the State of California for ORANGE COUNTY has jurisdiction over COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, a Delaware Corporation, because it has qualified with the California Secretary of State to do business and is doing business in Irvine, Orange County, California.

8.      Venue as to each defendant is proper in this judicial district, pursuant to California Code of Civil Procedure section 395.

9.      The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants sued herein as DOES 1 to 100, inclusive, are currently unknown to Plaintiff, who therefore sue Defendants by such fictitious names under California Code of Civil Procedure § 474.  Plaintiff are informed and believe, and based thereon alleges, that each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the defendants designated hereinafter as DOES when such identities become known.

10.     Plaintiff are informed and believe, and based thereon alleges, that each Defendant acted in all respects pertinent to this action as the agent of the other defendants, carried out a joint scheme, business plan or policy in all respects pertinent hereto, and the acts of each defendant are legally attributable to the other defendants. Furthermore, Defendants in all respects acted as the employer and/or joint employer of Plaintiff and THE CLASS.  Plaintiff are informed

4

and believe and thereon alleges that at all times relevant to this action, the named defendant and defendants DOES 1 through 100 were affiliated and were an integrated enterprise.

11.     Plaintiff are informed and believe and thereon alleges that at all relevant times each defendant, directly or indirectly, or through agents or other persons, employed Plaintiff and the other Class Members, and exercised control over the wages, hours, and working conditions of Plaintiff and the other Class Members.  Plaintiff are informed and believe and thereon alleges that, at all relevant times, each defendant was the principal, agent, partner, joint venturer, officer, director, controlling shareholder, subsidiary, affiliate, parent corporation, successor in interest and/or predecessor in interest of some or all of the other Defendants, and was engaged with some or all of the other Defendants in a joint enterprise for profit, and bore such other relationships to some or all of the other Defendants so as to be liable for their conduct with respect to the matters allegesd below.  Plaintiff are informed and believe and thereon alleges that each defendant acted pursuant to and within the scope of the relationships allegesd above, that each defendant knew or should have known about, authorized, ratified, adopted, approved, controlled, aided and abetted the conduct of all other Defendants; and that each defendant acted pursuant to a conspiracy and agreement to do the things allegesd herein.

## III.

## SUMMARY OF CLAIMS

12.     Plaintiff are former COGNIZANT employees whose primary duties were non-exempt and who were misclassified by COGNIZANT as exempt from the overtime provisions of the applicable state wage and hour laws of California, as described in this complaint.

13.     Plaintiff held the title of Analyst and was misclassified in the performance of his primary duties under that title.  Plaintiff bring this action on behalf of all persons who were, are, or will be employed by COGNIZANT in California under either title and as defined in the complaint at any time within the four years prior to the date of the filing of this Complaint through the date of the final disposition of this action (the "California Class Period"), and who

5

CLASS ACTION COMPLAINT

*Cognizant*

were, are, or continue to be improperly misclassified as exempt from overtime pay under California law.

## IV.

## CLASS ALLEGATIONS

14.     Plaintiff brings this cause of action on behalf of himself and on behalf of the CLASS of all persons similarly situated, as more fully explained below and above.  This action is brought and may properly be maintained as a class action pursuant to the provisions of California Code of Civil Procedure section 382 and other applicable law pertaining to class actions.

15.     The proposed Class Plaintiff seeks to represent, sometimes referred to herein as the "Class Members" or "Class Members" is presently defined as follows: all employees of any of the Defendants who are, have been, or will be employed in any California location owned or operated by any of the Defendants in any job whose title is or was referred to by any of the Defendants as defined above and who held an "Analyst" positing in Information Technology or Engineering or any similar derivative title that is better defined by a "skill set" that describes realistic descriptions and expectations of the duties performed by THE CLASS or sub-classes; and, that were so employed during the period of time covered by the statute of limitations applicable to the particular cause of action in which the terms "Class Members" or "the Class" appear, including periods of time during which the statute of limitations was or may have been tolled or suspended.  There is a well defined community of interest in the litigation and THE CLASS is ascertainable.

A.      **Numerosity**: THE CLASS is so numerous that individual joinder of all members is impractical under the circumstances of this case. While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff are informed and believe and thereon alleges that it is several thousand employees or more.

B.      **Common Questions Predominate**:  Common questions of law and fact exist as to all Class Members, and predominate over any questions that affect only individual members of THE CLASS.  The common questions of law and fact include, but are not limited to:

6

(A)     What were and are the policies, programs, practices, procedures and protocols of Defendants regarding Class Members' actual work and tasks, and their job duties irrespective of job titles;

(B)     Whether Defendants are and were subject to overtime requirements contained in the California IWC Wage Orders and other California law with respect to **THE CLASS** Members pursuant to Labor Code Section 510, and Wage Order, No. 4, for the period commencing four years prior to the date of the filing of this complaint and continuing through the date of judgment;

(C)     Whether Defendant's policy and practice of classifying Class Members as exempt from overtime entitlement under California law and Defendant's policy and practice of failing to pay overtime to the California Class members violate applicable provisions of California law, including applicable statutory and regulatory authority;

(D)     Whether Defendant unlawfully failed to pay overtime compensation in violation of the California Unfair Competition Law, Cal. Bus. t& Prof. Code §17200 et seq., and the California Labor Code and related regulations, Cal. Labor Code §§ 201, 202, 203, 226, 510, 515.5, 1174, 1174.5, and 1194, the applicable Cal. Wage Orders;

(E)     Whether Defendants violated California law by their policies, programs, practices, procedures and protocols regarding rest periods for Class Members;

(F)     Whether Defendants violated California law by their policies, programs, practices, procedures and protocols regarding meal periods for Class Members;

(G)     What were and are the policies, programs, practices, procedures and protocols of Defendants regarding furnishing to **THE CLASS** Members, upon each payment of wages, itemized statements required by Labor Code section 226;

(H)     Whether Defendants violated California law by their policies, programs, practices, procedures and protocols regarding furnishing to **THE CLASS** Members, upon each payment of wages, itemized statements required by Labor Code section 226;

(I)     Whether Defendants violated Business & Professions Code sections 17200 *et seq.* by their policies, programs, practices, procedures and conduct referred to in this cause of action;

7

(J)    Whether Defendants obtained voluntarily waivers with consent and full disclosure, and whether a written signed waiver is effective as to all future meal and rest periods;

(K)    The proper *measure of* damages sustained and the proper measure of restitution recoverable by members of the California Class; and,

(L)    Additional common questions of law and fact may develop as the litigation progresses.

C.    **Typicality**: Plaintiff's claims are typical of the claims of THE CLASS Members. Plaintiff and other Class Members sustained losses, injuries and damages arising out of the Defendants' common policies, programs, practices, procedures, and course of conduct referred to in each cause of action and throughout this Complaint, which were applied uniformly to Class Members as well as Plaintiff. Plaintiff seeks recoveries for the same types of losses, injuries, and damages as were suffered by the other Class Members as well as Plaintiff.

D.    **Adequacy**: Plaintiff and their counsel will fairly and adequately protect the interests of THE CLASS Members. Plaintiff has no interest that is adverse to the interests of the other Class Members.

E.    **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all Class Members is impractical. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender. Also, because the losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public of adjudication of individual litigation and claims would be substantial, and substantially more than if the claims are treated as

8

class action.  Individual litigation and claims would also present the potential for inconsistent or contradictory results.

F.    **Public Policy Considerations**: Defendants, such as COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, routinely violate wage and hour laws. Their employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Their former employees are fearful of bringing claims because doing so can harm their employment and future employment and future efforts to secure employment.  This reality is of particular concern in the high technology industry where employees are misled or are misinformed about the practical consequence of filing individualized claims.  In recent lawsuits, Plaintiff' counsel surveyed a broad spectrum of Silicon Valley employees and confirmed a strong fear of retaliation in high-tech companies.  The surveys uncovered an overwhelming resistance by high tech employees to assert claims for misclassification (primarily, for fear of being "black-listed").  However, the same individuals were willing to assist litigation when a colleague asserted typical claims, such as overtime.  Class actions provide Class Members who are not named in the complaint a degree of anonymity that allows for vindication of their rights while eliminating these risks, or at least enormously reducing them.  This dynamic is particularly true in the high-tech industry where the perception of retaliation is measured against the cost of obtaining a bona fide professional degree in a bona fide professional position.  The risk of litigation-related consequences to prospective employment virtually assures defendants in Silicon Valley a safe-haven to violate California's overtime laws.

## V.

## CAUSES OF ACTION

**First Cause of Action**
*Failure to Pay Wages at Overtime Rate*
(Lab. Code §§ 510, 515.5, 1194 and 1199, IWC Wage Orders, and Related Violations)

9

16.     Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

17.     Throughout the period applicable to this cause of action Plaintiff and the proposed CLASS MEMBERS worked in excess of forty (40) hours per week and/or in excess of excess of eight (8) hours per day more than 50% of the time in non-exempt duties lacking the requisite discretion and independent judgment in matters of significance, as required by California law.

18.     Throughout the period applicable to this cause of action, Defendants did not pay Plaintiff or Class Members at the required overtime rates for the work described in the preceding paragraphs.

19.     Pursuant to California Labor Code section 1194, Plaintiff and THE CLASS Members are entitled to recover unpaid overtime compensation, and other unpaid wages, plus interest, plus attorneys' fees and costs.

20.     As a direct and proximate result of Defendant's unlawful conduct, as set forth herein, the California Plaintiff and the California Class members have sustained damages, including loss of earnings for hours of overtime worked on behalf of Defendant in an amount to be established at trial, prejudgment interest, and costs and attorneys' fees, pursuant to statute and other applicable law.

21.     WHEREFORE, Plaintiff and THE CLASS Members he seeks to represent request relief as described herein and below.

## Second Cause of Action
*Failure to Provide Meal Periods*
(Lab. Code §§ 226.7 and 512)

22.     Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

23.     Throughout the period applicable to this cause of action, California law, as set forth in relevant part by the Industrial Welfare Commission Wage Orders at section (11), provided as follows:

          (A)     No employer shall employ any person for a work

10

period of more than five (5) hours without a meal period of not less than 30 minutes . . .

        (B)    If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this Order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the meal period is not provided.

24.    Similarly, Labor Code section 226.7 requires payment of one (1) hour of pay in lieu of meal periods not provided by the employer. Throughout the period applicable to this cause of action, Defendants failed to consistently allow and provide the meal periods required by California law. Therefore, Plaintiff and THE CLASS Members are entitled to compensation as stated above, plus interest, attorneys' fees, costs and other applicable relief.

25.    Throughout the period applicable to this cause of action, Defendants required Plaintiff and THE CLASS Members to work during meal periods mandated by the applicable orders of the Industrial Welfare Commission. Therefore Plaintiff and THE CLASS Members are entitled to be paid as stated in Labor Code section 226.7, plus interest, attorneys' fees, costs and other applicable relief.

26.    On information and belief, Plaintiff alleges that THE CLASS Members did not voluntarily or willfully waive rest and/or meal periods and were regularly required to work through rest and meal periods. Defendants failed to meet the requirements for lawful on-duty rest and/or meal periods and/or instituted a course of conduct that created a working environment in which non-exempt employees were incapable of taking rest and/or meal periods. As such, non-exempt employees were intimidated or coerced into waiving rest and/or meal periods, and any written waivers were obtained without full disclosure and are thus involuntarily and without consent.

27.    WHEREFORE, Plaintiff and THE CLASS he seeks to represent request relief as described herein and below.

//

//

11

CLASS ACTION COMPLAINT

*Cognizant*

### Third Cause of Action
*Failure to Provide Rest Periods*
(Lab. Code § 226.7)

28.    Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

29.    By their failure to provide rest periods for every four (4) hours or major fraction thereof worked per workday by non-exempt employees, and failing to provide one (1) hour's pay in lieu thereof, as allegesd above and herein, Defendants willfully violated the provisions of Labor Code sections 226.7 and IWC Wage Orders at section (12).

30.    By failing to keep adequate time records required by sections 226 and 1174(d) of the Labor Code and IWC Wage Order at section (7), Defendants have injured Plaintiff and Class Members and made it difficult to calculate the unpaid rest and meal period compensation due Plaintiff and members of the Plaintiff Class. On information and belief, Plaintiff alleges that Defendants' failure to maintain accurate records was willful.

31.    As a result of the unlawful acts of Defendants, Plaintiff and THE CLASS he seeks to represent have been deprived of premium wages in amounts to be determined at trial, and are entitled to an accounting and recovery of such amounts, plus interest and penalties thereon, attorneys' fees, and costs, under Labor Code sections 201, 202, 203, 218.5, 226, 226.7, 1194 and 1199, and the applicable IWC Wage Orders.

32.    WHEREFORE, Plaintiff and THE CLASS he seeks to represent request relief as described herein and below.

### Fourth Cause of Action
*Failure to Pay All Wages Upon Termination of Employment*
(Lab. Code §§ 201, 202, and 203)

33.    Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

34.    Plaintiff and many of the other Class Members quit or were discharged from their employment within the statute of limitations period applicable to this cause of action. As of the

12

filing of the Complaint, Defendants failed to timely pay wages due, and Plaintiff and Class Members are owed penalties pursuant to Labor Code sections 201, 202, 203.

35.     Defendants failed to pay said employees, without abatement, all wages (as defined by applicable California law) within the time required by applicable California law. Among other things, these employees were never paid any of the overtime compensation referred to in this Complaint, nor were they paid the other unpaid wages referred to in this Complaint. Defendants' failure to pay said wages within the required time was willful within the meaning of Labor Code section 203.

36.     Therefore, each of these employees is entitled to one day's wages for each day he or she was not timely paid all said wages due, up to a maximum of thirty days' wages for each employee. Because none of said employees were ever paid the overtime wages to which they were entitled, and were never paid other unpaid wages referred to in this Complaint, each of said employees is entitled to thirty days' wages.

37.     WHEREFORE, Plaintiff and THE CLASS he seeks to represent request relief as described herein and below.

### Fifth Cause of Action

*Failure to Furnish Itemized Statements*
(Lab. Code §§ 226(b), 1174, 1175)

38.     Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

39.     Throughout the period applicable to this cause of action, Defendants intentionally failed to furnish to Plaintiff and THE CLASS Members, upon each payment of wages, itemized statements accurately showing, among other matters: total hours worked, the applicable hourly rates in effect during the pay period, and the corresponding number of hours worked at each hourly rate.

40.     Plaintiff and THE CLASS Members were damaged by these failures because, among other things, the failures led them to believe that they were not entitled to be paid

13

overtime, even though they were so entitled, and because the failures hindered them from determining the amounts of overtime wages owed to them.

41.     Plaintiff sand THE CLASS Members are entitled to the amounts provided for in Labor Code section 226(e), plus costs and attorneys' fees.

42.     WHEREFORE, Plaintiff and THE CLASS he seeks to represent request relief as described herein and below.

### Sixth Cause of Action
*Violation of Unfair Competition Law*
(Bus. and Prof. Code § 17200 *et seq.*)

43.     Plaintiff incorporate all previous paragraphs of this Complaint as though fully set forth herein.

44.     Plaintiff bring this action on behalf of each and all members of the general public, including THE CLASS Members and Plaintiff himself, pursuant to Business and Professions Code sections 17200 *et seq.*  Defendants' conduct allegesd above constitutes unlawful business acts and practices in violation of Business & Professions Code sections 17200 *et seq.*  Defendant engaged in unfair competition in violation of the UCL by violating, *inter alia,* each of the following laws:  each of these violations constitutes an independent and separate violation of the UCL:

       a.     California applicable Wage Orders

       b.     California Labor Code § 1194;

       c.     California Labor Code §§ 201, 202, 203, 204, and 226;

       d.     California Labor Code § 1174; and

       e.     California Labor Code § 510, which provides in relevant part:
              *(B)     Any work in excess of eight hours in one workday and any work in excess of 40 hours in anyone workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee. Any work in excess of 12 hours in one day shall be compensated at the rate of no less than*

14

*twice the regular rate of pay for an employee. In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee.*

45.     Defendant's course of conduct, acts, and practices in violation of the California laws mentioned in the above paragraph constitute a separate and independent violation of the UCL. Defendant's conduct described herein violates the policy or spirit of such laws or otherwise significantly threatens or harms competition.  The harm to California Plaintiff and the California Class in being wrongfully denied lawfully earned wages outweighs the utility, if any, of Defendant's policies or practices and, therefore, Defendant's actions described herein constitute an unfair business practice or act within the meaning of the UCL.

46.     The unlawful and unfair business practices and acts of Defendant, described above, have injured the California Class members in that they were wrongfully denied the payment of earned overtime wages.

47.     The California Plaintiff, on behalf of himself and THE CLASS, seek restitution in the amount of the respective unpaid wages earned and due at a rate not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a work week, or eight hours in a day, and double the regular rate of pay for work performed in excess of twelve hours per day and such other legal and equitable relief from Defendant's unlawful and willful conduct as the Court deems just and proper.

48.     Pursuant to Business and Professions Code sections 17200 *et seq.*, for the statute of limitations period covered by this cause of action Plaintiff and THE CLASS Members, are entitled to restitution for at least the following:  the unpaid overtime earnings and other unpaid earnings withheld and retained by Defendants referred to above.

49.     Plaintiff and THE CLASS Members and the general public are also entitled to permanent injunctive and declaratory relief prohibiting COGNIZANT from engaging in the violations and other misconduct referred to above.

15

CLASS ACTION COMPLAINT                                                                     *Cognizan*

50.    Defendants are also liable to pay attorneys' fees pursuant to California Code of Civil Procedure section 1021.5 and other applicable law, and costs. The Plaintiff, on behalf of himself and Class members, also seek recovery of attorneys' fees and costs of this action to be paid by COGNIZANT, as provided by the UCL and California Labor Code §§ 218, 218.5, and 1194.

51.    WHEREFORE, Plaintiff and **THE CLASS** he seeks to represent request relief as described herein and below.

## VI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and all members of THE CLASS, pray for relief as follows:

1.    That the Court determine that this action may be maintained as a class action;

2.    That Plaintiff be appointed the representative of THE CLASS;

3.    That the attorneys of record for Plaintiff whose names appear in this Complaint be appointed Class counsel;

4.    For unpaid wages at overtime rates for all overtime work and unpaid wages for all work for which they were not paid;

5.    For such general and special damages as may be appropriate;

6.    For waiting time penalties and civil penalties for all Class Members no longer in Defendants' employ at the time of Judgment;

7.    For pre-judgment interest;

8.    For the amounts provided for in Labor Code §§ 226(b), 226.7,

9.    For restitution as described in the cause of action under Business & Professions Code §§ 17200 *et seq.* above;

16

CLASS ACTION COMPLAINT                                                          *Cognizant*

10.   For permanent injunctive and declaratory relief described in the cause of action under Business & Professions Code §§ 17200 *et seq.* above.

11.   A declaratory judgment that the practices complained of herein are unlawful under California state law;

12.   Attorney's fees and costs of suit, including expert fees pursuant to Ca. Lab. Code §§218.5, 1194, and Calif. Code Civ. Proc. §1021.5;

13.   Such other injunctive and equitable relief as the Court may deem proper.

DATED:  June 13, 2011                    JOSE GARAY, *APLC*

                                         &

                                         HAMNER LAW OFFICES, LP


                                         By:  Jose Garay, Esq., Co-Counsel for Plaintiff,
                                         John Thomas, on behalf of himself and all others
                                         similarly situated.

17

CLASS ACTION COMPLAINT                                              *Cognizant*

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jose R. Garay, Esq., SBN 200494<br>JOSE GARAY, A PROFESSIONAL LAW CORPORATION<br>9900 Irvine Center Drive,<br>Irvine, CA 92618<br>TELEPHONE NO.: (949)208-3400    FAX NO.: (949)713-0432<br>ATTORNEY FOR *(Name):* John Thomas | |

**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange<br><br>**06/16/2011** at 09:17:13 AM<br>Clerk of the Superior Court<br>By Maarit H Nordman, Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 751 W. Santa Ana Blvd.
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Civil Complex Center

CASE NAME:
John Thomas vs. Cognizant Technology Solutions U.S. Corporation

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 30-2011-00484761-CU-OE-CXC |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE: Judge Ronald L. Bauer<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46) | [ ] Breach of contract/warranty (06)<br>[ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03)<br>[ ] Construction defect (10) |
| Other PI/PD/WD (Personal Injury/Property<br>Damage/Wrongful Death) Tort | [ ] Other collections (09)<br>[ ] Insurance coverage (18) | [ ] Mass tort (40)<br>[ ] Securities litigation (28) |
| [ ] Asbestos (04)<br>[ ] Product liability (24)<br>[ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23) | [ ] Other contract (37)<br>Real Property<br>[ ] Eminent domain/Inverse<br>condemnation (14) | [ ] Environmental/Toxic tort (30)<br>[ ] Insurance coverage claims arising from the<br>above listed provisionally complex case<br>types (41) |
| Non-PI/PD/WD (Other) Tort<br>[ ] Business tort/unfair business practice (07)<br>[ ] Civil rights (08)<br>[ ] Defamation (13)<br>[ ] Fraud (16)<br>[ ] Intellectual property (19)<br>[ ] Professional negligence (25)<br>[ ] Other non-PI/PD/WD tort (35) | [ ] Wrongful eviction (33)<br>[ ] Other real property (26)<br>Unlawful Detainer<br>[ ] Commercial (31)<br>[ ] Residential (32)<br>[ ] Drugs (38)<br>Judicial Review<br>[ ] Asset forfeiture (05)<br>[ ] Petition re: arbitration award (11) | Enforcement of Judgment<br>[ ] Enforcement of judgment (20)<br>Miscellaneous Civil Complaint<br>[ ] RICO (27)<br>[ ] Other complaint *(not specified above)* (42)<br>Miscellaneous Civil Petition<br>[ ] Partnership and corporate governance (21) |
| Employment<br>[ ] Wrongful termination (36)<br>[ ] Other employment (15) | [ ] Writ of mandate (02)<br>[ ] Other judicial review (39) | [ ] Other petition *(not specified above)* (43) |

2. This case [✓] is  [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. [✓] Large number of separately represented parties  d. [✓] Large number of witnesses
  b. [✓] Extensive motion practice raising difficult or novel  e. [ ] Coordination with related actions pending in one or more courts
     issues that will be time-consuming to resolve    in other counties, states, or countries, or in a federal court
  c. [✓] Substantial amount of documentary evidence  f. [✓] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [✓] punitive
4. Number of causes of action *(specify):* Six (6)
5. This case [✓] is  [ ] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 16, 2011
Jose Garay, Esq.
_____
(TYPE OR PRINT NAME)  (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov
American LegalNet, Inc.

EXHIBIT A - Page 40

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)--Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or
toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice--
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil
harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer
or wrongful eviction)*
Contract/Warranty Breach--Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case--Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally
complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent
domain, landlord/tenant, or
foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ--Administrative Mandamus
Writ--Mandamus on Limited Court
Case Matter
Writ--Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal--Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400--3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex
case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-
domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-
harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified
above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

EXHIBIT A - Page 41

 CT Corporation

**Service of Process Transmittal**
06/27/2011
CT Log Number 518740542

**TO:**     Lynn Paulison
Cognizant Technology Solutions Corporation
500 Frank W. Burr Blvd., Suite 50
Teaneck, NJ 07666

**RE:**     **Process Served in California**

**FOR:**    Cognizant Technology Solutions U.S. Corporation (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | John Thomas, etc., Pltf. vs. Cognizant Technology Solutions U.S. Corporation, etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Cover Sheet |
| **COURT/AGENCY:** | Orange County - Superior Court - Santa Ana, CA<br>Case # 30201100484761CUOECXC |
| **NATURE OF ACTION:** | Employee Litigation - Labor Code 203 Penalties and Unfaire Business Practices - Failure to pay overtime wages, provide meal periods, provide rest periods, and to provide itemized statements |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/27/2011 at 08:00 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | 30 calendar days |
| **ATTORNEY(S) / SENDER(S):** | Jose Garay<br>Jose Garay, APLC<br>9900 Irvine Center Dr.<br>Irvine, CA 92618<br>949-260-9193 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 797245923487<br>Image SOP<br>Email Notification, Lynn Paulison LPaulison@cognizant.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Page 1 of  1 / TH

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

EXHIBIT A - Page 42

6·27·11   8am

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

| | FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Cognizant Technology Solutions U.S. Corporation, a Delaware
corporation and DOES 1 through 100, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

John Thomas, an individual California resident, on behalf of himself and
all others similarly situated,

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**06/16/2011** at 09:17:13 AM
Clerk of the Superior Court
By Maarit H Nordman, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Civil Complex Center | CASE NUMBER:<br>*(Número)* 30-2011-00484761-CU-OE-CXC |
|---|---|

751 W. Santa Ana Blvd.
Santa Ana, CA 92701

Judge Ronald L. Bauer

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jose Garay, Esq. JOSE GARAY, APLC 9900 Irvine Center Dr., Irvine, CA 92618

| DATE: 06/16/2011 ALAN CARLSON, Clerk of the Court<br>*(Fecha)* | Clerk, by *(Secretario)* _Alext Nordman_ | , Deputy<br>*(Adjunto)* |
|---|---|---|

Maarit H Nordman

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
   Cognizant Technology Solutions U.S.
3. ☒ on behalf of *(specify)*: Corporation, a Delaware Corporation

under: ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov<br>American LegalNet, Inc. |
|---|---|---|

EXHIBIT A - Page 43

# EXHIBIT B

1   MORGAN, LEWIS & BOCKIUS LLP
    CARRIE A. GONELL, SBN 257163
2   cgonell@morganlewis.com
    MARIA O. GUTIERREZ, SBN 209995
3   maria.gutierrez@morganlewis.com
    5 Park Plaza, Suite 1750
4   Irvine, CA 92614
    Tel: 949.399.7000
5   Fax: 949.399.7001

6   Attorneys for Defendant
    COGNIZANT TECHNOLOGY SOLUTIONS
7   U.S. CORPORATION

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11  JOHN THOMAS, an individual          Case No.
    California resident, on behalf of himself
12  and all others similarly situated,    **DECLARATION OF MISTY
                                           PEDERSON IN SUPPORT OF
13              Plaintiff,                 DEFENDANT COGNIZANT
                                           TECHNOLOGY SOLUTIONS'
14         vs.                             NOTICE OF REMOVAL**

15  COGNIZANT TECHNOLOGY
    SOLUTIONS U.S. CORPORATION, a
16  Delaware corporation and DOES 1
    through 100, inclusive,
17
                Defendants.
18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 22575098.1

Case No. _____
DEFENDANT'S DISCLOSURE STATEMENT
PURSUANT TO FED. R. CIV. P. 7.1

EXHIBIT B - Page 45

## DECLARATION OF MISTY PEDERSON

1    I, Misty Peterson, declare as follows:

2    1.    I am over the legal age of 21, have personal knowledge of and am competent to testify to the facts set forth herein, and would testify competently to them if called to do so.

3    2.    I am currently Senior Director in the Global Compliance & Ethics department for Cognizant Technology Solutions U.S. Corporation ("Cognizant").

4    3.    Cognizant's Operations are headquartered in New Jersey. More specifically, the majority of Cognizant's officers, as well as its human resources and finance departments, are based in Teaneck, New Jersey. In addition, Cognizant regularly identifies Teaneck as its headquarters in public company filings. For example, I have attached hereto as Exhibit A a true and correct copy of Cognizant's most recent 10-Q filing. I have attached hereto as Exhibit B a true and correct copy of Cognizant's Articles of Incorporation.

5    4.    Cognizant employs individuals in California to perform testing analyst functions. Based on personnel records identifying employees who perform such functions, there are at least 565 such current and former employees in California who were employed at any time since June 16, 2007. Of these 551 total employees, 102 are former employees. Generally, these employees: (a) work shifts of at least five hours, five days per week; and (b) are paid on a semi-monthly basis, resulting in 24 pay periods per year.

6    5.    Attached to this declaration as Exhibit C is a true and correct copy of a list of the employees described in Paragraph 5, which includes: (1) annual salary for each of these employees when he or she began working in California, or salary information as of June 16, 2007, if he or she were working in California as of this date; (2) annual salary as of the date of the employee's termination or as of July 20, 2011, if the individual is a current employee; and (3) all dates between June 16, 2007 and July 20, 2011 during which each such employee received semi-monthly

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 22575098.1

1  pay statements.  Exhibit C shows 678 lines of data because there are multiple rows
2  of data for some employees.
3      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the
4  laws of the United States and the State of California that the foregoing is true and
5  correct.  Executed at Teaneck, New Jersey on July 27, 2011.

6
7
8
9                                          Misty Pederson
                                           Misty Pederson
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
Irvine

3

DB2/ 22575098.1

# EXHIBIT A
## to Misty Pederson Declaration

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10- Q

✓ **Quarterly Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
For the quarterly period ended March 31, 2011

☐ **Transition Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.**
For the transition period from _____ to _____.

Commission File Number 0- 24429

# COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION
### (Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **13- 3728359** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **Glenpointe Centre West** | |
| **500 Frank W. Burr Blvd.** | |
| **Teaneck, New Jersey** | **07666** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code (201) 801- 0233

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ✓ No: ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S- T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ✓ No: ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non- accelerated filer or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b- 2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ✓ | Accelerated filer | ☐ |
| | ☐ (Do not check if a smaller reporting company) | | |
| Non- accelerated filer | | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b- 2 of the Exchange Act).   Yes ☐ No ✓

Indicate the number of shares outstanding of each of the issuer's class of common stock, as of April 29, 2011:

| Class | Number of Shares |
|---|---|
| Class A Common Stock, par value $.01 per share | 304,249,849 |

**Table of Contents**

COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION
TABLE OF CONTENTS

| | | Page |
|---|---|---|
| PART I. | FINANCIAL INFORMATION | 1 |
| Item 1. | Condensed Consolidated Financial Statements (Unaudited) | 1 |
| | Condensed Consolidated Statements of Operations (Unaudited) for the Three Months Ended March 31, 2011 and 2010 | 1 |
| | Condensed Consolidated Statements of Financial Position (Unaudited) as of March 31, 2011 and December 31, 2010 | 2 |
| | Condensed Consolidated Statements of Cash Flows (Unaudited) for the Three Months Ended March 31, 2011 and 2010 | 3 |
| | Notes to Condensed Consolidated Financial Statements (Unaudited) | 4 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 14 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 25 |
| Item 4. | Controls and Procedures | 25 |
| PART II. OTHER INFORMATION | | 26 |
| Item 1A. | Risk Factors | 26 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 41 |
| Item 6. | Exhibits | 42 |
| SIGNATURES | | 43 |

i

Table of Contents

PART I. FINANCIAL INFORMATION

Item 1.      Condensed Consolidated Financial Statements (unaudited).

COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited)
(in thousands, except per share data)

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2011 | 2010 |
| Revenues | $ 1,371,253 | $ 959,720 |
| Operating expenses: | | |
| Cost of revenues (exclusive of depreciation and amortization expense shown separately below) | 782,176 | 555,904 |
| Selling, general and administrative expenses | 296,330 | 194,993 |
| Depreciation and amortization expense | 27,382 | 25,806 |
| Income from operations | 265,365 | 183,017 |
| Other income (expense), net: | | |
| Interest income | 8,937 | 6,054 |
| Other, net | 6,198 | (10,319) |
| Total other income (expense), net | 15,135 | (4,265) |
| Income before provision for income taxes | 280,500 | 178,752 |
| Provision for income taxes | 72,173 | 27,252 |
| Net income | $ 208,327 | $ 151,500 |
| Basic earnings per share | $ 0.69 | $ 0.51 |
| Diluted earnings per share | $ 0.67 | $ 0.49 |
| Weighted average number of common shares outstanding  Basic | 304,041 | 297,885 |
| Dilutive effect of shares issuable under stock-based compensation plans | 7,762 | 8,779 |
| Weighted average number of common shares outstanding Diluted | 311,803 | 306,664 |

The accompanying notes are an integral part of the unaudited condensed consolidated financial statements.

1

Table of Contents

COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF FINANCIAL POSITION
(Unaudited)
(in thousands, except par values)

| | March 31, 2011 | December 31, 2010 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,293,499 | $ 1,540,969 |
| Short- term investments | 874,616 | 685,419 |
| Trade accounts receivable, net of allowances of $19,851 and $20,991, respectively | 994,948 | 901,308 |
| Unbilled accounts receivable | 128,202 | 112,960 |
| Deferred income tax assets, net | 68,120 | 96,164 |
| Other current assets | 176,415 | 181,414 |
| Total current assets | 3,535,800 | 3,518,234 |
| Property and equipment, net of accumulated depreciation of $377,051 and $352,472, respectively | 601,699 | 570,448 |
| Goodwill | 224,009 | 223,963 |
| Intangible assets, net | 81,790 | 85,136 |
| Deferred income tax assets, net | 112,306 | 109,808 |
| Other noncurrent assets | 82,269 | 75,485 |
| Total assets | $ 4,637,873 | $ 4,583,074 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 117,595 | $ 75,373 |
| Deferred revenue | 82,021 | 84,590 |
| Accrued expenses and other current liabilities | 602,097 | 770,763 |
| Total current liabilities | 801,713 | 930,726 |
| Deferred income tax liabilities, net | 3,870 | 4,946 |
| Other noncurrent liabilities | 68,101 | 62,971 |
| Total liabilities | 873,684 | 998,643 |
| Commitments and contingencies (See Note 7) | | |
| Stockholders' equity: | | |
| Preferred stock, $.10 par value, 15,000 shares authorized, none issued | | |
| Class A common stock, $.01 par value, 500,000 shares authorized, 304,210 and 303,941 shares issued and outstanding at March 31, 2011 and December 31, 2010, respectively | 3,042 | 3,039 |
| Additional paid-in capital | 813,962 | 846,886 |
| Retained earnings | 2,907,235 | 2,698,908 |
| Accumulated other comprehensive income (loss) | 39,950 | 35,598 |
| Total stockholders' equity | 3,764,189 | 3,584,431 |
| Total liabilities and stockholders' equity | $ 4,637,873 | $ 4,583,074 |

The accompanying notes are an integral part of the unaudited condensed consolidated financial statements.

Table of Contents

# COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION
## CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
### (Unaudited)
### (in thousands)

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2011 | 2010 |
| Cash flows from operating activities: | | |
| Net income | $ 208,327 | $ 151,500 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 28,964 | 27,381 |
| Provision for doubtful accounts | (819) | 2,658 |
| Deferred income taxes | 19,901 | 23,326 |
| Stock- based compensation expense | 16,065 | 13,945 |
| Excess tax benefit on stock-based compensation plans | (15,792) | (15,753) |
| Other | 240 | (10,162) |
| Changes in assets and liabilities: | | |
| Trade accounts receivable | (89,029) | (92,220) |
| Other current assets | (7,148) | (46,307) |
| Other assets | (6,334) | (4,989) |
| Accounts payable | 41,079 | 36,088 |
| Other current and noncurrent liabilities | (149,825) | (83,139) |
| Net cash provided by operating activities | 45,629 | 2,328 |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (55,815) | (24,219) |
| Purchases of investments | (317,783) | (46,798) |
| Proceeds from maturity or sale of investments | 128,836 | 13,876 |
| Acquisitions, net of cash acquired | (7,895) | - |
| Net cash used in investing activities | (252,657) | (57,141) |
| Cash flows from financing activities: | | |
| Issuance of common stock under stock- based compensation plans | 23,430 | 30,103 |
| Excess tax benefit on stock-based compensation plans | 15,792 | 15,753 |
| Repurchases of common stock | (88,266) | (2,315) |
| Net cash (used in) provided by financing activities | (49,044) | 43,541 |
| Effect of currency translation on cash and cash equivalents | 8,602 | (8,716) |

| | | | |
|---|---|---|---|
| Decrease in cash and cash equivalents | | (247,470) | (19,988) |
| Cash and cash equivalents, beginning of year | | 1,540,969 | 1,100,930 |
| Cash and cash equivalents, end of period | $ | 1,293,499 | $ 1,080,942 |

The accompanying notes are an integral part of the unaudited condensed consolidated financial statements.

3

COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)
(dollar amounts in thousands)

**Note 1 - Interim Condensed Consolidated Financial Statements**

The terms "Cognizant," "we," "our," "us" and "Company" refer to Cognizant Technology Solutions Corporation unless the context indicates otherwise. We have prepared the accompanying unaudited condensed consolidated financial statements included herein in accordance with generally accepted accounting principles in the United States of America and Article 10 of Regulation S- X under the Securities and Exchange Act of 1934, as amended. The accompanying unaudited condensed consolidated financial statements should be read in conjunction with our audited consolidated financial statements (and notes thereto) included in our Annual Report on Form 10- K for the year ended December 31, 2010. In our opinion, all adjustments considered necessary for a fair presentation of the accompanying unaudited condensed consolidated financial statements have been included, and all adjustments are of a normal and recurring nature. Operating results for the interim periods are not necessarily indicative of results that may be expected to occur for the entire year.

**Note 2 - Investments**

Investments were as follows:

|  | March 31, 2011 | December 31, 2010 |
|---|---|---|
| Available- for- sale securities: |  |  |
| U.S. Treasury and agency debt securities | $ 383,057 | $ 340,384 |
| Corporate and other debt securities | 161,331 | 122,909 |
| Asset- backed securities | 58,289 | 33,154 |
| Municipal debt securities | 40,971 | 41,655 |
| Foreign government debt securities | 9,026 | 7,926 |
| Total available- for- sale securities | 652,674 | 546,028 |
| Time deposits | 221,942 | 139,391 |
| Total investments | $ 874,616 | $ 685,419 |

Our available- for- sale investment securities consist primarily of U.S. Treasury notes, U.S. government agency debt securities, municipal debt securities, non- U.S. government debt securities, U.S. and international corporate bonds, debt securities issues by supranational institutions and asset-backed securities, including those backed by auto loans, credit card receivables, mortgages loans and other receivables. Our investment guidelines are to purchase securities with a credit rating of A and above at the time of acquisition. We monitor the credit ratings of the securities in our portfolio on an ongoing basis. The carrying value of the time deposits approximated fair value as of March 31, 2011 and December 31, 2010.

*Available- for- Sale Securities*

The amortized cost, gross unrealized gains and losses and fair value of available- for- sale investment securities at March 31, 2011 were as follows:

|  | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| U.S. Treasury and agency debt securities | $ 383,505 | $ 641 | $ (1,089) | $ 383,057 |
| Corporate and other debt securities | 160,642 | 845 | (156) | 161,331 |
| Asset- backed securities | 58,398 | 35 | (144) | 58,289 |
| Municipal debt securities | 41,094 | 11 | (134) | 40,971 |
| Foreign government debt securities | 8,944 | 87 | (5) | 9,026 |
| Total available- for- sale investment securities | $ 652,583 | $ 1,619 | $ (1,528) | $ 652,674 |

The amortized cost, gross unrealized gains and losses and fair value of available- for- sale investment securities at December 31, 2010 were as follows:

4

Table of Contents

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| U.S. Treasury and agency debt securities | $ 339,982 | $ 994 | $ (592) | $ 340,384 |
| Corporate and other debt securities | 122,137 | 835 | (63) | 122,909 |
| Asset-backed securities | 33,258 | 33 | (137) | 33,154 |
| Municipal debt securities | 41,802 | 2 | (149) | 41,655 |
| Foreign government debt securities | 7,844 | 83 | (1) | 7,926 |
| Total available-for-sale investment securities | $ 545,023 | $ 1,947 | $ (942) | $ 546,028 |

The fair value and related unrealized losses of available-for-sale investment securities in a continuous unrealized loss position for less than 12 months were as follows:

| | March 31, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| U.S. Treasury and agency debt securities | $ 279,119 | $ (1,089) | $ 200,772 | $ (592) |
| Corporate and other debt securities | 64,327 | (156) | 16,518 | (63) |
| Asset-backed securities | 39,771 | (144) | 17,791 | (137) |
| Municipal debt securities | 20,881 | (134) | 25,598 | (149) |
| Foreign government debt securities | 1,104 | (5) | 1,203 | (1) |
| Total | $ 405,202 | $ (1,528) | $ 261,882 | $ (942) |

As of March 31, 2011 and as of December 31, 2010, we did not have any investments in available-for-sale securities that had been in an unrealized loss position for 12 months or longer. The unrealized losses for the above securities are primarily attributable to changes in interest rates. As of March 31, 2011, we do not consider any of the investments to be other-than-temporarily impaired.

The gross unrealized gains and losses in the above tables were recorded, net of taxes in accumulated other comprehensive income (loss).

The contractual maturities of available-for-sale investment securities as of March 31, 2011 are set forth in the following table:

| | Amortized Cost | Fair Value |
|---|---|---|
| Due within one year | $ 51,127 | $ 51,230 |
| Due after one year through five years | 528,685 | 528,861 |
| Due after five years through ten years | 1,070 | 1,039 |
| Due after ten years | 13,303 | 13,255 |
| Asset-backed securities | 58,398 | 58,289 |
| Total available-for-sale investment securities | $ 652,583 | $ 652,674 |

5

Table of Contents

Asset- backed securities were excluded from the maturity categories because the actual maturities may differ from the contractual maturities since the underlying receivables may be prepaid without penalties. Further, actual maturities of debt securities may differ from those presented above since certain obligations provide the issuer the right to call or prepay the obligation prior to scheduled maturity without penalty.

Proceeds from sales of available- for- sale investment securities and the gross gains and losses that have been included in earnings as a result of those sales were as follows for the three months ended March 31, 2011:

| | | |
|---|---|---:|
| Proceeds from sales of available- for- sale investment securities | $ | 127,527 |
| | | |
| Gross gains | $ | 482 |
| Gross losses | | (133) |
| | | |
| Net gains on sales of available- for- sale investment securities | $ | 349 |

There were no sales of available- for- sale investment securities during the three months ended March 31, 2010.

**Note 3 - Accrued Expenses and Other Current Liabilities**

Accrued expenses and other current liabilities were as follows:

| | March 31, 2011 | | December 31, 2010 |
|---|---:|---|---:|
| Compensation and benefits | $ 363,143 | $ | 533,067 |
| Income taxes | 20,338 | | 14,999 |
| Professional fees | 36,189 | | 34,121 |
| Travel and entertainment | 17,237 | | 16,531 |
| Customer volume incentives | 87,597 | | 85,180 |
| Derivative financial instruments | 12,283 | | 7,504 |
| Deferred income taxes | 1,131 | | 1,134 |
| Other | 64,179 | | 78,227 |
| | | | |
| Total accrued expenses and other current liabilities | $ 602,097 | $ | 770,763 |

**Note 4 - Income Taxes**

Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export- oriented companies that are eligible for certain income tax holiday benefits granted by the government of India for export activities. These benefits for export activities conducted within Software Technology Parks, or STPs, expired during the first quarter ended March 31, 2011. A significant portion of the earnings of Cognizant India is generated within STPs, and upon expiration of these benefits these earnings are subject to regular corporate income tax at the current rate of 32.4%. In addition to STPs, we have constructed and expect to continue to locate most of our newer development centers in areas designated as Special Economic Zones, or SEZs. Development centers operating in SEZs are entitled to certain income tax incentives for periods up to 15 years. Effective April 1, 2011, all Indian profits, including those generated within SEZs, are subject to the Minimum Alternative Tax, or MAT, at the current rate of 20.0%. Any MAT paid is creditable against future taxable income for a period of up to 10 years.

Our effective income tax rates were as follows for the three months ended March 31:

| | 2011 | 2010 |
|---|---:|---:|
| Effective income tax rate | 25.7% | 15.2% |

For the 2011 and 2010 periods, the principal difference between our effective income tax rates and the U.S. federal statutory rate is the effect of the Indian tax holiday and earnings taxed in countries that have lower rates than the United States.

**Note 5 - Fair Value Measurements**

We measure our cash equivalents, investments and foreign exchange forward contracts at fair value. The authoritative guidance defines fair value as the exit price, or the amount that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants as of the measurement date. The authoritative guidance also establishes a fair value hierarchy that is intended to increase consistency and comparability in fair value measurements and related disclosures. The fair value hierarchy is based on inputs to valuation techniques that are used to measure fair value that are either observable or unobservable. Observable inputs reflect assumptions market participants would use in pricing an asset or liability based on market data obtained from independent sources while unobservable inputs reflect a reporting entity's pricing based upon their own market assumptions.

6

Table of Contents

The fair value hierarchy consists of the following three levels:

Level 1  Inputs are quoted prices in active markets for identical assets or liabilities.

Level 2  Inputs are quoted prices for similar assets or liabilities in an active market, quoted prices for identical or similar assets or liabilities in markets that are not active, inputs other than quoted prices that are observable and market- corroborated inputs which are derived principally from or corroborated by observable market data.

Level 3  Inputs are derived from valuation techniques in which one or more significant inputs or value drivers are unobservable. The following table summarizes our financial assets and (liabilities) measured at fair value on a recurring basis as of March 31, 2011:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Cash equivalents: | | | | |
| Money market funds | $ 562,754 | $ - | $ - | $ 562,754 |
| Time deposits | - | 1,848 | | 1,848 |
| Commercial paper | - | 19,028 | | 19,028 |
| Total cash equivalents | 562,754 | 20,876 | | 583,630 |
| Investments: | | | | |
| Time deposits | | 221,942 | | 221,942 |
| Available- for- sale securities current: | | | | |
| U.S. Treasury and agency debt securities | 281,422 | 101,635 | | 383,057 |
| Corporate and other debt securities | | 161,331 | | 161,331 |
| Asset- backed debt securities | | 58,289 | | 58,289 |
| Municipal debt securities | | 40,971 | | 40,971 |
| Foreign government debt securities | - | 9,026 | | 9,026 |
| Total available- for- sale securities current | 281,422 | 371,252 | - | 652,674 |
| Total investments | 281,422 | 593,194 | | 874,616 |
| Derivative financial instruments foreign exchange forward contracts: | | | | |
| Other current assets | | 32,418 | | 32,418 |
| Accrued expenses and other current liabilities | | (12,283) | | (12,283) |
| Other noncurrent assets | | 9,989 | | 9,989 |
| Other noncurrent liabilities | | (7,867) | | (7,867) |
| Total | $ 844,176 | $ 636,327 | $ - | $ 1,480,503 |

The following table summarizes our financial assets and (liabilities) measured at fair value on a recurring basis as of December 31, 2010:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Cash equivalents: | | | | |
| Money market funds | $ 421,424 | $ - | $ - | $ 421,424 |
| Time deposits | - | 67,703 | | 67,703 |
| Total cash equivalents | 421,424 | 67,703 | - | 489,127 |
| Investments: | | | | |

| | | | |
|---|---|---|---|
| Time deposits | - | 139,391 | - | 139,391 |

**Available- for- sale securities current:**

| | | | | |
|---|---|---|---|---|
| U.S. Treasury and agency debt securities | 268,114 | 72,270 | - | 340,384 |
| Corporate and other debt securities | - | 122,909 | | 122,909 |
| Asset- backed debt securities | - | 33,154 | - | 33,154 |
| Municipal debt securities | - | 41,655 | | 41,655 |
| Foreign government debt securities | - | 7,926 | - | 7,926 |
| Total available- for- sale securities, current | 268,114 | 277,914 | | 546,028 |
| Total investments | 268,114 | 417,305 | - | 685,419 |

7

Table of Contents

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Derivative financial instruments: foreign exchange forward contracts: | | | | |
| Other current assets | - | 30,983 | - | 30,983 |
| Accrued expenses and other current liabilities | - | (7,504) | - | (7,504) |
| Other noncurrent assets | - | 8,144 | - | 8,144 |
| Other noncurrent liabilities | - | (6,601) | - | (6,601) |
| Total | $ 689,538 | $ 510,030 | $ - | $ 1,199,568 |

We measure the fair value of money market funds and U.S. Treasury securities based on quoted prices in active markets for identical assets. The fair value of commercial paper, U.S. government agency securities, municipal debt securities, U.S. and international corporate bonds and foreign government debt securities is measured based on relevant trade data, dealer quotes, or model driven valuations using significant inputs derived from or corroborated by observable market data, such as yield curves and credit spreads. We measure the fair value of our asset- backed securities using model driven valuations based on dealer quotes, available trade information, spread data, current market assumptions on prepayment speeds and defaults and historical data on deal collateral performance.

We estimate the fair value of each foreign exchange forward contract by using a present value of expected cash flows model. This model calculates the difference between the current market forward price and the contracted forward price for each foreign exchange contract and applies the difference in the rates to each outstanding contract. The market forward rates included a discount and credit risk factor. The amounts were aggregated by type of contract and maturity.

During the three months ended March 31, 2011 and the year ended December 31, 2010, there were no transfers among Level 1, Level 2, or Level 3 financial assets and liabilities.

Note 6 - Derivative Financial Instruments

In the normal course of business, we use foreign exchange forward contracts to manage foreign currency exchange rate risk. The estimated fair value of the foreign exchange forward contracts considers the following items: discount rate, timing and amount of cash flow and counterparty credit risk. Derivatives may give rise to credit risks from the possible non- performance by counterparties. Credit risk is generally limited to the fair value of those contracts that are favorable to us. We have limited our credit risk by entering into derivative transactions only with highly- rated global financial institutions, limiting the amount of credit exposure with any one financial institution and conducting ongoing evaluation of the creditworthiness of the financial institutions with which we do business.

The following table provides information on the location and fair values of derivative financial instruments included in our condensed consolidated statements of financial position as of March 31, 2011:

| Designation of Derivatives | Location on Statement of Financial Position | Assets | Liabilities |
|---|---|---|---|
| Cash Flow Hedges  Designated as hedging instruments | | | |
| Foreign exchange forward contracts | Other current assets | $ 32,418 | $ - |
| | Other assets | 9,989 | - |
| | Accrued expenses and other current liabilities | | 718 |
| | Noncurrent liabilities | | 7,867 |
| | Total | 42,407 | 8,585 |
| Other Derivatives  Not designated as hedging instruments | | | |
| Foreign exchange forward contracts | Accrued expenses and other current liabilities | - | 11,565 |
| | Total | | 11,565 |
| Total | | $ 42,407 | $ 20,150 |

8

Table of Contents

The following table provides information on the location and fair values of derivative financial instruments in our condensed consolidated statements of financial position as of December 31, 2010:

| Designation of Derivatives | Location on Statement of Financial Position | Assets | Liabilities |
|---|---|---|---|
| **Cash Flow Hedges  Designated as hedging instruments** | | | |
| Foreign exchange forward contracts | Other current assets | $ 30,983 | $ – |
| | Other assets | 8,144 | |
| | Accrued expenses and other current liabilities | | 187 |
| | Noncurrent liabilities | | 6,601 |
| | Total | 39,127 | 6,788 |
| **Other Derivatives  Not designated as hedging instruments** | | | |
| Foreign exchange forward contracts | Accrued expenses and other current liabilities | | 7,317 |
| | Total | | 7,317 |
| Total | | $ 39,127 | $ 14,105 |

*Cash Flow Hedges*

We have entered into a series of foreign exchange forward contracts that are designated as cash flow hedges of certain salary payments in India. These contracts are intended to partially offset the impact of movement of exchange rates on future operating costs and are scheduled to mature each month during 2011, 2012, 2013, and 2014. Under these contracts, we purchase Indian rupees and sell U.S. dollars. The changes in fair value of these contracts are initially reported in the caption "accumulated other comprehensive income (loss)" on our accompanying condensed consolidated statements of financial position and are subsequently reclassified to earnings in the same period the hedge contract matures. The notional value of our outstanding contracts by year of maturity and the net unrealized gain included in accumulated other comprehensive income (loss) for such contracts were as follows:

| | March 31, 2011 | December 31, 2010 |
|---|---|---|
| 2011 | $ 585,000 | $ 780,000 |
| 2012 | 900,000 | 780,000 |
| 2013 | 840,000 | 600,000 |
| 2014 | 360,000 | |
| Total notional value of contracts outstanding | $ 2,685,000 | $ 2,160,000 |
| Net unrealized gain included in accumulated other comprehensive income (loss), net of taxes | $ 26,781 | $ 30,723 |

9

Table of Contents

Upon settlement or maturity of the cash flow hedge contracts, we record the related gain or loss, based on our designation at the commencement of the contract, to salary expense reported within cost of revenues and selling, general and administrative expenses. The following table provides information on the location and amounts of pre- tax gains (losses) on our cash flow hedges for the three months ended March 31, 2011:

| | Increase (decrease) in Derivative Gains (Losses) Recognized in Accumulated Other Comprehensive Income (Loss) (effective portion) | Location of Net Derivative Gains (Losses) Reclassified from Accumulated Other Comprehensive Income (Loss) into Income (effective portion) | Net Gain (Loss) Reclassified from Accumulated Other Comprehensive Income (Loss) into Income (effective portion) |
|---|---|---|---|
| **Cash Flow Hedges Designated as hedging instruments** | | | |
| Foreign exchange forward contracts | $ 13,078 | Cost of revenues | $ 9,562 |
| | | Selling, general and administrative expenses | 2,033 |
| Total | $ 13,078 | | $ 11,595 |

The following table provides information on the location and amounts of pre- tax gains (losses) on our cash flow hedges for the three months ended March 31, 2010:

| | Increase (decrease) in Derivative Gains (Losses) Recognized in Accumulated Other Comprehensive Income (Loss) (effective portion) | Location of Net Derivative Gains (Losses) Reclassified from Accumulated Other Comprehensive Income (Loss) into Income (effective portion) | Net Gain (Loss) Reclassified from Accumulated Other Comprehensive Income (Loss) into Income (effective portion) |
|---|---|---|---|
| **Cash Flow Hedges Designated as hedging instruments** | | | |
| Foreign exchange forward contracts | $ 42,024 | Cost of revenues | $ 8,332 |
| | | Selling, general and administrative expenses | 1,037 |
| Total | $ 42,024 | | $ 9,369 |

*Other Derivatives*

We also use foreign exchange forward contracts, which have not been designated as hedges, to hedge our balance sheet exposure to Indian rupee denominated net monetary assets. We entered into a series of foreign exchange forward contracts to purchase U.S. dollars and sell Indian rupees. Realized gains or losses and changes in the estimated fair value of these derivative financial instruments are recorded in Other, net in our condensed consolidated statements of operations.

Additional information related to our outstanding contracts is as follows:

| | March 31, 2011 | December 31, 2010 |
|---|---|---|
| Notional value of contracts outstanding | $ 234,021 | $ 234,021 |

The following table provides information on the location and amounts of realized and unrealized pre- tax gains (losses) on our derivative financial instruments for the three months ended March 31, 2011 and 2010:

| Location of Net Gains / (Losses) on Derivative Instruments | Amount of Net Gains (Losses) on Derivative Instruments |
|---|---|

| | | 20__ | 2010 |
|---|---|---|---|
| Other Derivatives Not designated as hedging instruments. Foreign exchange forward contracts | Other, net | $              (4,248) | $      (16,095) |

The related cash flow impacts of all of our derivative activities are reflected as cash flows from operating activities.

10

Table of Contents

Note 7 - Commitments and Contingencies

Our current India real estate development program includes planned construction of approximately 8.0 million square feet of new space. The expanded program includes the expenditure of approximately $500,000 on land acquisition, facilities construction and furnishings to build new, company- owned state- of- the- art development and delivery centers in regions primarily designated as SEZs located in India. As of March 31, 2011, we had outstanding fixed capital commitments of approximately $125,941 related to our India development center expansion program.

We are involved in various claims and legal actions arising in the ordinary course of business. In the opinion of management, the outcome of such claims and legal actions, if decided adversely, is not expected to have a material adverse effect on our business, financial condition and results of operations. Additionally, many of our engagements involve projects that are critical to the operations of our customers' business and provide benefits that are difficult to quantify. Any failure in a customer's systems or our failure to meet our contractual obligations to our clients, including any breach involving a customer's confidential information or sensitive data, or our obligations under applicable laws or regulations could result in a claim for substantial damages against us, regardless of our responsibility for such failure. Although we attempt to contractually limit our liability for damages arising from negligent acts, errors, mistakes, or omissions in rendering our services, there can be no assurance that the limitations of liability set forth in our contracts will be enforceable in all instances or will otherwise protect us from liability for damages. Although we have general liability insurance coverage, including coverage for errors or omissions, there can be no assurance that such coverage will continue to be available on reasonable terms or will be available in sufficient amounts to cover one or more large claims, or that the insurer will not disclaim coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage or changes in our insurance policies, including premium increases or the imposition of large deductible or co- insurance requirements, could have a material adverse effect on our business, results of operations and financial condition.

In the normal course of business and in conjunction with certain client engagements, we have entered into contractual arrangements through which we may be obligated to indemnify clients or other parties with whom we conduct business with respect to certain matters. These arrangements can include provisions whereby we agree to hold the indemnified party and certain of their affiliated entities harmless with respect to third- party claims related to such matters as our breach of certain representations or covenants, or out of our intellectual property infringement, our gross negligence or willful misconduct or certain other claims made against certain parties. Payments by us under any of these arrangements are generally conditioned on the client making a claim and providing us with full control over the defense and settlement of such claim. It is not possible to determine the maximum potential amount under these indemnification agreements due to the unique facts and circumstances involved in each particular agreement. Historically, we have not made payments under these indemnification agreements so they have not had any impact on our operating results, financial position, or cash flows. However, if events arise requiring us to make payment for indemnification claims under our indemnification obligations in contracts we have entered, such payments could have material impact on our operating results, financial position, and cash flows.

Note 8 - Comprehensive Income

The components of accumulated other comprehensive income (loss) as of March 31, 2011 and December 31, 2010 were as follows:

| | March 31, 2011 | December 31, 2010 |
|---|---|---|
| Foreign currency translation adjustments | $ 13,115 | $ 4,278 |
| Unrealized gain on cash flow hedges, net of taxes | 26,781 | 30,723 |
| Unrealized gain on available- for- sale securities, net of taxes | 54 | 597 |
| Total accumulated other comprehensive income (loss) | $ 39,950 | $ 35,598 |

The components of comprehensive income for the three months ended March 31, 2011 and 2010 were as follows:

| | 2011 | 2010 |
|---|---|---|
| Net income | $ 208,327 | $ 151,500 |
| Foreign currency translation adjustments | 8,837 | (7,905) |
| Change in unrealized (loss) gain on cash flow hedges, net of taxes of $5,425 and $984, respectively | (3,942) | 31,671 |
| Change in unrealized (loss) on available- for- sale securities, net of taxes of ($371) and $0, respectively | (543) | - |
| Total comprehensive income | $ 212,679 | $ 175,266 |

11

Table of Contents

**Note 9 - Segment Information**

Our reportable segments are: Financial Services, which includes customers providing banking/transaction processing, capital markets and insurance services; Healthcare, which includes healthcare providers and payers as well as life sciences customers; Manufacturing/Retail/Logistics, which includes manufacturers, retailers, travel and other hospitality customers, as well as customers providing logistics services; and Other, which is an aggregation of industry segments which, individually, are less than 10% of consolidated revenues and segment operating profit. The Other reportable segment includes entertainment, media and information services, communications and high technology operating segments. Our sales managers, account executives, account managers and project teams are aligned in accordance with the specific industries they serve.

Our chief operating decision maker evaluates the Company's performance and allocates resources based on segment revenues and operating profit. Segment operating profit is defined as income from operations before unallocated costs. Generally, operating expenses for each operating segment have similar characteristics and are subject to the same factors, pressures and challenges. However, the economic environment and its effects on industries served by our operating segments may affect revenue and operating expenses to differing degrees. Expenses included in segment operating profit consist principally of direct selling and delivery costs as well as a per seat charge for use of the development and delivery centers. Certain expenses, such as general and administrative, and a portion of depreciation and amortization, are not specifically allocated to specific segments as management does not believe it is practical to allocate such costs to individual segments because they are not directly attributable to any specific segment. Further, stock- based compensation expense is not allocated to individual segments in internal management reports used by the chief operating decision maker. Accordingly, these expenses are separately disclosed as "unallocated" and adjusted only against our total income from operations. Additionally, management has determined that it is not practical to allocate identifiable assets, by segment, since such assets are used interchangeably among the segments.

Revenues from external customers and segment operating profit, before unallocated expenses, for the Financial Services, Healthcare, Manufacturing/Retail/Logistics, and Other reportable segments were as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| **Revenues:** | | |
| Financial Services | $ 569,976 | $ 398,687 |
| Healthcare | 348,969 | 252,425 |
| Manufacturing/Retail/Logistics | 274,335 | 173,131 |
| Other | 177,973 | 135,477 |
| Total revenue | $ 1,371,253 | $ 959,720 |
| **Segment Operating Profit:** | | |
| Financial Services | $ 194,498 | $ 128,264 |
| Healthcare | 127,566 | 92,357 |
| Manufacturing/Retail/Logistics | 101,450 | 54,812 |
| Other | 56,122 | 43,186 |
| Total segment operating profit | 479,636 | 318,619 |
| Less: unallocated costs [1] | 214,271 | 135,602 |
| Income from operations | $ 265,365 | $ 183,017 |

(1)   Includes $16,065 and $13,945 of stock- based compensation expense for the three months ended March 31, 2011 and 2010, respectively.

12

Table of Contents

*Geographic Area Information*
Revenue and long-lived assets, by geographic area, are as follows:

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2011** | | **2010** | |
| Revenues [1] | | | | |
| North America [2] | $ | 1,069,953 | $ | 755,690 |
| Europe [3] | | 255,886 | | 173,632 |
| Other [4] | | 45,414 | | 30,398 |
| Total | | 1,371,253 | $ | 959,720 |

| | As of March 31, 2011 | | As of December 31, 2010 | |
|---|---|---|---|---|
| Long-lived Assets [5] | | | | |
| North America [2] | $ | 12,820 | $ | 12,198 |
| Europe | | 4,103 | | 3,687 |
| Other [4][6] | | 584,776 | | 554,563 |
| Total | $ | 601,699 | $ | 570,448 |

(1) Revenues are attributed to regions based upon customer location.
(2) Substantially all relates to operations in the United States.
(3) Includes revenue from operations in the United Kingdom of $162,856 and $106,621 for the three months ended March 31, 2011 and 2010, respectively.
(4) Includes our operations in Asia Pacific, Middle East and South America.
(5) Long-lived assets include property and equipment, net of accumulated depreciation and amortization.
(6) Substantially all of these long-lived assets relate to our operations in India.

Note 10 - Recent Accounting Pronouncements

In December 2010, the FASB issued a new accounting standard requiring that Step 2 of the goodwill impairment test be performed for reporting units whose carrying value is zero or negative. We adopted the new guidance effective January 1, 2011. Our adoption of this standard did not have a material effect on our financial condition or consolidated results of operations.

In December 2010, the FASB issued new guidance clarifying some of the disclosure requirements related to business combinations that are material on an individual or aggregate basis. Specifically, the guidance states that, if comparative financial statements are presented, the entity should disclose revenue and earnings of the combined entity as though the business combination(s) that occurred during the current year occurred as of the beginning of the comparable prior annual reporting period only. Additionally, the new standard expands the supplemental pro forma disclosure required by the authoritative guidance to include a description of the nature and amount of material, nonrecurring pro forma adjustments directly attributable to the business combination in the reported pro forma revenue and earnings. We adopted the new guidance effective January 1, 2011. Our adoption of this standard did not have a material effect on our financial condition or consolidated results of operations. However, it may result in additional disclosures in the event that we enter into a business combination that is material either on an individual or aggregate basis.

13

Table of Contents

Item 2.      Management's Discussion and Analysis of Financial Condition and Results of Operations.

Executive Summary

During the three months ended March 31, 2011, our revenue increased to $1,371.3 million compared to $959.7 million during the three months ended March 31, 2010. Net income increased to $208.3 million, or $0.67 per diluted share, including stock- based compensation expense, net of tax, equal to $0.04 per diluted share, during the three months ended March 31, 2011. This is compared to net income of $151.5 million, or $0.49 per diluted share, including stock- based compensation expense, net of tax, of $0.04 per diluted share, during the three months ended March 31, 2010. The key drivers of our revenue growth during the three months ended March 31, 2011 were as follows:

Strong performance across all our business segments with revenue growth ranging from 58.5% for Manufacturing/Retail/Logistics to 31.4% for our Other segment for the quarter as compared to the quarter ended March 31, 2010;

Continued penetration of the European market where we experienced revenue growth of 47.4% for the quarter as compared to the quarter ended March 31, 2010;

Increased customer spending on discretionary development projects;

Expansion of our service offerings, which enabled us to cross- sell new services to our customers and meet the rapidly growing demand for complex large- scale outsourcing solutions;

Increased penetration at existing customers, including strategic customers; and

Continued expansion of the market for global delivery of IT services and business process outsourcing.

We saw a continued increase in demand from our customers for a broad range of IT solutions, including application maintenance, complex systems development engagements, testing, enterprise resource planning, or ERP, infrastructure management, business process outsourcing, or BPO, and business intelligence. We finished the quarter with approximately 714 active clients compared to 597 as of March 31, 2010 and increased the number of strategic clients by seven during the quarter bringing the total number of our strategic clients to 173. We define a strategic client as one offering the potential to generate at least $5 million to $50 million or more in annual revenues at maturity. Our top five and top ten customers accounted for approximately 17.0% and 28.8%, respectively, of our total revenues during the quarter ended March 31, 2011 as compared to approximately 17.6% and 30.3%, respectively, for the quarter ended March 31, 2010. As we continue to add new customers and increase our penetration at existing customers, we expect the percentage of revenues from our top five and top ten customers to decline over time.

During the quarter ended March 31, 2011, our revenue from European customers increased by 47.4% to approximately $255.9 million compared to approximately $173.6 million in the quarter ended March 31, 2010. For the quarter ended March 31, 2011, revenue from Europe, excluding the UK, increased by approximately $26.0 million from approximately $67.0 million in the quarter ended March 31, 2010 to approximately $93.0 million and revenue from the UK increased by approximately $56.2 million from approximately $106.6 million in the quarter ended March 31, 2010 to approximately $162.9 million. We believe that Europe will continue to be an area of significant investment for us as we see this region as well as the Middle East and the Asia Pacific regions, particularly Japan, India, Australia and Singapore, as growth opportunities for the long term.

Our revenue growth is also attributed to increasing market acceptance of, and strong demand for, offshore IT software and services and business process outsourcing. NASSCOM (India's National Association of Software and Service Companies) reports indicate that India's IT software and services and business process outsourcing sectors are expected to exceed $88 billion at the end of NASSCOM's fiscal year 2012. This is an expected growth rate of approximately 17% over the prior fiscal year. According to NASSCOM's "Perspective 2020: Transform Business, Transform India" report, global changes and new megatrends within economic, demographic, business, social and environmental areas are set to expand the outsourcing industry by creating new dynamics and opportunities and are expected to result in export revenues of $175 billion by 2020.

Our operating margin increased to approximately 19.4% for the quarter ended March 31, 2011 compared to 19.1% for the quarter ended March 31, 2010. Excluding stock- based compensation expense of approximately $16.1 million, operating margin for the quarter ended March 31, 2011 was approximately 20.5%. This was slightly above our historic targeted operating margin range, excluding stock- based compensation expense, of 19% to 20% of total revenues. The increase in operating margin was primarily driven by improvements in pricing and achieving operating efficiencies, largely offset by an increase in compensation costs. Historically, we have invested our profitability above the 19% to 20% operating margin level, which excludes stock- based compensation, back into our business, which we believe is a significant contributing factor to our strong revenue growth. This investment is primarily focused in the areas of: hiring client partners and relationship personnel with specific industry experience or domain expertise; training our technical staff in a broader range of service offerings; strengthening our business analytic capabilities; strengthening and expanding our portfolio of services; continuing to expand our geographic presence for both sales and delivery; and recognizing and rewarding exceptional performance by our employees. In addition, this investment includes maintaining a level of resources, trained in a broad range of service offerings, to be well positioned to respond to our customer requests to take on additional projects. For the year ending December 31, 2011, we expect to continue to invest amounts in excess of our targeted operating margin levels back into the business.

14

Table of Contents

We finished the first quarter of 2011 with total headcount of approximately 111,200, which is an increase of approximately 25,700 as compared to the total headcount at March 31, 2010. The increase in the number of our technical personnel and the related infrastructure costs, to meet the demand for our services, is the primary driver of the increase in our operating expenses in 2011. Annualized turnover, including both voluntary and involuntary, was approximately 15.1% during the three months ended March 31, 2011. The majority of our turnover occurs in India. As a result, annualized attrition rates on- site at clients are below our global attrition rate. In addition, attrition is weighted towards the more junior members of our staff. We have experienced increases in compensation and benefit costs, including incentive- based compensation costs, in India which may continue in the future; however, historically, this has not had a material impact on our results of operations as we have been able to absorb such cost increases through price increases or cost management strategies such as managing discretionary costs, mix of professional staff and utilization levels and achieving other operating efficiencies.

Our current India real estate development program includes planned construction of an additional 8.0 million square feet of new space. The expanded program includes the expenditure of approximately $500.0 million between 2011 and the end of 2014 on land acquisition, facilities construction and furnishings to build new company- owned state- of- the- art development and delivery centers in regions primarily designated as Special Economic Zones, or SEZs, located in India. During 2011, we expect to spend approximately $285 million globally for capital expenditures, a portion of which relates to our India real estate development program.

At March 31, 2011, we had cash and cash equivalents and short- term investments of $2,168.1 million and working capital of $2,734.1 million. Accordingly, we do not anticipate any near- term liquidity issues. During the three months ended March 31, 2011, we repurchased $77.1 million of our Class A common stock under our stock repurchase program. Stock repurchases were funded from working capital.

While several measures have indicated that the economy may be improving, the global economic environment remains fragile. During 2011, we expect the following factors to affect our business and our operating results:

Stabilization of global economic conditions and the financial services sector;

Normalization of customer IT budgets, which may result in spending by customers on discretionary projects, specifically application development projects;

Continued focus by customers on directing IT spending towards cost containment projects, such as application maintenance, infrastructure management and BPO;

Secular changes driven by evolving technologies and regulatory changes;

Foreign currency volatility; and

Increase in our effective income tax rate as a result of the expiration of tax holiday benefits related to our Software Technology Parks, or STPs, in India.

In response to this fragile global economic environment, we plan to:

Continue to invest in our talent base and new service offerings;

Partner with our existing customers to provide innovative solutions resulting in our garnering an increased portion of our customers' overall IT spend;

Continue our focus on growing our business in Europe, the Middle East and the Asia Pacific region, where we believe there are opportunities to gain market share;

Continue to increase our strategic customer base across all of our business segments;

Opportunistically look for acquisitions that can improve our overall service delivery capabilities;

Continue operating focus and discipline to appropriately manage our cost structure; and

Continue to locate most of our new development center facilities in SEZs to take advantage of SEZ tax incentives.

**Critical Accounting Estimates and Risks**

Management's discussion and analysis of our financial condition and results of operations is based on our condensed consolidated financial statements that have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires management to make estimates and assumptions that affect the amounts reported for assets and liabilities, including the recoverability of tangible and intangible assets, disclosure of contingent assets and liabilities as of the date of the financial statements, and the reported amounts of revenues and expenses during the reported period. On an on- going basis, we evaluate our estimates. The most significant estimates relate to the recognition of revenue and profits based on the percentage of completion method of accounting for certain fixed- bid contracts, the allowance for doubtful accounts, income taxes, valuation of goodwill and other long- lived assets, valuation of investments, assumptions used in valuing stock- based compensation arrangements, contingencies and litigation. We base our estimates on historical experience and on various other

15

Table of Contents

assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. The actual amounts may differ from the estimates used in the preparation of the accompanying unaudited condensed consolidated financial statements. Our significant accounting policies are described in Note 1 to the audited consolidated financial statements included in our Annual Report on Form 10- K for the year ended December 31, 2010.

We believe the following critical accounting policies require a higher level of management judgments and estimates than others in preparing the consolidated financial statements:

*Revenue Recognition.* Revenues related to our highly complex information technology application development contracts, which are predominantly fixed- priced contracts, are recognized as the service is performed using the percentage of completion method of accounting. Under this method, total contract revenue during the term of an agreement is recognized on the basis of the percentage that each contract's total labor cost to date bears to the total expected labor cost (cost to cost method). This method is followed where reasonably dependable estimates of revenues and costs can be made. Management reviews total expected labor costs on an ongoing basis. Revisions to our estimates may result in increases or decreases to revenues and income and are reflected in the consolidated financial statements in the periods in which they are first identified. If our estimates indicate that a contract loss will be incurred, a loss provision is recorded in the period in which the loss first becomes probable and reasonably estimable. Contract losses are determined to be the amount by which the estimated costs of the contract exceed the estimated total revenues that will be generated by the contract and are included in cost of revenues in our condensed consolidated statement of operations. Contract losses for the periods presented were immaterial.

*Stock- Based Compensation.* Utilizing the fair value recognition provisions prescribed by the authoritative guidance, stock- based compensation cost is measured at the grant date based on the value of the award and is recognized as expense over the vesting period. Determining the fair value of stock- based awards at the grant date requires judgment, including estimating the expected term over which the stock awards will be outstanding before they are exercised, the expected volatility of our stock and the number of stock- based awards that are expected to be forfeited. In addition, for performance stock units, we are required to estimate the most probable outcome of the performance conditions in order to determine the amount of stock compensation costs to be recorded over the vesting period. If actual results differ significantly from our estimates, stock- based compensation expense and our results of operations could be materially impacted.

*Income Taxes.* Determining the consolidated provision for income tax expense, deferred income tax assets and liabilities and related valuation allowance, if any, involves judgment. As a global company, we are required to calculate and provide for income taxes in each of the jurisdictions where we operate. Changes in the geographic mix or estimated level of annual pre- tax income can also affect the overall effective income tax rate. Our provision for income taxes also includes the impact of provisions established for uncertain income tax positions, as well as the related net interest. Tax exposures can involve complex issues and may require an extended period to resolve. Although we believe we have adequately reserved for our uncertain tax positions, no assurance can be given that the final tax outcome of these matters will not be different. We adjust these reserves in light of changing facts and circumstances, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters differs from the amounts recorded, such differences will impact the provision for income taxes in the period in which such determination is made.

On an on- going basis, we evaluate whether a valuation allowance is needed to reduce our deferred income tax assets to the amount that is more likely than not to be realized. While we have considered future taxable income and on- going prudent and feasible tax planning strategies in assessing the need for the valuation allowance, in the event we determine that we will be able to realize deferred income tax assets in the future in excess of the net recorded amount, an adjustment to the deferred income tax asset would increase income in the period such determination was made. Likewise, should we determine that we will not be able to realize all or part of the net deferred income tax asset in the future, an adjustment to the deferred income tax asset would be charged to income in the period such determination was made.

Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export- oriented companies that are eligible for certain income tax holiday benefits granted by the Indian government for export activities. These benefits for export activities conducted within STPs, expired during the first quarter ended March 31, 2011. A significant portion of the earnings of Cognizant India is generated within STPs, and upon expiration of these benefits these earnings are subject to regular corporate income tax at the current rate of 32.4%. The increase in our effective income tax rate for the three months ended March 31, 2011 is due primarily to the expiration of these STP holidays.

In addition, we have constructed and expect to continue to locate most of our newer development facilities in SEZs, which are entitled to certain income tax incentives for periods up to 15 years.

16

Table of Contents

*Derivative Financial Instruments*. Derivative financial instruments are accounted for in accordance with the authoritative guidance which requires that each derivative instrument be recorded on the balance sheet as either an asset or liability measured at its fair value as of the reporting date. Our derivative financial instruments consist of foreign exchange forward contracts. We estimate the fair value of each foreign exchange forward contract by using a present value of expected cash flows model. This model utilizes various assumptions, including, but not limited to timing and amounts of cash flows, discount rates, and credit risk factors. The use of different assumptions could have a positive or negative effect on our results of operations and financial condition.

*Investments*. Our investment portfolio is primarily comprised of U.S. dollar denominated corporate bonds, municipal bonds, debt issuances by the U.S. government, U.S. government agencies, foreign governments and supranational entities, asset- backed securities, and bank time deposits. The asset- backed securities include securities backed by auto loans, credit card receivables, mortgage loans and other receivables and are rated AAA/Aaa. The years of issuance of our asset- backed securities fall in the 2004 to 2011 range.

We utilize various inputs to determine the fair value of our investment portfolio. To the extent they exist, unadjusted quoted market prices for identical assets in active markets (Level 1) or quoted prices on similar assets (Level 2) are utilized to determine the fair value of each investment in the portfolio. In the absence of quoted prices or liquid markets, valuation techniques would be used to determine fair value of any investments that require inputs that are both significant to the fair value measurement and unobservable (Level 3). Valuation techniques are based on various assumptions, including, but not limited to timing and amounts of cash flows, discount rates, rate of return, and adjustments for nonperformance and liquidity. A significant degree of judgment is involved in valuing investments using Level 3 inputs. The use of different assumptions could have a positive or negative effect on our results of operations and financial condition. See Note 5 for additional information related to our security valuation methodologies.

We periodically evaluate if unrealized losses, as determined based on the security valuation methodologies discussed above, on individual securities classified as available for sale in the investment portfolio are considered to be other- than- temporary. The analysis of other- than- temporary impairment requires the use of various assumptions, including, but not limited to, the length of time an investment's book value is greater than fair value, the severity of the investment's decline, any credit deterioration of the investment, whether management intends to sell the security and whether it is more likely than not that we will be required to sell the security prior to recovery of its amortized cost basis. Once a decline in fair value is determined to be other- than- temporary, an impairment charge is generally recorded to earnings and a new cost basis in the investment is established.

*Allowance for Doubtful Accounts*. We maintain an allowance for doubtful accounts for estimated losses resulting from the inability of our customers to make required payments. The allowance for doubtful accounts is determined by evaluating the relative credit- worthiness of each customer, historical collections experience and other information, including the aging of the receivables. If the financial condition of our customers were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required.

*Goodwill* . We evaluate goodwill for impairment at least annually, or as circumstances warrant. When determining the fair value of our reporting units, we utilize various assumptions, including projections of future cash flows. Any adverse changes in key assumptions about our businesses and their prospects or an adverse change in market conditions may cause a change in the estimation of fair value and could result in an impairment charge. Based upon our most recent evaluation of goodwill, there are no significant risks of impairment. As of March 31, 2011, our goodwill balance was $224.0 million.

*Long- Lived Assets*. We review long- lived assets and certain identifiable intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In general, we will recognize an impairment loss when the sum of undiscounted expected future cash flows is less than the carrying amount of such asset. The measurement for such an impairment loss is then based on the fair value of the asset. If such assets were determined to be impaired, it could have a material adverse effect on our business, results of operations and financial condition.

*Risks* . The majority of our development and delivery centers, including a majority of our employees, are located in India. As a result, we may be subject to certain risks associated with international operations, including risks associated with foreign currency exchange rate fluctuations and risks associated with the application and imposition of protective legislation and regulations relating to import and export or otherwise resulting from foreign policy or the variability of foreign economic or political conditions. Additional risks associated with international operations include difficulties in enforcing intellectual property rights, limitations on immigration programs, the burdens of complying with a wide variety of foreign laws, potential geo- political and other risks associated with terrorist activities and local and cross border conflicts, and potentially adverse tax consequences, tariffs, quotas and other barriers. We are also subject to risks associated with our overall compliance with Section 404 of the Sarbanes- Oxley Act of 2002. The inability of our management to ensure the adequacy and effectiveness of our internal control over financial reporting for future year ends could result in adverse consequences to us, including, but not limited to, a loss of investor confidence in the reliability of our financial statements, which could cause the market price of our stock to decline. See Part II, Item 1A. "Risk Factors."

17

Table of Contents

Results of Operations
*Three Months Ended March 31, 2011 Compared to Three Months Ended March 31, 2010*
The following table sets forth, for the periods indicated, certain financial data expressed for the three months ended March 31:
(Dollars in thousands)

| | 2011 | % of Revenues | 2010 | % of Revenues | Increase / (Decrease) $ | % |
|---|---|---|---|---|---|---|
| Revenues | $ 1,371,253 | 100.0 | $ 959,720 | 100.0 | $ 411,533 | 42.9 |
| Cost of revenues (1) | 782,176 | 57.0 | 555,904 | 57.9 | 226,272 | 40.7 |
| Selling, general and administrative expenses | 296,330 | 21.6 | 194,993 | 20.3 | 101,337 | 52.0 |
| Depreciation and amortization expense | 27,382 | 2.0 | 25,806 | 2.7 | 1,576 | 6.1 |
| Income from operations | 265,365 | 19.4 | 183,017 | 19.1 | 82,348 | 45.0 |
| Other income (expense), net | 15,135 | | (4,265) | | 19,400 | - |
| Provision for income taxes | 72,173 | | 27,252 | | 44,921 | 164.8 |
| Net income | $ 208,327 | 15.2 | $ 151,500 | 15.8 | $ 56,827 | 37.5 |

(1)  Includes stock- based compensation expense of $3,487 in 2011 and $3,667 in 2010 and is exclusive of depreciation and amortization expense.
(2)  Includes stock- based compensation expense of $12,578 in 2011 and $10,278 in 2010 and is exclusive of depreciation and amortization expense.

The following table includes non- GAAP income from operations, excluding stock- based compensation, a measure defined by the Securities and Exchange Commission as a non- GAAP financial measure. This non- GAAP financial measure is not based on any comprehensive set of accounting rules or principles and should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and may be different from non- GAAP measures used by other companies. In addition, this non- GAAP measure, the financial statements prepared in accordance with GAAP and reconciliations of our GAAP financial statements to such non- GAAP measure should be carefully evaluated.

We seek to manage the company to a targeted operating margin, excluding stock- based compensation expense, of 19% to 20% of revenues. Accordingly, we believe that non- GAAP income from operations, excluding stock- based compensation expense, is a meaningful measure for investors to evaluate our financial performance. For our internal management reporting and budgeting purposes, we use financial statements that do not include stock- based compensation expense for financial and operational decision making, to evaluate period- to- period comparisons and for making comparisons of our operating results to that of our competitors. Moreover, because of varying available valuation methodologies and the variety of award types that companies can use to account for stock- based compensation expense, we believe that providing a non- GAAP financial measure that excludes stock- based compensation expense allows investors to make additional comparisons between our operating results and those of other companies. Accordingly, we believe that the presentation of non- GAAP income from operations when read in conjunction with our reported GAAP income from operations can provide useful supplemental information to our management and to investors regarding financial and business trends relating to our financial condition and results of operations.

A limitation of using non- GAAP income from operations versus income from operations reported in accordance with GAAP is that non- GAAP income from operations excludes stock- based compensation expense, which is recurring. Stock- based compensation expense will continue to be for the foreseeable future a significant recurring expense in our business. In addition, other companies may calculate non- GAAP financial measures differently than us, thereby limiting the usefulness of this non- GAAP financial measure as a comparative tool. We compensate for these limitations by providing specific information regarding the GAAP amounts excluded from non- GAAP income from operations and evaluating such non- GAAP financial measures with financial measures calculated in accordance with GAAP.

18

Table of Contents

A reconciliation of income from operations as reported and non- GAAP income from operations, excluding stock- based compensation expense, is as follows for the three months ended March 31:
(Dollars in thousands)

| | 2011 | % of Revenues | 2010 | % of Revenues |
|---|---|---|---|---|
| Income from operations, as reported | $ 265,365 | 19.4 | $ 183,017 | 19.1 |
| Add: stock- based compensation expense | 16,065 | 1.1 | 13,945 | 1.4 |
| Non- GAAP income from operations, excluding stock- based compensation expense | $ 281,430 | 20.5 | $ 196,962 | 20.5 |

*Revenue.* Revenue increased 42.9%, or approximately $411.5 million, from approximately $959.7 million during the three months ended March 31, 2010 to approximately $1,371.3 million during the three months ended March 31, 2011. This increase was primarily attributed to greater acceptance of our global delivery model among an increasing number of industries, continued interest in using our global delivery model as a means to reduce overall IT and operations costs, increased customer spending on discretionary development projects, and greater penetration in the European market. Revenue from customers existing as of March 31, 2010 increased by approximately $354.3 million and revenue from new customers added since March 31, 2010 was approximately $57.2 million or approximately 13.9% of the period over period revenue increase and 4.2% of total revenues for the three months ended March 31, 2011. In addition, revenue from our North American and European customers for the three months ended March 31, 2011 increased by $314.3 million and $82.3 million, respectively, over the comparable 2010 quarter. We had approximately 714 active clients as of March 31, 2011 as compared to 597 active clients as of March 31, 2010. In addition, we experienced strong demand across all of our business segments for an increasingly broad range of services. Our Financial Services and Manufacturing/Retail/Logistics business segments accounted for approximately $171.3 million and $101.2 million, respectively, of the approximately $411.5 million increase in revenue. Additionally, our IT consulting and technology services and IT outsourcing revenues increased by approximately 58.6% and 29.9%, respectively, compared to the three months ended March 31, 2010 and represented approximately 50.1% and 49.9%, respectively, of total revenues for the three months ended March 31, 2011. No customer accounted for sales in excess of 10% of revenues during the three months ended March 31, 2011 and 2010.

*Cost of Revenues (Exclusive of Depreciation and Amortization Expense).* Our cost of revenues consists primarily of salaries, incentive- based compensation, stock- based compensation expense, payroll taxes, benefits, immigration and project- related travel for technical personnel, subcontracting and sales commissions related to revenues. Our cost of revenues increased by 40.7%, or approximately $226.3 million, from approximately $555.9 million during the three months ended March 31, 2010 to approximately $782.2 million during the three months ended March 31, 2011. The increase was due primarily to an increase in compensation and benefits costs of approximately $197.3 million, resulting from the increase in the number of our technical personnel and incentive- based compensation, as well as the appreciation of the Indian rupee versus the U.S. dollar offset by continued improvements in operating efficiencies.

*Selling, General and Administrative Expenses.* Selling, general and administrative expenses consist primarily of salaries, incentive- based compensation, stock- based compensation expense, payroll taxes, employee benefits, travel, promotion, communications, management, finance, administrative and occupancy costs. Selling, general and administrative expenses, including depreciation and amortization, increased by 46.6%, or approximately $102.9 million, from approximately $220.8 million during the three months ended March 31, 2010 to approximately $323.7 million during the three months ended March 31, 2011, and increased as a percentage of revenue from 23.0% to 23.6%. The increase as a percentage of revenue was due to an increase in compensation and benefit costs, including incentive- based compensation, and the impact of the appreciation of the Indian rupee versus the U.S. dollar, partially offset by economies of scale driven by increased revenues that resulted from our expanded sales and marketing activities in the current year and in prior years that allowed us to leverage our cost structure over a larger organization.

*Income from Operations.* Income from operations increased 45.0%, or approximately $82.4 million, from approximately $183.0 million during the three months ended March 31, 2010 to approximately $265.4 million during the three months ended March 31, 2011, representing operating margins of 19.4% of revenues in 2011 and 19.1% of revenues in 2010. The increase in operating margin was primarily driven by improvements in pricing and achieving operating efficiencies, largely offset by an increase in compensation costs. Excluding the impact of applicable designated cash flow hedges, the appreciation of the Indian rupee against the U.S. dollar negatively impacted our operating margin by approximately 38 basis points or 0.38 percentage points. Each additional 1.0% change in exchange rate between the Indian rupee and the U.S. dollar will have the effect of moving our operating margin by approximately 26 basis points or 0.26 percentage points. Excluding stock- based compensation expense of $16.1 million and $13.9 million for the three months ended March 31, 2011 and March 31, 2010, operating margin was 20.5% for each of the three month periods ended March 31, 2011 and 2010.

Table of Contents

We entered into foreign exchange forward contracts to hedge certain salary payments in India. These hedges are intended to mitigate the volatility of the changes in the exchange rate between the U.S. dollar and the Indian rupee. During the three months ended March 31, 2011, the settlement of certain cash flow hedges favorably impacted our operating margin by approximately 85 basis points or 0.85 percentage points.

*Other Income (Expense), Net.* Total other income (expense), net consists primarily of foreign currency exchange gains and (losses) and interest income. The following table sets forth total other income (expense), net for the three months ended March 31:

(Dollars in thousands)

| | 2011 | 2010 | Increase/ (Decrease) |
|---|---|---|---|
| Foreign currency exchange gains | $ 10,196 | $ 5,635 | $ 4,561 |
| Losses on foreign exchange forward contracts not designated as hedging instruments | (4,248) | (16,095) | 11,847 |
| Net foreign currency exchange gains (losses) | 5,948 | (10,460) | 16,408 |
| Interest income | 8,937 | 6,054 | 2,883 |
| Other, net | 250 | 141 | 109 |
| Total other income (expense), net | $ 15,135 | $ (4,265) | $ 19,400 |

The foreign currency exchange gains of approximately $10.2 million were primarily attributed to intercompany transactions between our European subsidiaries and Cognizant India for services performed by Cognizant India on behalf of our European customers and the remeasurement of the Indian rupee net monetary assets on Cognizant India's books to the U.S. dollar functional currency. The $4.2 million of losses on foreign exchange forward contracts were related to the change in fair value of foreign exchange forward contracts entered into to offset foreign currency exposure to Indian rupee denominated net monetary assets. As of March 31, 2011, the notional value of these undesignated hedges was $234.0 million. The increase in interest income of $2.9 million was primarily attributed to higher invested balances.

*Provision for Income Taxes.* The provision for income taxes increased from approximately $27.3 million during the three months ended March 31, 2010 to approximately $72.2 million during the three months ended March 31, 2011. The effective income tax rate increased from 15.2% for the three months ended March 31, 2010 to 25.7% for the three months ended March 31, 2011. The increase in our effective income tax rate was primarily attributed to the expiration of the STP holidays as well as a higher U.S. state effective income tax rate in 2011.

*Net Income.* Net income increased from approximately $151.5 million for the three months ended March 31, 2010 to approximately $208.3 million for the three months ended March 31, 2011, representing 15.8% and 15.2% of revenues, respectively. The decrease in net income as a percentage of revenues was primarily attributed to a higher effective income tax rate in the 2011 period partially offset by a higher operating margin.

20

Table of Contents

Results by Business Segment

Our reportable segments are: Financial Services, which includes customers providing banking / transaction processing, capital markets and insurance services; Healthcare, which includes healthcare providers and payers as well as life sciences customers; Manufacturing/Retail/Logistics, which includes manufacturers, retailers, travel and other hospitality customers, as well as customers providing logistics services; and Other, which is an aggregation of industry operating segments which, individually, are less than 10.0% of consolidated revenues and segment operating profit. The Other segment includes entertainment, media and information services, communications, and high technology operating segments. Our sales managers, account executives, account managers and project teams are aligned in accordance with the specific industries they serve.

Our chief operating decision maker evaluates Cognizant's performance and allocates resources based on segment revenues and operating profit. Segment operating profit is defined as income from operations before unallocated costs. Generally, operating expenses for each operating segment have similar characteristics and are subject to the same factors, pressures and challenges. However, the economic environment and its effects on industries served by our operating groups may affect revenue and operating expenses to differing degrees. Expenses included in segment operating profit consist principally of direct selling and delivery costs as well as a per seat charge for use of the development and delivery centers. Certain expenses, such as general and administrative, and a portion of depreciation and amortization, are not specifically allocated to specific segments as management does not believe it is practical to allocate such costs to individual segments because they are not directly attributable to any specific segment. Further, stock- based compensation expense is not allocated to individual segments in internal management reports used by the chief operating decision maker. Accordingly, these expenses are separately disclosed as "unallocated" and are adjusted only against the total income from operations.

As of March 31, 2011, we had 714 active customers. Accordingly, we provide a significant volume of services to many customers in each of our business segments. Therefore, a loss of a significant customer or a few significant customers in a particular segment could materially reduce revenues for such segment. However, no individual customer exceeded 10% of our consolidated revenues for the three months ended March 31, 2011 and 2010, respectively. In addition, the services we provide to our larger customers are often critical to the operations of such customers and a termination of our services would require an extended transition period with gradual declining revenues.

*Three Months Ended March 31, 2011 Compared to Three Months Ended March 31, 2010*

Revenues from external customers and segment operating profit, before unallocated expenses, for the Financial Services, Healthcare, Manufacturing/Retail/Logistics and Other segments for the three months ended March 31, 2011 and 2010 are as follows:

(Dollars in thousands)

|  | 2011 | 2010 | Increase / (Decrease) $ | % |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Financial Services | $ 569,976 | $ 398,687 | $ 171,289 | 43.0 |
| Healthcare | 348,969 | 252,425 | 96,544 | 38.2 |
| Manufacturing/Retail/Logistics | 274,335 | 173,131 | 101,204 | 58.5 |
| Other | 177,973 | 135,477 | 42,496 | 31.4 |
| Total revenues | $ 1,371,253 | $ 959,720 | $ 411,533 | 42.9 |
| **Segment Operating Profit:** | | | | |
| Financial Services | $ 194,498 | $ 128,264 | $ 66,234 | 51.6 |
| Healthcare | 127,566 | 92,357 | 35,209 | 38.1 |
| Manufacturing/Retail/Logistics | 101,450 | 54,812 | 46,638 | 85.1 |
| Other | 56,122 | 43,186 | 12,936 | 30.0 |
| Total segment operating profit | $ 479,636 | $ 318,619 | $ 161,017 | 50.5 |

Financial Services Segment

*Revenue.* Revenue increased by 43.0%, or approximately $171.3 million, from approximately $398.7 million during the three months ended March 31, 2010 to approximately $570.0 million during the three months ended March 31, 2011. The increase in revenue was primarily driven by continued expansion of existing customer relationships as well as revenue contributed by new customers. The increase in revenue from customers existing as of March 31, 2010 and customers added during the three months ended March 31, 2011 was approximately $159.0 million and approximately $12.3 million, respectively. Within the segment, quarterly revenue from our banking and insurance customers increased approximately $129.1 million and $42.2 million, respectively. Overall, the year- over-

21

Table of Contents

year increase can also be attributed to leveraging sales and marketing investments in this business segment as well as greater acceptance of our global services delivery model and increased customer spending on discretionary development projects.

*Segment Operating Profit.* Segment operating profit increased 51.6%, or approximately $66.2 million, from approximately $128.3 million during the three months ended March 31, 2010 to approximately $194.5 million during the three months ended March 31, 2011. The increase in segment operating profit was attributable primarily to increased revenues and achieving operating efficiencies, including continued leverage of prior sales and marketing investments, partially offset by additional headcount to support our revenue growth, an increase in compensation and benefit costs, including incentive-based compensation, and the impact of the appreciation of the Indian rupee versus the U.S. dollar.

Healthcare Segment

*Revenue.* Revenue increased by 38.2%, or approximately $96.5 million, from approximately $252.4 million during the three months ended March 31, 2010 to approximately $348.9 million during the three months ended March 31, 2011. The increase in revenue was primarily driven by continued expansion of existing customer relationships as well as revenue contributed by new customers. The increase in revenue from customers existing as of March 31, 2010 and customers added during the three months ended March 31, 2011 was approximately $89.3 million and approximately $7.2 million, respectively. Within the segment, growth was strong among both our life sciences and healthcare customers, where revenue increased by approximately $59.4 million and $37.1 million, respectively. The increase can also be attributed to leveraging sales and marketing investments in this business segment as well as greater acceptance of our global services delivery model and increased customer spending on discretionary development projects.

*Segment Operating Profit.* Segment operating profit increased 38.1%, or approximately $35.2 million, from approximately $92.3 million during the three months ended March 31, 2010 to approximately $127.5 million during the three months ended March 31, 2011. The increase in segment operating profit was attributable primarily to increased revenues during the quarter.

Manufacturing/Retail/Logistics Segment

*Revenue.* Revenue increased by 58.5%, or approximately $101.2 million, from approximately $173.1 million during the three months ended March 31, 2010 to approximately $274.3 million during the three months ended March 31, 2011. The increase in revenue was driven by continued expansion of existing customer relationships as well as revenue contributed by new customers. The increase in revenue from customers existing as of March 31, 2010 and customers added during the three months ended March 31, 2011 was approximately $78.2 million and approximately $23.0 million, respectively. Within the segment, growth was strong among both our retail and hospitality customers and our manufacturing and logistics customers, where revenue during 2011 increased by approximately $56.4 million and $44.8 million, respectively. The increase can also be attributed to leveraging sales and marketing investments in this business segment as well as greater acceptance of our global services delivery model and increased customer spending on discretionary development projects.

*Segment Operating Profit.* Segment operating profit increased 85.1%, or approximately $46.6 million, from approximately $54.8 million during the three months ended March 31, 2010 to approximately $101.4 million during the three months ended March 31, 2011. The increase in segment operating profit was attributable primarily to increased revenues during the year and achieving operating efficiencies, including continued leverage of prior sales and marketing investments, partially offset by additional headcount to support our revenue growth, an increase in compensation and benefit costs, including incentive-based compensation, and the impact of the appreciation of the Indian rupee versus the U.S. dollar.

Other Segment

*Revenue.* Revenue increased 31.4%, or approximately $42.5 million, from approximately $135.5 million during the three months ended March 31, 2010 to approximately $178.0 million during the three months ended March 31, 2011. The increase in revenue was driven by continued expansion of existing customer relationships as well as revenue contributed by new customers. The increase in revenue from customers existing as of March 31, 2010 and customers added during the three months ended March 31, 2011 was approximately $27.8 million and approximately $14.7 million, respectively. Within the Other segment, growth was particularly strong among our entertainment, media and information services customers and our telecommunications customers where revenue increased by approximately $18.8 million and $15.5 million, respectively. The increase can also be attributed to leveraging sales and marketing investments in this business segment as well as greater acceptance of our global services delivery model and increased customer spending on discretionary development projects.

*Segment Operating Profit.* Segment operating profit increased 30.0%, or approximately $12.9 million, from approximately $43.2 million during the three months ended March 31, 2010 to approximately $56.1 million during the three months ended March 31, 2011. The increase in segment operating profit was attributable primarily to increased revenues, partially offset by additional headcount to support our revenue growth, continued investment in sales and marketing, an increase in compensation and benefit costs, including incentive-based compensation, and the impact of the appreciation of the Indian rupee versus the U.S. dollar.

Table of Contents

**Liquidity and Capital Resources**

At March 31, 2011, we had cash and cash equivalents and short- term investments of $2,168.1 million. We have used, and plan to use, such cash for expansion of existing operations, including our offshore development and delivery centers; continued development of new service lines; possible acquisitions of related businesses; formation of joint ventures; stock repurchases; and general corporate purposes, including working capital. As of March 31, 2011, we had working capital of approximately $2,734.1 million, including short- term investments of $874.6 million. Accordingly, we do not anticipate any near- term liquidity issues.

Net cash provided by operating activities was approximately $45.6 million during the three months ended March 31, 2011 as compared to approximately $2.3 million during the three months ended March 31, 2010. The increase was primarily attributed to an increase in net income during the quarter. Trade accounts receivable increased from approximately $901.3 million at December 31, 2010 to approximately $995.0 million at March 31, 2011. Unbilled accounts receivable increased from approximately $113.0 million at December 31, 2010 to approximately $128.2 million at March 31, 2011. The increase in trade accounts receivable and unbilled receivables as of March 31, 2011 as compared to December 31, 2010 was primarily due to increased revenues and a higher number of days of sales outstanding. We monitor turnover, aging and the collection of accounts receivable through the use of management reports that are prepared on a customer basis and evaluated by our finance staff. At March 31, 2011, our days of sales outstanding, including unbilled receivables, were approximately 74 days as compared to 71 days at December 31, 2010 and 76 days as of March 31, 2010.

Our investing activities used net cash of approximately $252.7 million during the three months ended March 31, 2011 as compared to approximately $57.1 million during the three months ended March 31, 2010. The increase in net cash used in investing activities primarily related to an increase in net investments and capital expenditures during the three months ended March 31, 2011.

Our financing activities used net cash of approximately $49.0 million during the three months ended March 31, 2011 as compared to providing approximately $43.5 million during the three months ended March 31, 2010. The increase in net cash used in financing activities primarily related to an increase in common stock repurchases during the three months ended March 31, 2011.

Our ability to expand and grow our business in accordance with current plans, to make acquisitions and form joint ventures and to meet our long-term capital requirements beyond a twelve month period will depend on many factors, including the rate, if any, at which our cash flow increases, our ability and willingness to accomplish acquisitions and joint ventures with capital stock, our continued intent not to repatriate foreign earnings, and the availability of public and private debt and equity financing. We cannot be certain that additional financing, if required, will be available on terms favorable to us, if at all. We expect our operating cash flow and cash and cash equivalents to be sufficient to meet our operating requirements for the next twelve months.

**Commitments and Contingencies**

As of March 31, 2011, we had outstanding fixed capital commitments of approximately $125.9 million related to our India development center expansion program, which includes expenditures for land acquisition, facilities construction and furnishings to build new state- of- the- art development and delivery centers in regions primarily designated as SEZs located in India.

We are involved in various claims and legal actions arising in the ordinary course of business. In the opinion of management, the outcome of such claims and legal actions, if decided adversely, is not expected to have a material adverse effect on our quarterly or annual operating results, cash flows, or consolidated financial position. Additionally, many of our engagements involve projects that are critical to the operations of our customers' business and provide benefits that are difficult to quantify. Any failure in a customer's systems or our failure to meet our contractual obligations to our clients, including any breach involving a customer's confidential information or sensitive data, or our obligations under applicable laws or regulations could result in a claim for substantial damages against us, regardless of our responsibility for such failure. Although we attempt to contractually limit our liability for damages arising from negligent acts, errors, mistakes, or omissions in rendering our services, there can be no assurance that the limitations of liability set forth in our contracts will be enforceable in all instances or will otherwise protect us from liability for damages. Although we have general liability insurance coverage, including coverage for errors or omissions, there can be no assurance that such coverage will continue to be available on reasonable terms or will be available in sufficient amounts to cover one or more large claims, or that the insurer will not disclaim coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage or changes in our insurance policies, including premium increases or the imposition of large deductible or co- insurance requirements, could have a material adverse effect on our quarterly and annual operating results, financial position and cash flows.

**Foreign Currency Risk**

Overall, we believe that we have limited revenue risk resulting from movement in foreign currency exchange rates as approximately 78.0% of our revenues for the quarter ended March 31, 2011 are generated from customers located in North America. However, a portion of our costs in India, representing approximately 31.6% of our global operating costs for the quarter ended

23

<u>Table of Contents</u>

March 31, 2011, are denominated in the Indian rupee and are subject to foreign exchange rate fluctuations. These foreign currency exchange rate fluctuations have an impact on our results of operations. In addition, a portion of our balance sheet is exposed to foreign currency exchange rate fluctuations, which may result in non- operating foreign currency gains or losses upon remeasurement. For the quarter ended March 31, 2011, we reported foreign currency exchange gains, exclusive of losses on foreign exchange forward contracts not designated as hedging instruments of approximately $10.2 million, which were primarily attributed to the remeasurement of intercompany balances between our European subsidiaries and Cognizant India for services performed by Cognizant India on behalf of our European customers and Indian rupee net monetary assets on Cognizant India's books to the U.S. dollar functional currency. On an ongoing basis, we manage a portion of this risk by limiting our net monetary asset exposure to the Indian rupee in our Indian subsidiaries.

We entered into a series of foreign exchange forward contracts that are designated as cash flow hedges of certain salary payments in India. Cognizant India converts U.S. dollar receipts from intercompany billings to Indian rupees to fund local expenses, including salaries. These U.S. dollar / Indian rupee hedges to buy Indian rupees and sell U.S. dollars are intended to partially offset the impact of movement of exchange rates on future operating costs. During the first quarter of 2011, we reported income of $11.6 million on contracts that settled during the quarter. As of March 31, 2011, we have outstanding contracts with a notional value of $585.0 million and weighted average forward rate of 48.1 rupees to the U.S. dollar scheduled to mature in 2011, outstanding contracts with a notional value of $900 million and weighted average forward rate of 48.2 rupees to the U.S. dollar scheduled to mature in 2012, outstanding contracts with a notional value of $840.0 million and weighted average forward rate of 50.1 rupees to the U.S. dollar scheduled to mature in 2013, and outstanding contracts with a notional value of $360.0 million and weighted average forward rate of 52.1 rupees to the U.S. dollar scheduled to mature in 2014.

We also use foreign currency forward contracts to hedge balance sheet exposure to our Indian rupee denominated net monetary assets. These contracts are not designated as hedges and are intended to offset the foreign currency exchange rate gains or losses upon the remeasurement of the underlying Indian rupee denominated net monetary assets. During 2010, we entered into a series of foreign exchange forward contracts, scheduled to mature in 2011, to buy U.S. dollars and sell Indian rupees. At March 31, 2011, the notional value of the outstanding contracts was $234.0 million and the related fair value was a liability of $11.6 million. During the three months ended March 31, 2011, inclusive of losses of $4.2 million on these undesignated balance sheet hedges, we reported net foreign currency exchange gains of approximately $5.9 million.

There were no off- balance sheet transactions, arrangements or other relationships with unconsolidated entities or other persons in 2011 and 2010 that would have affected our liquidity or the availability of or requirements for capital resources.

Recent Accounting Pronouncements

See Note 10 to our condensed consolidated financial statements for additional information.

Effects of Inflation

Our most significant costs are the salaries and related benefits for our professional staff. Competition in India, the United States and Europe for professionals with advanced technical skills necessary to perform our services offered has caused wages to increase at a rate greater than the general rate of inflation. As with other service providers in our industry, we must adequately anticipate wage increases, particularly on our fixed- price contracts. Historically, we have experienced increases in compensation and benefit costs, including incentive- based compensation, in India; however, this has not had a material impact on our results of operations as we have been able to absorb such cost increases through price increases or cost management strategies such as managing discretionary costs, mix of professional staff and utilization levels and achieving other operating efficiencies. There can be no assurance that we will be able to offset such cost increases in the future.

Forward Looking Statements

The statements contained in this Quarterly Report on Form 10- Q that are not historical facts are forward- looking statements (within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended) that involve risks and uncertainties. Such forward- looking statements may be identified by, among other things, the use of forward- looking terminology such as "believes," "expects," "may," "could," "would," "plan," "intend," "estimate," "predict," "potential," "continue," "should" or "anticipates" or the negative thereof or other variations thereon or comparable terminology, or by discussions of strategy that involve risks and uncertainties. From time to time, we or our representatives have made or may make forward-looking statements, orally or in writing.

Such forward- looking statements may be included in various filings made by us with the Securities and Exchange Commission, or press releases or oral statements made by or with the approval of one of our authorized executive officers. These forward- looking statements, such as statements regarding anticipated future revenues or operating margins, contract percentage completions, earnings, capital expenditures and other statements regarding matters that are not historical facts, involve predictions. Our actual results, performance or achievements could differ materially from the results expressed in, or implied by, these forward- looking statements. We undertake no obligation to update or revise any forward- looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws. There are a number of important factors that could cause our

24

Table of Contents

results to differ materially from those indicated by such forward-looking statements. These factors include those set forth in Part II, Item 1A. "Risk Factors".

**Item 3.      Quantitative and Qualitative Disclosures about Market Risk.**

We are exposed to foreign currency exchange rate risk in the ordinary course of doing business as we transact or hold a portion of our funds in foreign currencies, particularly the Indian rupee. Accordingly, we periodically evaluate the need for hedging strategies, including the use of derivative financial instruments, to mitigate the effect of foreign currency exchange rate fluctuations and expect to continue to use such instruments in the future to reduce foreign currency exposure to appreciation or depreciation in the value of certain foreign currencies. All hedging transactions are authorized and executed pursuant to regularly reviewed policies and procedures.

We have entered into a series of foreign exchange forward contracts that are designated as cash flow hedges of certain salary payments in India. Cognizant India converts U.S. dollar receipts from intercompany billings to Indian rupees to fund local expenses, including salaries. These U.S. dollar / Indian rupee hedges are intended to partially offset the impact of movement of exchange rates on future operating costs. As of March 31, 2011 and December 31, 2010, the notional value of these contracts was $2,685.0 million and $2,160.0 million, respectively. The outstanding contracts at March 31, 2011 are scheduled to mature each month during 2011, 2012, 2013 and 2014. At March 31, 2011 and December 31, 2010, the net unrealized gain on our outstanding foreign exchange forward contracts was $33.8 million and $32.3 million, respectively. Based upon a sensitivity analysis of our foreign exchange forward contracts at March 31, 2011, which estimates the fair value of the contracts based upon market exchange rate fluctuations, a 10.0% change in the foreign currency exchange rate against the U.S. dollar with all other variables held constant would have resulted in a change in the fair value of approximately $249.1 million.

We also use foreign exchange forward contracts to hedge balance sheet exposure to our Indian rupee denominated net monetary assets. These contracts are not designated as hedges and are intended to offset the foreign currency exchange rate gains or losses upon the remeasurement of the underlying Indian rupee denominated net monetary assets. We entered into a series of foreign exchange forward contracts, scheduled to mature in 2011, to buy U.S. dollars and sell Indian rupees. At March 31, 2011, the notional value of the outstanding contracts was $234.0 million and the related fair value was a liability of $11.6 million. Based upon a sensitivity analysis of our foreign exchange forward contracts at March 31, 2011, which estimates the fair value of the contracts based upon market exchange rate fluctuations, a 10.0% change in the foreign currency exchange rate against the U.S. dollar with all other variables held constant would have resulted in a change in the fair value of approximately $24.5 million.

There were no off-balance sheet transactions, arrangements or other relationships with unconsolidated entities or other persons in 2011 and 2010 that would have affected our liquidity or the availability of or requirements for capital resources.

We do not believe we are exposed to material direct risks associated with changes in interest rates other than with our cash and cash equivalents and short-term investments. As of March 31, 2011, we had approximately $2,168.1 million of cash and cash equivalents and short-term investments most of which are impacted almost immediately by changes in short-term interest rates.

We typically invest in highly rated securities and our policy generally limits the amount of credit exposure to any one issuer. Our investment policy requires investments to be investment grade, rated A or better with the objective of minimizing the potential risk of principal loss. We may sell our investments prior to their stated maturities for strategic purposes, in anticipation of credit deterioration, or for duration management. As of March 31, 2011, our short-term investments totaled $874.6 million. Our investment portfolio is primarily comprised of U.S. dollar denominated corporate bonds, municipal bonds, debt issuances by the U.S. government and U.S. government agencies, debt issuances by foreign governments and supranational entities, asset-backed securities, and bank time deposits.

**Item 4.      Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our management under the supervision and with the participation of our chief executive officer and our chief financial officer, evaluated the design and operating effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of March 31, 2011. Based on this evaluation, our chief executive officer and our chief financial officer concluded that, as of March 31, 2011, our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in our reports that we file or submit under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to our chief executive officer and our chief financial officer as appropriate to allow timely decisions regarding required disclosure.

25

Table of Contents

**Changes in Internal Control over Financial Reporting**

No changes in our internal control over financial reporting (as defined in Rules 13a- 15(f) and 15d- 15(f) under the Exchange Act) occurred during the fiscal quarter ended March 31, 2011 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

<div align="center">PART II. OTHER INFORMATION</div>

**Item        1A. Risk Factors.**

**Factors That May Affect Future Results**

*In addition to the risks and uncertainties described elsewhere in this Quarterly Report on Form 10- Q, if any of the following risks occur, our business, financial condition, results of operations or prospects could be materially adversely affected. In such case, the trading price of our common stock could decline.*

**Our global operations are subject to complex risks, some of which might be beyond our control.**

We have offices and operations in various countries around the world and provide services to clients globally. During the first quarter of 2011, approximately 78.0% of our revenues were attributable to the North American region, 18.7% were attributable to the European region, and 3.3% were attributable to the rest of the world, primarily the Asia Pacific region. If we are unable to manage the risks of our global operations, including regulatory, economic, political and other uncertainties in India, fluctuations in foreign exchange and inflation rates, international hostilities, terrorism, natural disasters, and multiple legal and regulatory systems, our results of operations could be adversely affected.

**A substantial portion of our assets and operations are located in India and we are subject to regulatory, economic, political and other uncertainties in India.**

We intend to continue to develop and expand our offshore facilities in India where a majority of our technical professionals are located. While wage costs are lower in India than in the United States and other developed countries for comparably skilled professionals, wages in India have historically increased at a faster rate than in the United States. If this trend continues in the future, it would result in increased costs for our skilled professionals and thereby potentially reduce our operating margins. Also, there is no assurance that, in future periods, competition for skilled professionals will not drive salaries higher in India, thereby resulting in increased costs for our technical professionals and reduced operating margins.

India has also recently experienced civil unrest and terrorism and has been involved in conflicts with neighboring countries. In recent years, there have been military confrontations between India and Pakistan that have occurred in the region of Kashmir and along the India- Pakistan border. The potential for hostilities between the two countries has been high in light of tensions related to recent terrorist incidents in India and the unsettled nature of the regional geopolitical environment, including events in and related to Afghanistan and Iraq. If India becomes engaged in armed hostilities, particularly if these hostilities are protracted or involve the threat of or use of weapons of mass destruction, it is likely that our operations would be materially adversely affected. In addition, companies may decline to contract with us for services in light of international terrorist incidents or armed hostilities, even where India is not involved because of more generalized concerns about relying on a service provider utilizing international resources that may be viewed as less stable than those provided domestically.

In the past, the Indian economy has experienced many of the problems that commonly confront the economies of developing countries, including high inflation, erratic gross domestic product growth and shortages of foreign exchange. The Indian government has exercised, and continues to exercise, significant influence over many aspects of the Indian economy and Indian government actions concerning the economy could have a material adverse effect on private sector entities like us. In the past, the Indian government has provided significant tax incentives and relaxed certain regulatory restrictions in order to encourage foreign investment in specified sectors of the economy, including the software development services industry. Programs that have benefited us include, among others, tax holidays, liberalized import and export duties and preferential rules on foreign investment and repatriation. Notwithstanding these benefits, as noted above, India's central and state governments remain significantly involved in the Indian economy as regulators. In recent years, the Indian government has introduced non- income related taxes, including new service taxes, and income- related taxes, including the Minimum Alternative Tax, or MAT. In addition, a change in government leadership in India or change in policies of the existing government in India that results in the elimination of any of the benefits realized by us from our Indian operations or the imposition of new taxes applicable to such operations could have a material adverse effect on our business, results of operations and financial condition.

In addition, the emergence of a widespread health emergency or pandemic, which may be more difficult to prevent or contain in a country like India as compared to more developed countries, could create economic or financial disruption that could negatively affect our revenue and operations or impair our ability to manage our business in certain parts of the world.

<div align="center">26</div>

Table of Contents

**Our international sales and operations are subject to many uncertainties.**

Revenues from customers outside North America represented approximately 22.0% of our revenues for the quarter ended March 31, 2011. We anticipate that revenues from customers outside North America will continue to account for a material portion of our revenues in the foreseeable future and may increase as we expand our international presence, particularly in Europe, the Asia Pacific region and the Latin America region. In addition, the majority of our employees, along with our development and delivery centers, are located in India. As a result, we may be subject to risks inherently associated with international operations, including risks associated with foreign currency exchange rate fluctuations, which may cause volatility in our reported income, and risks associated with the application and imposition of protective legislation and regulations relating to import or export or otherwise resulting from foreign policy or the variability of foreign economic conditions. From time to time, we may engage in hedging transactions to mitigate our risks relating to exchange rate fluctuations. The use of hedging contracts is intended to mitigate or reduce transactional level volatility in the results of our foreign operations, but does not completely eliminate volatility and risk. In addition, use of hedging contracts includes the risk of non- performance by the counterparty. Additional risks associated with international operations include difficulties in enforcing intellectual property and/or contractual rights, the burdens of complying with a wide variety of foreign laws, potentially adverse tax consequences, tariffs, quotas and other barriers and potential difficulties in collecting accounts receivable. In addition, we may face competition in other countries from companies that may have more experience with operations in such countries or with international operations. Additionally, such companies may have long- standing or well- established relationships with local officials and/or desired clients, which may put us at a competitive disadvantage. We may also face difficulties integrating new facilities in different countries into our existing operations, as well as integrating employees that we hire in different countries into our existing corporate culture. Our international expansion plans may not be successful and we may not be able to compete effectively in other countries. There can be no assurance that these and other factors will not impede the success of our international expansion plans, limit our ability to compete effectively in other countries or otherwise have a material adverse effect on our business, results of operations and financial condition.

**Our operating results may be adversely affected by fluctuations in the Indian rupee and other foreign currency exchange rates and restrictions on the deployment of cash across our global operations.**

Although we report our operating results in U.S. dollars, a portion of our revenues and expenses are denominated in currencies other than the U.S. dollar. Fluctuations in foreign currency exchange rates can have a number of adverse effects on us. Because our consolidated financial statements are presented in U.S. dollars, we must translate revenues, expenses and income, as well as assets and liabilities, into U.S. dollars at exchange rates in effect during or at the end of each reporting period. Therefore, changes in the value of the U.S. dollar against other currencies will affect our revenues, income from operations, other income (expense), net and the value of balance sheet items originally denominated in other currencies. There is no guarantee that our financial results will not be adversely affected by currency exchange rate fluctuations or that any efforts by us to engage in currency hedging activities will be effective. In addition, in some countries we could be subject to strict restrictions on the movement of cash and the exchange of foreign currencies, which could limit our ability to use this cash across our global operations. Finally, as we continue to leverage our global delivery model, more of our expenses are incurred in currencies other than those in which we bill for the related services. An increase in the value of certain currencies, such as the Indian rupee, against the U.S. dollar could increase costs for delivery of services at offshore sites by increasing labor and other costs that are denominated in local currency.

**Our operating results may be adversely affected by our use of derivative financial instruments.**

We have entered into a series of foreign exchange forward contracts that are designated as cash flow hedges of certain salary payments in India. These contracts are intended to partially offset the impact of the movement of the exchange rates on future operating costs. In addition, we also entered into foreign exchange forward contracts in order to mitigate foreign currency risk on Indian rupee denominated net monetary assets. The hedging strategies that we have implemented, or may in the future implement, to mitigate foreign currency exchange rate risks may not reduce or completely offset our exposure to foreign exchange rate fluctuations and may expose our business to unexpected market, operational and counterparty credit risks. Accordingly, we may incur losses from our use of derivative financial instruments that could have a material adverse effect on our business, results of operations and financial condition.

**Our global operations expose us to numerous and sometimes conflicting legal and regulatory requirements, and violations of these regulations could harm our business.**

Because we provide services to clients throughout the world, we are subject to numerous, and sometimes conflicting, legal rules on matters as diverse as import/export controls, content requirements, trade restrictions, tariffs, taxation, sanctions, government affairs, internal and disclosure control obligations, data privacy and labor relations. Violations of these laws or regulations in the conduct of our business could result in fines, criminal sanctions against us or our officers, prohibitions on doing business, damage to our reputation and other unintended consequences such as liability for monetary damages, fines and/or criminal prosecution, unfavorable publicity, restrictions on our ability to process information and allegations by our clients that we have not performed our contractual

27

obligations. Due to the varying degrees of development of the legal systems of the countries in which we operate, local laws might be insufficient to protect our rights. Our failure to comply with applicable legal and regulatory requirements could have a material adverse effect on our business, results of operations and financial condition.

In many parts of the world, including countries in which we operate, practices in the local business community might not conform to international business standards and could violate anti- corruption laws or regulations, including the U.S. Foreign Corrupt Practices Act. Although we have policies and procedures in place that are designed to promote legal and regulatory compliance, our employees, subcontractors and agents could take actions that violate these policies or procedures or applicable anti- corruption laws or regulations. Violations of these laws or regulations could subject us to criminal or civil enforcement actions, including fines and suspension or disqualification from government contracting or contracting with private entities in certain highly regulated industries, any of which could have a material adverse effect on our business.

**International hostilities, terrorist activities, other violence or war, natural disasters, pandemics and infrastructure disruptions, could delay or reduce the number of new service orders we receive and impair our ability to service our customers, thereby adversely affecting our business, financial condition and results of operations.**

Hostilities involving the United States and acts of terrorism, violence or war, such as the attacks of September 11, 2001 in the United States, the attacks of July 7, 2005 in the United Kingdom, the attacks of November 26, 2008 in Mumbai, India, and the continuing conflict in Iraq and Afghanistan, natural disasters, global health risks or pandemics or the threat or perceived potential for these events could materially adversely affect our operations and our ability to provide services to our customers. Such events may cause customers to delay their decisions on spending for information technology, consulting, and business and knowledge process outsourcing services and give rise to sudden significant changes in regional and global economic conditions and cycles. These events also pose significant risks to our people and to physical facilities and operations around the world, whether the facilities are ours or those of our clients, which could affect our financial results. By disrupting communications and travel, giving rise to travel restrictions, and increasing the difficulty of obtaining and retaining highly- skilled and qualified personnel, these events could make it difficult or impossible for us to deliver services to some or all of our clients. As noted above, the majority of our technical professionals are located in India, and the vast majority of our technical professionals in the United States and Europe are Indian nationals who are able to work in the United States and Europe only because they hold current visas and work permits. Travel restrictions could cause us to incur additional unexpected labor costs and expenses or could restrain our ability to retain the skilled professionals we need for our operations. In addition, any extended disruptions of electricity, other public utilities or network services at our facilities, as well as system failures at, or security breaches in, our facilities or systems, could also adversely affect our ability to serve our clients.

Although we continue to believe that we have a strong competitive position in the United States, we continue to increase our efforts to geographically diversify our clients and revenue. Despite our efforts to diversify, hostilities involving the United States, the United Kingdom, India and other countries in which we provide services to our clients, and other acts of terrorism, violence or war, natural disasters, global health risks or pandemics may reduce the demand for our services and negatively affect our revenues and profitability. While we plan and prepare to defend against each of these occurrences, we might be unable to protect our people, facilities and systems against all such occurrences. If these disruptions prevent us from effectively serving our clients, our operating results could be adversely affected.

**Anti- outsourcing legislation, if adopted, and negative perceptions associated with offshore outsourcing could adversely affect our business, financial condition and results of operations and impair our ability to service our customers.**

The issue of companies outsourcing services to organizations operating in other countries is a topic of political discussion in many countries, including the United States, which is our largest market. For example, measures aimed at limiting or restricting outsourcing by United States companies are periodically considered in the U.S. Congress and in numerous state legislatures to address concerns over the perceived association between offshore outsourcing and the loss of jobs domestically. On August 13, 2010, President Barack Obama signed Public Law 111- 230, which contained provisions to impose additional fees of $2,000 for certain H- 1B petitions and $2,250 for certain L- 1A and L- 1B petitions beginning in August 2010 through September 20, 2014. These fees were extended through September 20, 2015 in Public Law 111- 347. Given the ongoing debate over this issue, the introduction and consideration of other restrictive legislation is possible. If enacted, such measures may: broaden existing restrictions on outsourcing by federal and state government agencies and on government contracts with firms that outsource services directly or indirectly, or impact private industry with measures that include but are not limited to tax disincentives, fees or penalties, intellectual property transfer restrictions, and new standards that have the effect of restricting the use of certain business and/or work visas. In the event that any of these measures become law, our business, results of operations and financial condition could be adversely affected and our ability to provide services to our customers could be impaired.

In addition, from time to time, there has been publicity about negative experiences associated with offshore outsourcing, such as domestic job loss and theft and misappropriation of sensitive client data, particularly involving service providers in India. Current or

Table of Contents

prospective clients may elect to perform certain services themselves or may be discouraged from utilizing global service delivery providers due to negative perceptions that may be associated with using global service delivery models or firms. Any slowdown or reversal of existing industry trends toward offshore outsourcing would seriously harm our ability to compete effectively with competitors that provide the majority of their services from within the country in which our clients operate.

Existing and future legislative and administrative/regulatory policies restricting the performance of business process services from an offshore location in jurisdictions in Europe, the Asia Pacific, or any other region in which we have clients could also have a material adverse effect on our business, results of operations and financial condition. For example, legislation enacted in the United Kingdom, based on the 1977 EC Acquired Rights Directive, has been adopted in some form by many European Union, or EU, countries, and provides that if a company outsources all or part of its business to a service provider or changes its current service provider, the affected employees of the company or of the previous service provider are entitled to become employees of the new service provider, generally on the same terms and conditions as their original employment. In addition, dismissals of employees who were employed by the company or the previous service provider immediately prior to that transfer are automatically considered unfair dismissals that entitle such employees to compensation. As a result, to avoid unfair dismissal claims we may have to offer, and become liable for, voluntary redundancy payments to the employees of our clients who outsource business to us in the United Kingdom and other EU countries who have adopted similar laws. These types of policies may materially affect our ability to obtain new business from companies in the United Kingdom and EU and to provide outsourced services to companies in the United Kingdom and EU in a cost- effective manner.

**Our growth may be hindered by immigration restrictions.**

Our future success continues to depend on our ability to attract and retain employees with technical and project management skills from developing countries, especially India. The vast majority of our professionals in the United States and in Europe are Indian nationals. The ability of Indian nationals to work in the United States and Europe depends on their ability and our ability to obtain the necessary visas and work permits.

The H- 1B visa classification enables United States employers to hire certain qualified foreign workers in positions that require an education at least equal to a four- year bachelor degree in the United States in specialty occupations such as IT systems engineering and computer systems analysis. The H- 1B visa usually permits an individual to work and live in the United States for a period of up to six years. Under certain limited circumstances, H- 1B visa extensions after the six- year period may be available. There is a limit on the number of new H- 1B petitions that the United States Citizenship and Immigration Services, or CIS, may approve in any federal fiscal year, and in years in which this limit is reached, we may be unable to obtain H- 1B visas necessary to bring foreign employees to the United States. Currently, the limit is 65,000 for holders of United States or United States- equivalent bachelor degrees (the general cap), and an additional 20,000 for holders of advanced degrees from United States post- secondary educational institutions. We began filing H- 1B petitions with CIS against the fiscal year (FY) 2011 caps beginning April 1, 2010 for work in H- 1B status beginning on October 1, 2010. On January 21, 2011 CIS reached its advanced degree cap for FY 2011, and on January 27, 2011, CIS reached its general cap for FY 2011. We plan to begin filing H- 1B petitions with CIS against the FY 2012 caps beginning April 1, 2011 for work in H- 1B status beginning on October 1, 2011. As part of our advanced planning process, we believe that we have a sufficient number of employees work permit- ready to meet our anticipated business growth in the current year. In addition, there are strict labor regulations associated with the H- 1B visa classification. Larger users of the H- 1B visa program are often subject to investigations by the Wage and Hour Division of the United States Department of Labor. A finding by the United States Department of Labor of willful or substantial failure to comply with existing regulations on the H- 1B classification may result in back- pay liability, substantial fines, and/or a ban on future use of the H- 1B program and other immigration benefits.

We also regularly transfer employees from India to the United States to work on projects at client sites using the L- 1 visa classification. The L- 1 visa allows companies abroad to transfer certain managers, executives, and employees with specialized company knowledge to related United States companies such as a parent, subsidiary, affiliate, joint venture, or branch office. We have an approved "Blanket L" petition, under which the corporate relationships of our transferring and receiving entities have been pre- approved by CIS, thus enabling individual L- 1 visa applications to be presented directly to a visa- issuing United States consular post abroad rather than undergoing a pre- approval process through CIS in the United States. In recent years, both the United States consular posts that review initial L- 1 applications and CIS, which adjudicates individual petitions for initial grants and extensions of L- 1 status, have become increasingly restrictive with respect to this category. As a result, the rate of refusals of initial individual L- 1 petitions and extensions has increased. In addition, even where L- 1 visas are ultimately granted and issued, security measures undertaken by United States consular posts around the world have delayed visa issuances. Our inability to bring qualified technical personnel into the United States to staff on- site customer locations would have a material adverse effect on our business, results of operations and financial condition. Pursuant to the L- 1 Visa Reform Act which became effective in June 2005, there are a number of restrictions and requirements that must be met for us to obtain L- 1 visas for our personnel. Under one provision of the L- 1 Visa Reform Act, all L- 1 applicants, including those brought to the United States under a Blanket L Program, must have worked abroad with the related company for one full year in the prior three years. In addition, L- 1B holders (intracompany transferees with specialized company knowledge) may not

29

Table of Contents

be primarily stationed at the work site of another employer if the L-1B visa holder will be controlled and supervised by an employer other than the petitioning employer. Finally, L-1B status may not be granted where placement of the L-1B visa holder at a third party site is part of an arrangement to provide labor for the third party, rather than placement at the site in connection with the provision of a product or service involving specialized knowledge specific to the petitioning employer.

We do not place L-1B workers at third party sites where they are under the primary supervision of a different employer, nor do we place L-1B workers at third party sites in an arrangement to provide labor for the third party without providing a service involving our specialized knowledge. Since implementation of the L-1 Visa Reform Act, we consistently have established this fact to CIS's satisfaction. However, if CIS and/or the United States Department of State, through its visa-issuing consular posts abroad, decide to interpret these provisions in a very restrictive fashion, this could impair our ability to staff our projects in the United States with resources from our entities abroad. New guidance governing these statutory provisions is being developed by CIS, and if such guidance is restrictive in nature, our ability to staff our projects in the United States with resources from our entities abroad will be impaired.

We also process immigrant visas for lawful permanent residence in the United States for employees to fill positions for which there are an insufficient number of able, willing, and qualified United States workers available to fill the positions. Compliance with existing United States immigration and labor laws, or changes in those laws making it more difficult to hire foreign nationals or limiting our ability to successfully obtain permanent residence for our foreign employees in the United States, could require us to incur additional unexpected labor costs and expenses or could restrain our ability to retain the skilled professionals we need for our operations in the United States. Any of these restrictions or limitations on our hiring practices could have a material adverse effect on our business, results of operations and financial condition.

In addition to immigration restrictions in the United States, there are certain restrictions on transferring employees to work in the United Kingdom, where we have experienced significant growth. The United Kingdom currently requires that all employees who are not nationals of European Union countries (plus nationals of Bulgaria and Romania) or EEA nationals, obtain work permission before obtaining a visa/entry clearance to travel to the United Kingdom. European nations such as Hungary, Poland, Lithuania, Slovakia, and the Czech Republic do not have a work permit requirement but employees need to register to work within 30 days of arrival. The United Kingdom has a points-based system under which certain certificates of sponsorship are issued by licensed employer sponsors, provided the employees they seek to employ in the United Kingdom can accumulate a certain number of points based on certain attributes. Where the employee has not worked for a Cognizant group company outside the United Kingdom for at least 6 months, we must carry out a resident labor market test to confirm that the intended role cannot be filled by an EEA national. We are currently an A-rated sponsor and were allocated certificates of sponsorship which we believe are sufficient to meet our current and expected demand for transfers to the United Kingdom. On November 23, 2010, the United Kingdom announced new restrictions to control annual net migration, but allowed for temporary intra-company transfers of employees from outside the European Economic Area for up to five years as long as the employees meet certain compensation requirements.

Immigration and work permit laws and regulations in the United States, the United Kingdom, the EU, Switzerland and other countries are subject to legislative and administrative changes as well as changes in the application of standards and enforcement. Immigration and work permit laws and regulations can be significantly affected by political forces and levels of economic activity. Our international expansion strategy and our business, results of operations, and financial condition may be materially adversely affected if changes in immigration and work permit laws and regulations or the administration or enforcement of such laws or regulations impair our ability to staff projects with professionals who are not citizens of the country where the work is to be performed.

**Our revenues are highly dependent on clients primarily located in the United States and Europe, as well as on clients concentrated in certain industries, including the financial services industry. Continuing or worsening economic conditions or factors that negatively affect the economic health of the United States, Europe or these industries may adversely affect our business.**

Approximately 78.0% of our revenues during the quarter ended March 31, 2011 were derived from customers located in North America. In the same period, approximately 18.7% of our revenues were derived from customers located in Europe. If the United States or European economy continues to weaken or slow and conditions in the financial markets continue to deteriorate, pricing for our services may be depressed and our customers may reduce or postpone their technology spending significantly, which may in turn lower the demand for our services and negatively affect our revenues and profitability. Additionally, any prolonged recession in the United States and Europe could have an adverse impact on our revenues because a large portion of our revenues are derived from the United States and Europe. In addition, during the quarter ended March 31, 2011, we earned approximately 41.6% of our revenues from the financial services industry, which includes insurance. A deterioration in the financial services industry and significant consolidation in that industry, or a decrease in growth or consolidation in other industry segments on which we focus, may reduce the demand for our services and negatively affect our revenues and profitability. In addition, if we are unable to successfully anticipate changing economic and political conditions affecting the industries and markets in which we operate, we may be unable to effectively plan for or respond to those changes, and our business could be negatively affected.

30

Table of Contents

**We face intense competition from other service providers.**

The intensely competitive information technology, consulting and business process outsourcing professional services markets include a large number of participants and are subject to rapid change. These markets include participants from a variety of market segments, including:

systems integration firms;

contract programming companies;

application software companies;

internet solutions providers;

large or traditional consulting companies;

professional services groups of computer equipment companies; and

infrastructure management and outsourcing companies.

These markets also include numerous smaller local competitors in the various geographic markets in which we operate which may be able to provide services and solutions at lower costs or on terms more attractive to clients than we can. Our direct competitors include, among others, Accenture, Capgemini, Computer Sciences Corporation, HCL Technologies, HP Enterprise (formerly Electronic Data Systems), IBM Global Services, Infosys Technologies, Perot Systems (acquired by Dell Inc.), Tata Consultancy Services and Wipro. Many of our competitors have significantly greater financial, technical and marketing resources and greater name recognition and, therefore, may be better able to compete for new work and skilled professionals. There is a risk that increased competition could put downward pressure on the prices we can charge for our services and on our operating margins. Similarly, if our competitors develop and implement methodologies that yield greater efficiency and productivity, they may be able to offer services similar to ours at lower prices without adversely affecting their profit margins. Even if our offerings address industry and client needs, our competitors may be more successful at selling their services. If we are unable to provide our clients with superior services and solutions at competitive prices or successfully market those services to current and prospective clients, our results of operations may suffer. Further, a client may choose to use its own internal resources rather than engage an outside firm to perform the types of services we provide. We cannot be certain that we will be able to sustain our current levels of profitability or growth in the face of competitive pressures, including competition for skilled technology professionals and pricing pressure from competitors employing an on- site/offshore business model.

In addition, we may face competition from companies that increase in size or scope as the result of strategic mergers or acquisitions. These transactions may include consolidation activity among hardware manufacturers, software companies and vendors, and service providers. The result of any such vertical integration may be greater integration of products and services that were once offered separately by independent vendors. Our access to such products and services may be reduced as a result of such an industry trend, which could adversely affect our competitive position.

**We may not be able to sustain our current level of profitability.**

For the quarter ended March 31, 2011, we reported an operating margin of 19.4%. Our operating margin may decline if we experience declines in demand and pricing for our services, imposition of new non- income related taxes or due to adverse fluctuations in foreign currency exchange rates. In addition, historically, wages in India have increased at a faster rate than in the United States. Additionally, the number and type of equity- based compensation awards and the assumptions used in valuing equity- based compensation awards may change resulting in increased stock- based compensation expense and lower margins. Although we have historically been able to partially offset wage increases and foreign currency fluctuations through further leveraging the scale of our operating structure, obtaining price increases, and issuing a lower number of stock- based compensation awards in proportion to our overall headcount, we cannot be sure that we will be able to continue to do so in the future.

**Our profitability could suffer if we are not able to control our costs.**

Our ability to control our costs and improve our efficiency affects our profitability. If we are unable to control our costs or improve our efficiency, our profitability could be negatively affected.

**Our business will suffer if we fail to develop new services and enhance our existing services in order to keep pace with the rapidly evolving technological environment.**

The information technology, consulting and business process outsourcing professional services markets are characterized by rapid technological change, evolving industry standards, changing customer preferences and new product and service introductions.

31

Table of Contents

Our future success will depend on our ability to develop solutions that keep pace with changes in the markets in which we provide services. We cannot be sure that we will be successful in developing new services addressing evolving technologies in a timely or cost- effective manner or, if these services are developed, that we will be successful in the marketplace. In addition, we cannot be sure that products, services or technologies developed by others will not render our services non- competitive or obsolete. Our failure to address the demands of the rapidly evolving technological environment could have a material adverse effect on our business, results of operations and financial condition.

Our ability to remain competitive will also depend on our ability to design and implement, in a timely and cost- effective manner, solutions for customers that both leverage their legacy systems and appropriately utilize newer technologies such as Web 2.0 models, software- as- a- service, and service oriented architectures. Our failure to design and implement solutions in a timely and cost- effective manner could have a material adverse effect on our business, results of operations and financial condition.

**We may face difficulties in providing end- to- end business solutions for our clients that could cause clients to discontinue their work with us, which in turn could harm our business.**

We have been expanding the nature and scope of our engagements and have added new service offerings, such as IT consulting, business and knowledge process outsourcing, systems integration and outsourcing of entire portions of IT infrastructure. The success of these service offerings is dependent, in part, upon continued demand for such services by our existing, new and prospective clients and our ability to meet this demand in a cost- competitive and effective manner. In addition, our ability to effectively offer a wider breadth of end- to- end business solutions depends on our ability to attract existing or new clients to these service offerings. To obtain engagements for such end- to- end solutions, we also are more likely to compete with large, well- established international consulting firms, resulting in increased competition and marketing costs. Accordingly, we cannot be certain that our new service offerings will effectively meet client needs or that we will be able to attract existing and new clients to these service offerings.

The increased breadth of our service offerings may result in larger and more complex projects with our clients. This will require us to establish closer relationships with our clients and a thorough understanding of their operations. Our ability to establish such relationships will depend on a number of factors, including the proficiency of our professionals and our management personnel. Our failure to understand our client requirements or our failure to deliver services that meet the requirements specified by our clients could result in termination of client contracts, and we could be liable to our clients for significant penalties or damages.

Larger projects may involve multiple engagements or stages, and there is a risk that a client may choose not to retain us for additional stages or may cancel or delay additional planned engagements. These terminations, cancellations or delays may result from factors that have little or nothing to do with the quality of our services, such as the business or financial condition of our clients or the economy generally. Such cancellations or delays make it difficult to plan for project resource requirements, and inaccuracies in such resource planning and allocation may have a negative impact on our profitability.

**If our clients are not satisfied with our services, our business could be adversely affected.**

Our business model depends in large part on our ability to attract additional work from our base of existing clients. Our business model also depends on relationships our account teams develop with our clients so that we can understand our clients' needs and deliver solutions and services that are tailored to those needs. If a client is not satisfied with the quality of work performed by us, or with the type of services or solutions delivered, then we could incur additional costs to address the situation, the profitability of that work might be impaired, and the client's dissatisfaction with our services could damage our ability to obtain additional work from that client. In particular, clients that are not satisfied might seek to terminate existing contracts prior to their scheduled expiration date and could direct future business to our competitors. In addition, negative publicity related to our client services or relationships, regardless of its accuracy, may further damage our business by affecting our ability to compete for new contracts with current and prospective clients.

**We rely on a few customers for a large portion of our revenues.**

Our top five customers generated approximately 17.0% of our revenues for the quarter ended March 31, 2011. The volume of work performed for specific customers is likely to vary from year to year, and a major customer in one year may not use our services in a subsequent year. The loss of one of our large customers could have a material adverse effect on our business, results of operations and financial condition.

**We generally do not have long- term contracts with our customers and our results of operations could be adversely affected if our clients terminate their contracts with us on short notice.**

Consistent with industry practice, we generally do not enter into long- term contracts with our customers. A majority of our contracts can be terminated by our clients with short notice and without significant early termination cost. Terminations may result from factors that are beyond our control and unrelated to our work product or the progress of the project, including the business or

32

Table of Contents

financial conditions of the client, changes in ownership or management at our clients, changes in client strategies or the economy or markets generally. When contracts are terminated, we lose the anticipated revenues and might not be able to eliminate our associated costs in a timely manner. Consequently, our profit margins in subsequent periods could be lower than expected. If we are unable to replace the lost revenue with other work on terms we find acceptable or effectively eliminate costs, we may not be able to maintain our level of profitability.

**Our results of operations may be affected by the rate of growth in the use of technology in business and the type and level of technology spending by our clients.**

Our business depends, in part, upon continued growth in the use of technology in business by our clients and prospective clients as well as their customers and suppliers. In challenging economic environments, our clients may reduce or defer their spending on new technologies in order to focus on other priorities. At the same time, many companies have already invested substantial resources in their current means of conducting commerce and exchanging information, and they may be reluctant or slow to adopt new approaches that could disrupt existing personnel, processes and infrastructures. If the growth of technology usage in business, or our clients' spending on technology in business, declines, or if we cannot convince our clients or potential clients to embrace new technological solutions, our results of operations could be adversely affected.

**If we are unable to collect our receivables from, or bill our unbilled services to, our clients, our results of operations and cash flows could be adversely affected.**

Our business depends on our ability to successfully obtain payment from our clients of the amounts they owe us for work performed. We evaluate the financial condition of our clients and usually bill and collect on relatively short cycles. We maintain allowances against receivables and unbilled services. Actual losses on client balances could differ from those that we currently anticipate and, as a result, we might need to adjust our allowances. There is no guarantee that we will accurately assess the creditworthiness of our clients. Macroeconomic conditions, such as the continued credit crisis and related turmoil in the global financial system, could also result in financial difficulties, including limited access to the credit markets, insolvency or bankruptcy, for our clients, and, as a result, could cause clients to delay payments to us, request modifications to their payment arrangements that could increase our receivables balance, or default on their payment obligations to us. Timely collection of client balances also depends on our ability to complete our contractual commitments and bill and collect our contracted revenues. If we are unable to meet our contractual requirements, we might experience delays in collection of and/or be unable to collect our client balances, and if this occurs, our results of operations and cash flows could be adversely affected. In addition, if we experience an increase in the time to bill and collect for our services, our cash flows could be adversely affected.

**We are investing substantial cash in new facilities and physical infrastructure, and our profitability could be reduced if our business does not grow proportionately.**

We have made and continue to make significant contractual commitments related to capital expenditures on construction or expansion of our development and delivery centers. We may encounter cost overruns or project delays in connection with new facilities. These expansions will likely increase our fixed costs and if we are unable to grow our business and revenues proportionately, our profitability may be reduced.

**Competition for highly- skilled technical personnel is intense and the success of our business depends on our ability to attract and retain highly- skilled professionals.**

Our future success will depend to a significant extent on our ability to attract, train and retain highly- skilled professionals so as to keep our supply of skills and resources in balance with client demand. In particular, we must attract, train and retain appropriate numbers of talented people, including project managers, IT engineers and other senior technical personnel, with diverse skills in order to serve client needs and grow our business. We are particularly dependent on retaining our senior executives and other experienced managers with the skill sets required by our business, and if we are unable to do so, our ability to develop new business and effectively lead our current projects could be jeopardized. Similarly, the profitability of our business model depends on our ability to effectively utilize personnel with the right mix of skills and experience to support our projects. The processes and costs associated with recruiting, training and retaining employees place significant demands on our resources.

We believe there is a shortage of, and significant competition for, professionals with the advanced technological skills necessary to perform the services we offer. We have subcontracted to a limited extent in the past, and may do so in the future, with other service providers in order to meet our obligations to our customers. Our ability to maintain and renew existing engagements and obtain new business will depend, in large part, on our ability to attract, train and retain technical personnel with the skills that keep pace with continuing changes in information technology, evolving industry standards and changing customer preferences. Further, we must train and manage our growing work force, requiring an increase in the level of responsibility for both existing and new management personnel. We cannot guarantee that the management skills and systems currently in place will be adequate or that we will be able to

Table of Contents

train and assimilate new employees successfully. Our profits and ability to compete for and manage client engagements could be adversely affected if we cannot manage employee hiring and attrition to achieve a stable and efficient workforce structure.

**Our ability to operate and compete effectively could be impaired if we lose key personnel or if we cannot attract additional qualified personnel.**

Our future performance depends to a significant degree upon the continued service of the key members of our management team, as well as marketing, sales and technical personnel, and our ability to attract and retain new management and other personnel. We do not maintain key man life insurance on any of our executive officers or significant employees. Competition for personnel is intense, and there can be no assurance that we will be able to retain our key employees or that we will be successful in attracting and retaining new personnel in the future. The loss of any one or more of our key personnel or the failure to attract and retain key personnel could have a material adverse effect on our business, results of operations and financial condition.

**Restrictions in non- competition agreements with our executive officers may not be enforceable.**

We have entered into non- competition agreements with our executive officers. We cannot be certain, however, that the restrictions in these agreements prohibiting such executive officers from engaging in competitive activities are enforceable. Further, substantially all of our professional non- executive staff are not covered by agreements that would prohibit them from working for our competitors. If any of our key professional personnel leaves our employment and joins one of our competitors, our business could be adversely affected.

**Our earnings may be adversely affected if we change our intent not to repatriate earnings in India or if such earnings become subject to U.S. tax on a current basis.**

Effective January 1, 2002, and in accordance with authoritative literature, we no longer accrue incremental U.S. taxes on all Indian earnings recognized in 2002 and subsequent periods as these earnings (as well as other foreign earnings for all periods) are considered to be indefinitely reinvested outside of the United States. While we have no plans to do so, events may occur in the future that could effectively force us to change our intent not to repatriate our foreign earnings. If we change our intent and repatriate such earnings, we will have to accrue the applicable amount of taxes associated with such earnings and pay taxes at a substantially higher rate than our effective income tax rate in 2011. These increased taxes could have a material adverse effect on our business, results of operations and financial condition.

**Our operating results may be negatively impacted upon the loss of certain tax benefits provided by India to companies in our industry as well as from proposed tax legislation in India.**

Cognizant India is primarily export- oriented and is eligible for certain income tax holiday benefits granted by the Indian government for export activities. These benefits for export activities conducted within STPs expired during the first quarter ended March 31, 2011. A significant portion of the earnings of Cognizant India is generated within STPs, and upon expiration of these benefits these earnings are subject to regular corporate income tax at the current rate of 32.4%, resulting in a significant increase in our effective income tax rate for 2011.

In addition to STPs, we have constructed and expect to continue to construct our newer development centers in areas designated as SEZs. Development centers operating in SEZs are entitled to certain income tax incentives for periods up to 15 years. Changes in Indian tax laws that would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition. In addition, as part of the Indian government's 2011 budget, effective April 1, 2011, all Indian profits, including those generated within SEZs, are subject to the MAT, at the current rate of 20.0%. Any MAT paid is creditable against future taxable income for a period of up to 10 years. Currently, we anticipate utilizing our existing MAT balances against future taxable income. Whether we will be able to fully realize our MAT related deferred income tax assets will depend on possible changes to the Indian tax laws as well as the future financial results of Cognizant India. The inability to fully realize our deferred income tax assets related to the MAT could have a material adverse effect on our business, results of operations and financial condition.

**If our pricing structures are based on inaccurate expectations and assumptions regarding the cost and complexity of performing our work, then our contracts could be unprofitable.**

We negotiate pricing terms with our clients utilizing a range of pricing structures and conditions. We predominantly contract to provide services either on a time- and- materials or on a fixed- price basis. Our pricing is highly dependent on our internal forecasts and predictions about our projects and the marketplace, which might be based on limited data and could turn out to be inaccurate. If we do not accurately estimate the costs and timing for completing projects, our contracts could prove unprofitable for us or yield lower profit margins than anticipated. We face a number of risks when pricing our contracts, as many of our projects entail the coordination of operations and workforces in multiple locations and utilizing workforces with different skill sets and competencies across geographically diverse service locations. Our pricing, cost and profit margin estimates for the work that we perform frequently include anticipated long- term cost savings from transformational and other initiatives that we expect to achieve and sustain over the life of the

34

Table of Contents

contract. There is a risk that we will underprice our projects, fail to accurately estimate the costs of performing the work or fail to accurately assess the risks associated with potential contracts. In particular, any increased or unexpected costs, delays or failures to achieve anticipated cost savings, or unexpected risks we encounter in connection with the performance of this work, including those caused by factors outside our control, could make these contracts less profitable or unprofitable, which could have an adverse effect on our profit margin.

In addition, a significant portion of our projects are on a fixed- price basis, subjecting us to the foregoing risks to an even greater extent. Fixed- price contracts accounted for approximately 31.8% of our revenues for the quarter ended March 31, 2011. We expect that an increasing number of our future projects will be contracted on a fixed- price basis. In addition to the other risks described in the paragraph above, we bear the risk of cost over-runs and operating cost inflation in connection with projects covered by fixed- price contracts. Our failure to estimate accurately the resources and time required for a fixed- price project, or our failure to complete our contractual obligations within the time frame committed, could have a material adverse effect on our business, results of operations and financial condition.

**Our profitability could suffer if we are not able to maintain favorable pricing rates.**

Our profit margin, and therefore our profitability, is dependent on the rates we are able to recover for our services. If we are not able to maintain favorable pricing for our services, our profit margin and our profitability could suffer. The rates we are able to recover for our services are affected by a number of factors, including:

  our clients' perceptions of our ability to add value through our services;

  competition;

  introduction of new services or products by us or our competitors;

  our competitors' pricing policies;

  our ability to accurately estimate, attain and sustain contract revenues, margins and cash flows over increasingly longer contract periods;

  bid practices of clients and their use of third- party advisors;

  the use by our competitors and our clients of offshore resources to provide lower- cost service delivery capabilities;

  our ability to charge premium prices when justified by market demand or the type of service; and

  general economic and political conditions.

**Our profitability could suffer if we are not able to maintain favorable utilization rates.**

The cost of providing our services, including the utilization rate of our professionals, affects our profitability. If we are not able to maintain an appropriate utilization rate for our professionals, our profit margin and our profitability may suffer. Our utilization rates are affected by a number of factors, including:

  our ability to efficiently transition employees from completed projects to new assignments and to hire and assimilate new employees;

  our ability to accurately forecast demand for our services and thereby maintain an appropriate headcount in each of our geographies and workforces;

  our ability to effectively manage attrition; and

  our need to devote time and resources to training, professional development and other non- chargeable activities.

**If we do not continue to improve our operational, financial and other internal controls and systems to manage our rapid growth and size or if we are unable to enter, operate and compete effectively in new geographic markets, our business may suffer and the value of our shareholders' investment may be harmed.**

Our anticipated growth will continue to place significant demands on our management and other resources. Our growth will require us to continue to develop and improve our operational, financial and other internal controls, both in the United States, India and elsewhere. In particular, our continued growth will increase the challenges involved in:

recruiting, training and retaining technical, finance, marketing and management personnel with the knowledge, skills and experience that our business model requires;

maintaining high levels of client satisfaction;

developing and improving our internal administrative infrastructure, particularly our financial, operational, communications and other internal systems;

35

Table of Contents

preserving our culture, values and entrepreneurial environment; and

effectively managing our personnel and operations and effectively communicating to our personnel worldwide our core values, strategies and goals.

In addition, the increasing size and scope of our operations increase the possibility that an employee will engage in unlawful or fraudulent activity, or otherwise expose us to unacceptable business risks, despite our efforts to train our people and maintain internal controls to prevent such instances. If we do not continue to develop and implement the right processes and tools to manage our enterprise, our ability to compete successfully and achieve our business objectives could be impaired.

As part of our growth strategy, we plan to continue expanding our operations in Europe, Asia, Middle East, and Latin America. We may not be able to compete effectively in these markets and the cost of entering these markets may be substantially greater than we expect. If we fail to compete effectively in the new markets we enter, or if the cost of entering those markets is substantially greater than we expect, our business, results of operations and financial condition could be adversely affected. In addition, if we cannot compete effectively, we may be required to reconsider our strategy to invest in our international expansion plans and change our intent on the repatriation of our earnings.

**Our operating results may experience significant quarterly fluctuations.**

Historically, we have experienced significant quarterly fluctuations in our revenues and results of operations and expect these fluctuations to continue. Among the factors causing these variations have been:

the nature, number, timing, scope and contractual terms of the projects in which we are engaged;

delays incurred in the performance of those projects;

the accuracy of estimates of resources and time required to complete ongoing projects; and

general economic conditions.

In addition, our future revenues, operating margins and profitability may fluctuate as a result of:

changes in pricing in response to customer demand and competitive pressures;

changes to the financial condition of our clients;

the mix of on- site and offshore staffing;

the ratio of fixed- price contracts versus time- and- materials contracts;

employee wage levels and utilization rates;

changes in foreign exchange rates, including the Indian rupee versus the U.S. dollar;

the timing of collection of accounts receivable;

enactment of new taxes;

changes in domestic and international income tax rates and regulations; and

changes to levels and types of stock- based compensation awards and assumptions used to determine the fair value of such awards.

A high percentage of our operating expenses, particularly personnel and rent, are relatively fixed in advance of any particular period. As a result, unanticipated variations in the number and timing of our projects or in employee wage levels and utilization rates may cause significant variations in our operating results in any particular period, and could result in losses. Any significant shortfall of revenues in relation to our expectations, any material reduction in utilization rates for our professional staff or variance in the on- site/offshore staffing mix, an unanticipated termination of a

major project, a customer's decision not to pursue a new project or proceed to succeeding stages of a current project or the completion of several major customer projects during a quarter could require us to pay underutilized employees and could therefore have a material adverse effect on our business, results of operations and financial condition.

As a result of these factors, it is possible that in some future periods, our revenues and operating results may be significantly below the expectations of public market analysts and investors. In such an event, the price of our common stock would likely be materially and adversely affected.

**We could be held liable for damages or our reputation could be damaged by disclosure of confidential information or personal data or system failures.**

We are dependent on information technology networks and systems to process, transmit and store electronic information and to communicate among our locations around the world and with our clients. Security breaches of this infrastructure could lead to

36

Table of Contents

shutdowns or disruptions of our systems and potential unauthorized disclosure of confidential information. In addition, many of our engagements involve projects that are critical to the operations of our customers' businesses and provide benefits that are difficult to quantify. Any failure in a customer's computer system could result in a claim for substantial damages against us, regardless of our responsibility for the failure. Although we attempt to limit by contract our liability for damages arising from negligent acts, errors, mistakes or omissions in rendering our services, we cannot assure you that any contractual limitations on liability will be enforceable in all instances or will otherwise protect us from liability for damages. In addition, we often have access to or are required to manage, utilize, collect and store sensitive or confidential client or employee data, including nonpublic personal data. As a result, we are subject to numerous U.S. and foreign jurisdiction laws and regulations designed to protect this information, such as the European Union Directive on Data Protection and various U.S. federal and state laws governing the protection of health or other individually identifiable information. If any person, including any of our employees, negligently disregards or intentionally breaches our established controls with respect to such data or otherwise mismanages or misappropriates that data, we could be subject to significant liability to our clients or our clients' customers for breaching contractual confidentiality provisions or privacy laws as well as liability and penalties in connection with any violation of applicable privacy laws and/or criminal prosecution. Unauthorized disclosure of sensitive or confidential client or employee data, whether through breach of computer systems, systems failure, employee negligence, fraud or misappropriation, or otherwise, could damage our reputation and cause us to lose clients. Similarly, unauthorized access to or through our information systems or those we develop or manage for our clients, whether by our employees or third parties, could result in negative publicity, legal liability and damage to our reputation.

Although we have general liability insurance coverage, including coverage for errors or omissions, there can be no assurance that coverage will continue to be available on reasonable terms or will be sufficient in amount to cover one or more large claims, or that the insurer will not disclaim coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage or changes in our insurance policies, including premium increases or the imposition of large deductible or co- insurance requirements, could have a material adverse effect on our business, results of operations and financial condition.

**Our business could be negatively affected if we incur legal liability, including with respect to our indemnification obligations, in connection with providing our solutions and services.**

If we fail to meet our contractual obligations or otherwise breach obligations to our clients, we could be subject to legal liability. We may enter into non- standard agreements because we perceive an important economic opportunity or because our personnel did not adequately adhere to our guidelines. In addition, the contracting practices of our competitors may cause contract terms and conditions that are unfavorable to us to become standard in the marketplace. If we cannot or do not perform our obligations, we could face legal liability and our contracts might not always protect us adequately through limitations on the scope and/or amount of our potential liability. If we cannot, or do not, meet our contractual obligations to provide solutions and services, and if our exposure is not adequately limited through the terms of our agreements, we might face significant legal liability and our business could be adversely affected.

In the normal course of business and in conjunction with certain client engagements, we have entered into contractual arrangements through which we may be obligated to indemnify clients or other parties with whom we conduct business with respect to certain matters. These arrangements can include provisions whereby we agree to hold the indemnified party and certain of their affiliated entities harmless with respect to third- party claims related to such matters as our breach of certain representations or covenants, or out of our intellectual property infringement, our gross negligence or willful misconduct or certain other claims made against certain parties. Payments by us under any of these arrangements are generally conditioned on the client making a claim and providing us with full control over the defense and settlement of such claim. It is not possible to determine the maximum potential amount under these indemnification agreements due to the unique facts and circumstances involved in each particular agreement. Historically, we have not made payments under these indemnification agreements so they have not had any impact on our operating results, financial position, or cash flows. However, if events arise requiring us to make payment for indemnification claims under our indemnification obligations in contracts we have entered, such payments could have material impact on our operating results, financial position, and cash flows.

**We could incur liability or our reputation could be damaged if our provision of services and solutions to our clients contributes to our clients' internal control deficiencies.**

Our clients may perform audits or require us to perform audits and provide audit reports with respect to the controls and procedures that we use in the performance of services for such clients, especially when we process data belonging to them. Our ability to acquire new clients and retain existing clients may be adversely affected and our reputation could be harmed if we receive a qualified opinion, or if we cannot obtain an unqualified opinion, with respect to our controls and procedures in connection with any such audit in a timely manner. Additionally, we could incur liability if our controls and procedures, or the controls and procedures we

37

Table of Contents

manage for a client, were to result in internal controls failures or impair our client's ability to comply with its own internal control requirements.

**If we are unable to protect our intellectual property rights, our business may be adversely affected.**

Our future success will depend, in part, on our ability to protect our proprietary methodologies and other intellectual property. We presently hold no patents or registered copyrights, and rely upon a combination of copyright and trade secret laws, non- disclosure and other contractual arrangements and various security measures to protect our intellectual property rights. Existing laws of some countries in which we provide services or solutions, such as China, might offer only limited protection of our intellectual property rights. India is a member of the Berne Convention, and has agreed to recognize protections on copyrights conferred under the laws of foreign countries, including the laws of the United States. We believe that laws, rules, regulations and treaties in effect in the United States, India and other countries in which we operate are adequate to protect us from misappropriation or unauthorized use of our copyrights and other intellectual property. However, there can be no assurance that these laws will not change and, in particular, that the laws of India or the United States will not change in ways that may prevent or restrict the transfer of software components, libraries and toolsets from India to the United States or from the United States to India. There can be no assurance that the steps we have taken to protect our intellectual property rights will be adequate to deter misappropriation of any of our intellectual property, or that we will be able to detect unauthorized use and take appropriate steps to enforce our rights. Enforcing our rights might also require considerable time, money and oversight. Unauthorized use of our intellectual property may result in development of technology, products or services that compete with our products and services and unauthorized parties may infringe upon or misappropriate our products, services or proprietary information. If we are unable to protect our intellectual property, our business may be adversely affected.

Depending on the circumstances, we might need to grant a specific client greater rights in intellectual property developed or used in connection with a contract than we generally do. In certain situations, we might forego all rights to the use of intellectual property we create and intend to reuse across multiple client engagements, which would limit our ability to reuse that intellectual property for other clients. Any limitation on our ability to provide a service or solution could cause us to lose revenue- generating opportunities and require us to incur additional expenses to develop new or modified solutions for future projects.

**Our services or solutions could infringe upon the intellectual property rights of others or we might lose our ability to utilize the intellectual property of others.**

We cannot be sure that our services and solutions, or the solutions of others that we offer to our clients, do not infringe on the intellectual property rights of others, and we could have infringement claims asserted against us or against our clients. These claims could harm our reputation, cost us money and prevent us from offering some services or solutions. In a number of our contracts, we have agreed to indemnify our clients for any expenses or liabilities resulting from claimed infringements of the intellectual property rights of third parties. In some instances, the amount of these indemnities could be greater than the revenues we receive from the client. Any claims or litigation in this area, whether we ultimately win or lose, could be time- consuming and costly, injure our reputation or require us to enter into royalty or licensing arrangements. If the latter, we might not be able to enter into these royalty or licensing arrangements on acceptable terms. If a claim of infringement were successful against us or our clients, an injunction might be ordered against our client or our own services or operations, causing further damages. We expect that the risk of infringement claims against us will increase if our competitors are able to obtain patents for software products and processes. Any infringement claim or litigation against us could have a material adverse effect on our business, results of operations and financial condition.

We could lose our ability or be unable to secure the right to utilize the intellectual property of others. Third- party suppliers of software, hardware or other intellectual property could be unwilling to permit us to use their intellectual property and this could impede or disrupt use of their products or services by us and our clients. If our ability to provide services and solutions to our clients is impaired, our operating results could be adversely affected.

**We may be unable to integrate acquired companies or technologies successfully and we may be subject to certain liabilities assumed in connection with our acquisitions that could harm our operating results.**

We expect to continue our program of pursuing strategic acquisitions and joint ventures designed to enhance our capabilities, enable us to expand our geographic presence, especially in the European market, enter new technology areas and/or expand our capacity. We cannot be sure that we will successfully identify suitable acquisition candidates, consummate any acquisition or joint venture, integrate any acquired business or joint venture into our operations or achieve desired financial and operating results. Further, acquisitions and joint ventures involve a number of special risks, including diversion of management's attention and failure to retain key personnel. We might need to dedicate additional management and other resources to complete the transactions. Our organizational structure could make it difficult for us to efficiently integrate acquired businesses or technologies into our ongoing operations and assimilate employees of those businesses into our culture and operations. Accordingly, we might fail to realize the expected benefits or strategic objectives of any acquisition we undertake. If we are unable to complete the number and kind of acquisitions for which we

38

EXHIBIT B - Page 94

Table of Contents

plan, or if we are inefficient or unsuccessful at integrating any acquired businesses into our operations, we may not be able to achieve our planned rates of growth or improve our market share, profitability or competitive position in specific markets or services. Also, we may finance any future acquisitions with cash, debt financing, the issuance of equity securities or a combination of the foregoing. We cannot assure you that we will be able to arrange adequate financing on acceptable terms. In addition, acquisitions financed with the issuance of our equity securities could be dilutive. Although we conduct due diligence in connection with each of our acquisitions, there may be liabilities that we fail to discover or that we inadequately assess in our due diligence efforts. In particular, to the extent that any acquired businesses or properties failed to comply with or otherwise violated applicable laws or regulations, or failed to fulfill their contractual obligations to customers, we, as the successor owner, may be financially responsible for these violations and failures and may suffer reputational harm or otherwise be adversely affected. While we generally require the selling party to indemnify us for any and all damages associated with such liabilities, if for any reason the seller does not perform their indemnification obligation, we may be held responsible for such liabilities and have no recourse for resulting damages. In addition, as part of an acquisition, we may assume responsibilities and obligations of the acquired business pursuant to the terms and conditions of services agreements entered by the acquired entity that are not consistent with the terms and conditions that we typically accept and require. Although we attempt to structure acquisitions in such a manner as to minimize the liability that could arise from such contractual commitments, we cannot assure you that any of our efforts to minimize the liability will be effective in all instances or will otherwise protect us from liability for damages under such agreements. The discovery of any material liabilities associated with our acquisitions for which we are unable to receive indemnification could harm our operating results.

**System failure or disruptions in communications could disrupt our business and result in lost customers and curtailed operations which would reduce our revenue and profitability.**

To deliver our services to our customers, we must maintain a high speed network of satellite, fiber optic and land lines and active voice and data communications twenty- four hours a day between our main operating offices in Chennai, our other development and delivery centers and the offices of our customers worldwide. Although we maintain redundancy facilities and satellite communications links, any systems failure or a significant lapse in our ability to transmit voice and data through satellite and telephone communications could result in lost customers and curtailed operations which would reduce our revenue and profitability.

**Consolidation in the industries that we serve could adversely affect our business.**

Companies in the industries that we serve may seek to achieve economies of scale and other synergies by combining with or acquiring other companies. If two or more of our current clients merge or consolidate and combine their operations, it may decrease the amount of work that we perform for these clients. If one of our current clients merges or consolidates with a company that relies on another provider for its consulting, systems integration and technology, or outsourcing services, we may lose work from that client or lose the opportunity to gain additional work. The increased market power of larger companies could also increase pricing and competitive pressures on us. Any of these possible results of industry consolidation could adversely affect our business.

**Our ability to attract and retain business may depend on our reputation in the marketplace.**

Our services are marketed to clients and prospective clients based on a number of factors. Since many of our specific client engagements involve unique services and solutions, our corporate reputation is a significant factor in our clients' evaluation of whether to engage our services. We believe the Cognizant brand name and our reputation are important corporate assets that help distinguish our services from those of our competitors and also contribute to our efforts to recruit and retain talented employees. However, our corporate reputation is potentially susceptible to damage by actions or statements made by current or former clients, competitors, vendors, adversaries in legal proceedings, government regulators, as well as members of the investment community and the media. There is a risk that negative information about our company, even if based on false rumor or misunderstanding, could adversely affect our business. In particular, damage to our reputation could be difficult and time- consuming to repair, could make potential or existing clients reluctant to select us for new engagements, resulting in a loss of business, and could adversely affect our recruitment and retention efforts. Damage to our reputation could also reduce the value and effectiveness of the Cognizant brand name and could reduce investor confidence in us, adversely affecting our share price.

**Provisions in our charter, by- laws and stockholders' rights plan and provisions under Delaware law may discourage unsolicited takeover proposals.**

Provisions in our charter and by- laws, each as amended, our stockholders' rights plan and Delaware General Corporate Law, or DGCL, may have the effect of deterring unsolicited takeover proposals or delaying or preventing changes in our control or management, including transactions in which stockholders might otherwise receive a premium for their shares over then- current market prices. In addition, these documents and provisions may limit the ability of stockholders to approve transactions that they may deem to be in their best interests. Our board of directors has the authority, without further action by the stockholders, to fix the rights and preferences, and issue shares of preferred stock. Our charter provides for a classified board of directors, which will prevent a

39

Table of Contents

change of control of our board of directors at a single meeting of stockholders. The prohibition of our stockholders' ability to act by written consent and to call a special meeting will delay stockholder actions until annual meetings or until a special meeting is called by our chairman or chief executive officer or our board of directors. The supermajority- voting requirement for specified amendments to our charter and by- laws allows a minority of our stockholders to block those amendments. The DGCL also contains provisions preventing stockholders from engaging in business combinations with us, subject to certain exceptions. These provisions could also discourage bids for our common stock at a premium as well as create a depressive effect on the market price of the shares of our common stock.

**New and changing corporate governance and public disclosure requirements add uncertainty to our compliance policies and increases our costs of compliance.**

Changing laws, regulations and standards relating to accounting, corporate governance and public disclosure, including the Sarbanes- Oxley Act of 2002, other SEC regulations, and the NASDAQ Global Select Market rules, are creating uncertainty for companies like ours. These laws, regulations and standards may lack specificity and are subject to varying interpretations. Their application in practice may evolve over time, as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs of compliance as a result of ongoing revisions to such corporate governance standards.

In particular, our efforts to comply with Section 404 of the Sarbanes- Oxley Act of 2002 and the related regulations regarding our required assessment of our internal controls over financial reporting and our external auditors' audit of that assessment requires the commitment of significant financial and managerial resources. We consistently assess the adequacy of our internal controls over financial reporting, remediate any control deficiencies that may be identified, and validate through testing that our controls are functioning as documented. While we do not anticipate any material weaknesses, the inability of management and our independent auditor to provide us with an unqualified report as to the adequacy and effectiveness, respectively, of our internal controls over financial reporting for future year ends could result in adverse consequences to us, including, but not limited to, a loss of investor confidence in the reliability of our financial statements, which could cause the market price of our stock to decline.

We are committed to maintaining high standards of corporate governance and public disclosure, and our efforts to comply with evolving laws, regulations and standards in this regard have resulted in, and are likely to continue to result in, increased general and administrative expenses and a diversion of management time and attention from revenue- generating activities to compliance activities. In addition, the laws, regulations and standards regarding corporate governance may make it more difficult for us to obtain director and officer liability insurance. Further, our board members, chief executive officer and chief financial officer could face an increased risk of personal liability in connection with their performance of duties. As a result, we may face difficulties attracting and retaining qualified board members and executive officers, which could harm our business. If we fail to comply with new or changed laws, regulations or standards of corporate governance, our business and reputation may be harmed.

**Our share price could be adversely affected if we are unable to maintain effective internal controls.**

The accuracy of our financial reporting is dependent on the effectiveness of our internal controls. We are required to provide a report from management to our shareholders on our internal control over financial reporting that includes an assessment of the effectiveness of these controls. Internal control over financial reporting has inherent limitations, including human error, the possibility that controls could be circumvented or become inadequate because of changed conditions, and fraud. Because of these inherent limitations, internal control over financial reporting might not prevent or detect all misstatements or fraud. If we cannot maintain and execute adequate internal control over financial reporting or implement required new or improved controls to ensure the reliability of the financial reporting and preparation of our financial statements for external use, we could suffer harm to our reputation, fail to meet our public reporting requirements on a timely basis, or be unable to properly report on our business and the results of our operations, and the market price of our securities could be materially adversely affected.

**We are exposed to credit risk and fluctuations in the market values of our investment portfolio.**

Recent turmoil in the financial markets has adversely affected economic activity in the United States and other regions of the world in which we do business. We believe that based on our current cash, cash equivalents and investment balances and expected operating cash flows, the current lack of liquidity in the credit markets will not have a material impact on our liquidity, cash flow or financial flexibility. Continued deterioration of the credit and capital markets could result in volatility of our investment earnings and impairments to our investment portfolio, which could negatively impact our financial condition and reported income. The continued decline in economic activity could adversely affect the ability of counterparties to certain financial instruments such as marketable securities and derivatives to meet their obligations to us.

40

Table of Contents

**Our stock price continues to be volatile.**

Our stock has at times experienced substantial price volatility as a result of variations between our actual and anticipated financial results, announcements by us and our competitors, projections or speculation about our business or that of our competitors by the media or investment analysts or uncertainty about current global economic conditions. The stock market, as a whole, also has experienced extreme price and volume fluctuations that have affected the market price of many technology companies in ways that may have been unrelated to these companies' operating performance. Furthermore, we believe our stock price should reflect future growth and profitability expectations and, if we fail to meet these expectations, our stock price may significantly decline.

**Item 2.       Unregistered Sales of Equity Securities and Use of Proceeds**

*Issuer Purchases of Equity Securities*

In December 2010, our Board of Directors authorized up to $150.0 million in funds for repurchases of Cognizant's outstanding shares of Class A common stock. The $150.0 million authorization excluded fees and expenses and expires in December 2011. The program authorizes management to repurchase shares in the open market or in private transactions from time to time, depending on market conditions. During the three months ended March 31, 2011, we repurchased $77.1 million of our Class A common stock under our stock repurchase program. Stock repurchases were funded from working capital.

| Month | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased under the Plans or Programs (in thousands) |
|---|---|---|---|---|
| January 1, 2011 – January 31, 2011 | | | | $   108,144 |
| February 1, 2011 – February 28, 2011 | 372,450 | $   74.57 | 372,450 | 80,369 |
| March 1, 2011 – March 31, 2011 | 661,750 | $   74.47 | 661,750 | 31,090 |
| Total | 1,034,200 | $   74.51 | 1,034,200 | |

41

Table of Contents
Item 6.        Exhibits.
(a) Exhibits.

| Exhibit No. | Description |
|---|---|
| 31.1 | Certification of principal executive officer pursuant to Section 302 of the Sarbanes- Oxley Act of 2002. |
| 31.2 | Certification of principal financial and accounting officer pursuant to Section 302 of the Sarbanes- Oxley Act of 2002. |
| 32.1 | Certification of principal executive officer pursuant to Section 906 of the Sarbanes- Oxley Act of 2002, 18 U.S.C. 1350. |
| 32.2 | Certification of principal financial and accounting officer pursuant to Section 906 of the Sarbanes- Oxley Act of 2002, 18 U.S.C. 1350. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

42

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Cognizant Technology Solutions Corporation

Date: May 5, 2011                                                    By:    /s/   Francisco D'Souza
                                                                                   _____

                                                                                   Francisco D'Souza,
                                                                                   President and Chief Executive Officer
                                                                                   (Principal Executive Officer)

Date: May 5, 2011                                                    By:    /s/   Gordon Coburn
                                                                                   _____

                                                                                   Gordon Coburn,
                                                                                   Chief Financial and Operating
                                                                                   Officer and Treasurer
                                                                                   (Principal Financial and Accounting Officer)

43

Table of Contents

**Exhibit Index**

| Exhibit No. | Description |
|---|---|
| 31.1 | Certification of principal executive officer pursuant to Section 302 of the Sarbanes- Oxley Act of 2002. |
| 31.2 | Certification of principal financial and accounting officer pursuant to Section 302 of the Sarbanes- Oxley Act of 2002. |
| 32.1 | Certification of principal executive officer pursuant to Section 906 of the Sarbanes- Oxley Act of 2002, 18 U.S.C. 1350. |
| 32.2 | Certification of principal financial and accounting officer pursuant to Section 906 of the Sarbanes- Oxley Act of 2002, 18 U.S.C. 1350. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

**EXHIBIT 31.1**

CERTIFICATION

I, Francisco D'Souza, certify that:

1. I have reviewed this Quarterly Report on Form 10- Q of Cognizant Technology Solutions Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d- 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d- 15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 5, 2011

/s/ Francisco D'Souza
Francisco D'Souza,
President and Chief Executive Officer
(Principal Executive Officer)

EXHIBIT 31.2

CERTIFICATION

I, Gordon Coburn, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of Cognizant Technology Solutions Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 5, 2011

/s/   Gordon Coburn
Gordon Coburn
Chief Financial and Operating Officer and Treasurer
(Principal Financial and Accounting Officer)

EXHIBIT B - Page 102

**EXHIBIT 32.1**

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES- OXLEY ACT OF 2002

In connection with the Quarterly Report on Form 10- Q of Cognizant Technology Solutions Corporation (the "Company") for the period ended March 31, 2011 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Francisco D'Souza, President, Chief Executive Officer and Director of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 5, 2011

/s/   Francisco D'Souza
Francisco D'Souza,
President and Chief Executive Officer
(Principal Executive Officer)

\*       A signed original of this written statement required by Section 906 has been provided to Cognizant Technology Solutions Corporation and will be retained by Cognizant Technology Solutions Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.2

## CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES- OXLEY ACT OF 2002

In connection with the Quarterly Report on Form 10- Q of Cognizant Technology Solutions Corporation (the "Company") for the period ended March 31, 2011 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Gordon Coburn, Chief Financial and Operating Officer and Treasurer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Dated: May 5, 2011                                    /s/   Gordon Coburn
                                                      Gordon Coburn
                                                      Chief Financial and Operating Officer and Treasurer
                                                      (Principal Financial and Accounting Officer)


*       A signed original of this written statement required by Section 906 has been provided to Cognizant Technology Solutions Corporation and will be retained by Cognizant Technology Solutions Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# EXHIBIT B
## to Misty Pederson Declaration

10/28/2003  12:19   2016782782          COGNIZANT TECH SOLN              PAGE  01/09



PAGE   1

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION" IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SIXTEENTH DAY OF SEPTEMBER, A.D. 2003.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.



Harriet Smith Windsor, Secretary of State

2701808   8300

030596659

AUTHENTICATION: 2636822

DATE: 09-16-03

EXHIBIT B - Page 106

PAGE  1

*State of Delaware*

## Office of the Secretary of State

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF AMENDMENT OF "COGNIZANT TECHNOLOGY
SOLUTIONS CORPORATION", CHANGING ITS NAME FROM "COGNIZANT
TECHNOLOGY SOLUTIONS CORPORATION" TO "COGNIZANT TECHNOLOGY
SOLUTIONS U.S. CORPORATION", FILED IN THIS OFFICE ON THE
TWENTY-FOURTH DAY OF FEBRUARY, A.D. 1998, AT 10 O'CLOCK A.M.



Edward J. Freel, Secretary of State

AUTHENTICATION:          8940228

DATE:

02-25-98

2701808   8100

981071042

EXHIBIT B - Page 107

# CERTIFICATE OF AMENDMENT

## OF

## CERTIFICATE OF INCORPORATION

## OF

## COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION

\* \* \* \*

Cognizant Technology Solutions Corporation, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, Does Hereby Certify:

First:  That the Board of Directors of said corporation, by unanimous written consent of its members, filed with the minutes of the Board, adopted a resolution proposing and declaring advisable the following amendment to the Certificate of Incorporation of said corporation:

RESOLVED, that Article 1 of the Certificate of Incorporation of the Corporation is amended in its entirety to read as follows:

"1.  The name of the corporation is:

Cognizant Technology Solutions U.S. Corporation"

Second:  That in lieu of a meeting and vote of shareholders, the sole shareholder has given unanimous written consent to said amendment in accordance with the provisions of § 228 of the General Corporation Law of the State of Delaware.

**Third:**  That the aforesaid amendment was duly adopted in accordance with the applicable provisions of § 228 and 242 of the General Corporation Law of the State of Delaware.  This Certificate of Amendment of the Certificate of Incorporation shall be effective on March 2, 1998.

**In Witness Whereof,** said Cognizant Technology Solutions Corporation has caused this certificate to be signed by Kenneth S. Siegel, its Secretary, this 23rd day of February, 1998.

Cognizant Technology Solutions Corporation

Kenneth S. Siegel, Secretary

# CERTIFICATE OF AMENDMENT

## OF

## CERTIFICATE OF INCORPORATION

## OF

## COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION

# \* \* \* \*

Cognizant Technology Solutions Corporation, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, Does Hereby Certify:

First:  That the Board of Directors of said corporation, by unanimous written consent of its members, filed with the minutes of the Board, adopted a resolution proposing and declaring advisable the following amendment to the Certificate of Incorporation of said corporation:

> RESOLVED, that Article 1 of the Certificate of Incorporation of the Corporation is amended in its entirety to read as follows:
>
> "1.  The name of the corporation is:
>
> Cognizant Technology Solutions U.S. Corporation"

Second:  That in Lieu of a meeting and vote of shareholders, the sole shareholder has given unanimous written consent to said amendment in accordance with the provisions of § 228 of the General Corporation Law of the State of Delaware.

EXHIBIT B - Page 110

**Third:**  That the aforesaid amendment was duly adopted in accordance with the applicable provisions of § 228 and 242 of the General Corporation Law of the State of Delaware.  This Certificate of Amendment of the Certificate of Incorporation shall be effective on March 2, 1998.

**In Witness Whereof,** said Cognizant Technology Solutions Corporation has caused this certificate to be signed by Kenneth S. Siegel, its Secretary, this 23rd day of February, 1998.

Cognizant Technology Solutions Corporation

Kenneth S. Siegel, Secretary

PAGE   1

*State of Delaware*

## *Office of the Secretary of State*

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF INCORPORATION OF "COGNIZANT
TECHNOLOGY SOLUTIONS CORPORATION", FILED IN THIS OFFICE ON THE
THIRTY-FIRST DAY OF DECEMBER, A.D. 1996, AT 12:31 O'CLOCK P.M.



Edward J. Freel, Secretary of State

AUTHENTICATION:        8279338

DATE:

01-09-97

2701808   8100

971009063

EXHIBIT B - Page 112

10/28/2003  12:19    2016782782    COGNIZANT TECH SOLN              PAGE  08/09

DEC-31-1996  11:59        C T SYSTEM                    1 212 247 2882    P.03/04

## CERTIFICATE OF INCORPORATION

12-31-96

### of

## COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION

* * * * * * * * *

**First:**    The name of the corporation is:

Cognizant Technology Solutions Corporation

**Second:**   The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

**Third:**    The nature of the business or purpose to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

**Fourth:**   The total number of shares of capital stock which the corporation shall have authority to issue is one hundred (100) shares of Common Stock; each such share shall have a $1.00 par value.

**Fifth:**    The name and mailing address of the incorporator is as follows:

| Name | Mailing Address |
|------|-----------------|
| Stephen J. Boatti | % Cognizant Corporation<br>200 Nyala Farms<br>Westport, CT 06880 |

**Sixth:**    The corporation shall have perpetual existence.

**Seventh:**  In furtherance and not in limitation of the powers conferred by statute, the board of directors is expressly authorized to make, alter or repeal the By-Laws of the corporation.

DEC-31-1996  11:59        C T SYSTEM                        1 212 247 2882   P.04/04

**Eighth:**    Elections of directors need not be by written ballot unless the By-Laws of the corporation shall so provide.  Meetings of stockholders may be held within or without the State of Delaware, as the By-Laws may provide.  The books of the corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the board of directors or in the By-Laws of the corporation.

**Ninth:** Directors of the corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended.  Any amendment, modification or repeal of the foregoing sentence shall not adversely affect any right or protection of a director of the corporation hereunder in respect of any act or omission occurring prior to the time of such amendment, modification or repeal.

**Tenth:** The corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

ELEVENTH: The effective date of this filing shall be January 1, 1997.
I, the undersigned, being the incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the State of Delaware, do make this Certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 31st day of December, 1996.

Stephen J. Boutti, Incorporator

TOTAL P.04

# EXHIBIT C
## to Misty Pederson Declaration

| START_DT | END_DT | No of days | Base as of (st) | COLA as of (st) | CONTRI as (st) | PB as of (st) | Base as of (en) | COLA as of (en) | CONTRI as (en) | PB as of (en) | Active/Inac | Termination Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/1/2007 | 1/5/2010 | 1100 | 59500 | 6500 | 0 | 0 | 62000 | 9000 | 0 | 0 | Active | |
| 5/4/2010 | 7/11/2011 | 433 | 62000 | 6500 | 1900 | 0 | 63900 | 6,500 | 3300 | 0 | Active | |
| 1/1/2007 | 5/2/2007 | 121 | 59500 | 8500 | 0 | 0 | 59500 | 8500 | 1000 | 595 | Inactive | 11-09-2007 |
| 1/1/2007 | 10/8/2007 | 280 | 59500 | 8500 | 0 | 0 | 59500 | 8500 | 1000 | 595 | Inactive | 03-31-2008 |
| 11/15/2007 | 4/1/2008 | 138 | 59500 | 8500 | 1000 | 595 | 60500 | 8500 | 0 | 0 | Inactive | 03-31-2008 |
| 4/1/2008 | 4/1/2008 | 0 | 60500 | 8500 | 0 | 0 | 60500 | 8500 | 0 | 0 | Inactive | 12-21-2007 |
| 1/1/2007 | 10/12/2007 | 284 | 49500 | 8500 | 0 | 0 | 49500 | 8500 | 1000 | 1237.5 | Inactive | 12-21-2007 |
| 1/1/2007 | 2/5/2007 | 35 | 49500 | 5500 | 0 | 0 | 49500 | 5500 | 0 | 0 | Inactive | 09-02-2008 |
| 2/12/2007 | 9/29/2007 | 229 | 49500 | 4000 | 0 | 0 | 49500 | 8500 | 1000 | 495 | Inactive | 09-28-2007 |
| 9/29/2007 | 9/29/2007 | 0 | 49500 | 8500 | 1000 | 495 | 49500 | 8500 | 1000 | 495 | Inactive | 09-28-2007 |
| 9/1/2008 | 11/6/2010 | 796 | 60500 | 6500 | 1500 | 0 | 62000 | 6500 | 1900 | 0 | Inactive | 11-05-2010 |
| 11/6/2010 | 11/6/2010 | 0 | 62000 | 6500 | 1900 | 0 | 62000 | 6500 | 1900 | 0 | Inactive | 11-05-2010 |
| 2/1/2008 | 8/1/2009 | 547 | 50500 | 8500 | 0 | 0 | 51500 | 9000 | 0 | 0 | Inactive | 06-03-2011 |
| 12/10/2009 | 7/7/2010 | 209 | 51500 | 9000 | 0 | 0 | 51500 | 9000 | 12400 | 0 | Inactive | 06-03-2011 |
| 10/4/2010 | 6/4/2011 | 243 | 63900 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 | Inactive | 06-03-2011 |
| 6/4/2011 | 6/4/2011 | 0 | 63900 | 9000 | 3300 | 0 | 63900 | 9000 | 3300 | 0 | Inactive | 06-03-2011 |
| 1/1/2007 | 9/21/2007 | 263 | 49500 | 8500 | 0 | 0 | 49500 | 8500 | 1000 | 1237.5 | Inactive | 12-28-2007 |
| 2/20/2007 | 6/23/2008 | 489 | 49500 | 5500 | 0 | 0 | 60500 | 5500 | 0 | 0 | Inactive | 11-10-2008 |
| 9/30/2008 | 11/11/2008 | 42 | 60500 | 6500 | 5500 | 0 | 60500 | 6500 | 5500 | 0 | Inactive | 11-10-2008 |
| 11/11/2008 | 11/11/2008 | 0 | 60500 | 6500 | 5500 | 0 | 60500 | 6500 | 5500 | 0 | Inactive | 11-10-2008 |
| 1/1/2007 | 10/18/2008 | 656 | 49500 | 8500 | 0 | 0 | 60500 | 9000 | 1500 | 0 | Inactive | 10-17-2008 |
| 10/18/2008 | 10/18/2008 | 0 | 60500 | 9000 | 1500 | 0 | 60500 | 9000 | 1500 | 0 | Inactive | 10-17-2008 |
| 1/1/2007 | 5/19/2007 | 138 | 49500 | 5500 | 0 | 0 | 49500 | 5500 | 1000 | 1237.5 | Active | |
| 5/19/2007 | 5/19/2007 | 0 | 49500 | 5500 | 1000 | 1237.5 | 49500 | 5500 | 1000 | 1237.5 | Active | |
| 9/30/2009 | 12/1/2009 | 62 | 51500 | 8500 | 0 | 0 | 51500 | 8500 | 0 | 0 | Active | |
| 12/1/2009 | 7/20/2011 | 596 | 51500 | 8500 | 0 | 0 | 63900 | 8500 | 3300 | 0 | Active | |
| 1/1/2007 | 9/29/2007 | 271 | 49500 | 5500 | 1000 | 0 | 49500 | 5500 | 1000 | 2475 | Inactive | 09-28-2007 |
| 9/29/2007 | 9/29/2007 | 0 | 49500 | 8500 | 1000 | 2475 | 49500 | 5500 | 1000 | 2475 | Inactive | 09-28-2007 |
| 1/1/2007 | 11/3/2007 | 306 | 49500 | 8500 | 0 | 0 | 49500 | 5500 | 11000 | 2475 | Inactive | 11-02-2007 |
| 11/3/2007 | 11/3/2007 | 0 | 49500 | 8500 | 11000 | 2475 | 49500 | 8500 | 11000 | 2475 | Inactive | 11-02-2007 |
| 1/1/2007 | 1/1/2010 | 1096 | 49500 | 8500 | 0 | 0 | 62000 | 9000 | 0 | 0 | Inactive | 12-31-2009 |
| 1/1/2010 | 1/1/2010 | 0 | 62000 | 9000 | 0 | 0 | 62000 | 9000 | 0 | 0 | Inactive | 12-31-2009 |
| 9/30/2008 | 11/3/2008 | 34 | 50500 | 6500 | 0 | 0 | 50500 | 6500 | 1000 | 0 | Inactive | 03-02-2009 |
| 1/1/2009 | 3/3/2009 | 61 | 51500 | 6500 | 1000 | 0 | 51500 | 6500 | 0 | 0 | Inactive | 03-02-2009 |
| 3/3/2009 | 3/3/2009 | 0 | 51500 | 6500 | 0 | 0 | 51500 | 6500 | 0 | 0 | Inactive | 03-02-2009 |
| 3/31/2007 | 7/20/2011 | 1572 | 49500 | 8500 | 0 | 0 | 63900 | 8500 | 3300 | 0 | Active | |
| 8/27/2008 | 10/1/2009 | 400 | 50500 | 6500 | 1000 | 0 | 51500 | 6500 | 0 | 0 | Active | |
| 6/2/2007 | 1/8/2008 | 220 | 47150 | 5500 | 1350 | 1178.75 | 48500 | 5500 | 0 | 0 | Inactive | 01-07-2008 |
| 1/8/2008 | 1/8/2008 | 0 | 48500 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 | Inactive | 01-07-2008 |
| 1/1/2007 | 7/20/2011 | 1661 | 49500 | 8500 | 0 | 0 | 63900 | 9000 | 3300 | 0 | Active | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/1/2007 | 6/1/2010 | 1247 | 49500 | 5500 | 0 | 0 | 51500 | 6500 | 12400 | 0 Inactive | 02-04-2011 |
| 8/16/2010 | 2/5/2011 | 173 | 51500 | 6500 | 0 | 12400 | 63900 | 6500 | 0 | 0 Inactive | 02-04-2011 |
| 2/5/2011 | 2/5/2011 | 0 | 63900 | 6500 | 0 | 0 | 63900 | 6500 | 0 | 0 Inactive | 02-04-2011 |
| 8/4/2008 | 2/7/2009 | 187 | 51500 | 6500 | 0 | 0 | 51500 | 6500 | 0 | 0 Active | |
| 2/12/2011 | 7/20/2011 | 158 | 63900 | 6500 | 0 | 0 | 63900 | 6500 | 3300 | 0 Active | |
| 2/1/2010 | 1/5/2011 | 338 | 51500 | 6500 | 1237.5 | 0 | 63900 | 6500 | 0 | 0 Active | |
| 7/1/2007 | 2/27/2008 | 241 | 49500 | 6500 | 0 | 1000 | 50500 | 7500 | 0 | 0 Inactive | 02-26-2008 |
| 2/27/2008 | 2/27/2008 | 0 | 50500 | 7500 | 0 | 0 | 50500 | 7500 | 3300 | 0 Inactive | 02-26-2008 |
| 8/27/2010 | 7/20/2011 | 327 | 63900 | 7500 | 0 | 0 | 63900 | 8500 | 3300 | 0 Active | |
| 9/13/2010 | 7/20/2010 | 310 | 63900 | 8500 | 0 | 0 | 63900 | 7500 | 0 | 0 Active | |
| 1/1/2007 | 6/8/2009 | 889 | 54750 | 8500 | 0 | 0 | 62000 | 9000 | 3300 | 0 Active | |
| 1/4/2010 | 7/20/2011 | 562 | 62000 | 8500 | 0 | 0 | 63900 | 9000 | 0 | 0 Active | |
| 11/15/2007 | 5/22/2008 | 189 | 50500 | 8500 | 0 | 0 | 50500 | 8500 | 12400 | 0 Active | |
| 7/2/2009 | 5/29/2010 | 331 | 51500 | 9000 | 1487.5 | 0 | 51500 | 9000 | 1000 | 0 Active | |
| 1/1/2007 | 8/4/2007 | 215 | 59500 | 5500 | 0 | 1000 | 59500 | 5500 | 1000 | 1487.5 Inactive | 08-03-2007 |
| 8/4/2007 | 8/4/2007 | 0 | 59500 | 5500 | 0 | 0 | 59500 | 5500 | 0 | 1487.5 Inactive | 08-03-2007 |
| 1/1/2007 | 1/4/2010 | 1099 | 47150 | 5500 | 0 | 0 | 51500 | 9000 | 3300 | 0 Active | |
| 7/2/2009 | 7/20/2011 | 748 | 62000 | 9000 | 495 | 0 | 63900 | 8500 | 0 | 0 Active | |
| 1/28/2008 | 7/12/2010 | 200 | 49500 | 5500 | 0 | 0 | 50500 | 9000 | 9400 | 0 Inactive | 08-07-2008 |
| 6/11/2008 | 7/12/2010 | 761 | 50500 | 8500 | 0 | 0 | 54500 | 9000 | 3350 | 0 Active | |
| 1/1/2007 | 7/2/2007 | 182 | 47150 | 8500 | 0 | 0 | 47150 | 8500 | 3350 | 1178.75 Inactive | 01-21-2011 |
| 10/15/2007 | 7/2/2007 | 287 | 47150 | 8500 | 0 | 0 | 47150 | 8500 | 1350 | 1178.75 Active | |
| 1/1/2007 | 1/13/2007 | 12 | 47150 | 8500 | 0 | 0 | 47150 | 8500 | 0 | 0 Inactive | 10-01-2007 |
| 12/25/2007 | 2/3/2008 | 60 | 48500 | 0 | 0 | 0 | 48500 | 0 | 0 | 0 Active | |
| 11/3/2008 | 3/21/2009 | 138 | 51500 | 9000 | 0 | 0 | 51500 | 9000 | 0 | 0 Active | |
| 1/18/2010 | 7/20/2011 | 548 | 51500 | 7500 | 0 | 0 | 63900 | 7500 | 3300 | 0 Active | |
| 11/15/2010 | 10/1/2007 | 247 | 63900 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 Active | |
| 1/1/2007 | 10/1/2007 | 273 | 49500 | 8500 | 0 | 0 | 49500 | 8500 | 1000 | 1237.5 Active | |
| 1/1/2007 | 10/1/2007 | 273 | 47150 | 8500 | 0 | 0 | 47150 | 8500 | 3350 | 2357.5 Active | |
| 1/1/2007 | 2/19/2007 | 414 | 50000 | 8500 | 0 | 0 | 50000 | 8500 | 10500 | 2500 Active | |
| 2/19/2008 | 12/8/2008 | 68 | 47150 | 5500 | 0 | 0 | 50500 | 5500 | 0 | 0 Active | |
| 10/1/2008 | 3/1/2008 | 425 | 50500 | 6600 | 0 | 0 | 50500 | 6500 | 1000 | 0 Active | |
| 1/1/2007 | 3/1/2008 | 0 | 59500 | 5500 | 0 | 0 | 60500 | 8500 | 0 | 0 Inactive | 02-29-2008 |
| 3/1/2008 | 6/1/2007 | 151 | 60500 | 8500 | 0 | 0 | 60500 | 8500 | 0 | 0 Inactive | 02-29-2008 |
| 1/1/2007 | 9/22/2007 | 33 | 47150 | 8500 | 0 | 0 | 47150 | 8500 | 1350 | 1178.75 Inactive | 01-28-2008 |
| 8/20/2007 | 12/13/2008 | 194 | 50500 | 5500 | 0 | 0 | 50500 | 5500 | 0 | 0 Active | |
| 6/2/2008 | 12/13/2008 | 12 | 50500 | 8500 | 0 | 0 | 50500 | 9000 | 1000 | 0 Active | |
| 1/1/2007 | 1/13/2007 | 33 | 48800.25 | 8500 | 0 | 0 | 48800.25 | 8500 | 0 | 0 Active | |
| 2/3/2007 | 2/3/2007 | 533 | 47150 | 7500 | 0 | 0 | 47150 | 8500 | 0 | 0 Active | |
| 7/14/2008 | 12/29/2009 | 522 | 51500 | 9000 | 0 | 0 | 51500 | 9000 | 0 | 0 Active | |
| 2/13/2010 | 7/20/2011 | | 51500 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 Active | |

| Date | Date | Qty | Amount | Rate | | | Rate | Amount | Units | Status | Status Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/5/2007 | 5/8/2007 | 64 | 47150 | 8500 | 0 | 0 | 8500 | 47150 | 3350 | 2358 Active | 07-11-2007 |
| 4/14/2007 | 6/11/2007 | 58 | 60500 | 8500 | 0 | 0 | 8500 | 60500 | 0 | 0 Active | 07-11-2007 |
| 1/1/2007 | 7/12/2007 | 192 | 59500 | 5500 | 0 | 0 | 5500 | 59500 | 1000 | 595 Inactive | |
| 7/12/2007 | 7/12/2007 | 0 | 59500 | 5500 | 595 | 1000 | 5500 | 59500 | 1000 | 595 Inactive | |
| 5/23/2011 | 7/20/2011 | 58 | 72000 | 6000 | 0 | 1440 | 6000 | 72000 | 1440 | 0 Active | |
| 1/1/2007 | 10/1/2007 | 273 | 59500 | 8500 | 0 | 0 | 8500 | 59500 | 1000 | 1487.5 Inactive | 09-30-2007 |
| 2/10/2009 | 4/1/2009 | 50 | 51500 | 6000 | 0 | 0 | 6000 | 51500 | 0 | 0 Active | |
| 5/22/2007 | 10/1/2008 | 498 | 50500 | 8500 | 0 | 0 | 8500 | 50500 | 1000 | 0 Active | |
| 3/28/2011 | 6/27/2011 | 91 | 63900 | 8500 | 0 | 0 | 8500 | 63900 | 3300 | 0 Active | |
| 1/1/2007 | 8/17/2007 | 228 | 47150 | 8500 | 0 | 0 | 8500 | 47150 | 11000 | 2475 Active | 06-27-2008 |
| 4/1/2007 | 2/16/2008 | 321 | 48500 | 8500 | 0 | 0 | 8500 | 48500 | 1000 | 0 Inactive | |
| 5/31/2007 | 11/3/2008 | 522 | 63900 | 9000 | 0 | 0 | 9000 | 63900 | 3300 | 0 Active | 12-15-2008 |
| 11/29/2010 | 7/20/2010 | 233 | 47150 | 9000 | 0 | 3300 | 9000 | 47150 | 1350 | 0 Active | |
| 1/1/2007 | 10/15/2007 | 287 | 47150 | 8500 | 0 | 0 | 8500 | 47150 | 0 | 471.5 Inactive | |
| 1/1/2007 | 10/15/2007 | 12 | 48328.75 | 8500 | 0 | 0 | 8500 | 48328.75 | 171.25 | 0 Active | 05-07-2010 |
| 10/15/2007 | 1/11/2007 | 287 | 47150 | 8500 | 0 | 171.25 | 8500 | 47150 | 0 | 483.29 Inactive | |
| 1/1/2007 | 7/20/2011 | 10 | 51500 | 5500 | 0 | 0 | 5500 | 51500 | 3300 | 0 Active | |
| 12/27/2009 | 8/13/2010 | 570 | 51500 | 8500 | 0 | 0 | 8500 | 51500 | 1600 | 0 Active | |
| 12/7/2009 | 10/17/2007 | 249 | 47150 | 9000 | 0 | 0 | 9000 | 47150 | 2000 | 0 Active | |
| 1/13/2007 | 2/1/2007 | 277 | 47150 | 8500 | 0 | 0 | 8500 | 47150 | 0 | 0 Active | |
| 1/1/2007 | 8/25/2007 | 31 | 48500 | 5500 | 0 | 0 | 5500 | 48500 | 1000 | 485 Inactive | 08-24-2007 |
| 1/1/2007 | 10/15/2007 | 236 | 48500 | 8500 | 0 | 0 | 8500 | 48500 | 1000 | 1487.5 Inactive | 02-08-2011 |
| 1/1/2007 | 5/5/2007 | 287 | 59500 | 8500 | 0 | 0 | 8500 | 59500 | 3300 | 1237.5 Active | |
| 6/1/2011 | 7/20/2011 | 124 | 49500 | 5500 | 0 | 0 | 5500 | 49500 | 171.25 | 1208.22 Active | |
| 1/1/2007 | 8/4/2007 | 49 | 63900 | 9000 | 0 | 0 | 9000 | 63900 | 171.25 | 1208.22 Active | |
| 9/3/2007 | 9/10/2007 | 215 | 48328.75 | 8500 | 1208.22 | 171.25 | 8500 | 48328.75 | 3300 | 0 Active | |
| 9/26/2009 | 7/20/2011 | 7 | 48328.75 | 8500 | 0 | 0 | 8500 | 48328.75 | 5316 | 0 Active | |
| 5/5/2010 | 7/20/2011 | 662 | 63900 | 6500 | 0 | 0 | 6500 | 63900 | 0 | 0 Active | |
| 1/1/2007 | 4/21/2008 | 441 | 63900 | 6500 | 0 | 0 | 6500 | 63900 | 1000 | 495 Active | |
| 1/1/2007 | 12/5/2007 | 476 | 50500 | 6500 | 0 | 0 | 6500 | 50500 | 1350 | 1178.75 Active | |
| 3/2/2007 | 10/15/2007 | 338 | 49500 | 5500 | 0 | 0 | 5500 | 49500 | 0 | 0 Active | |
| 5/1/2010 | 10/1/2007 | 287 | 47150 | 8500 | 0 | 0 | 8500 | 47150 | 0 | 0 Active | |
| 1/2/2007 | 8/23/2010 | 203 | 48500 | 8500 | 0 | 0 | 8500 | 48500 | 0 | 0 Active | |
| 1/1/2007 | 5/7/2009 | 114 | 53100 | 6500 | 0 | 0 | 6500 | 53100 | 0 | 0 Active | |
| 2/1/2007 | 4/18/2008 | 856 | 51500 | 5500 | 0 | 0 | 5500 | 51500 | 0 | 0 Active | |
| 10/22/2007 | 10/15/2007 | 473 | 48328.75 | 6500 | 0 | 0 | 6500 | 48500 | 0 | 0 Active | |
| 1/1/2007 | 7/20/2011 | 256 | 47150 | 8500 | 0 | 0 | 8500 | 48500 | 0 | 0 Active | |
| 1/1/2007 | 3/3/2007 | 1367 | 48500 | 8500 | 0 | 0 | 8500 | 55200 | 0 | 0 Active | |
| 2/5/2007 | 9/10/2007 | 61 | 49500 | 9000 | 0 | 0 | 9000 | 49500 | 0 | 0 Active | |
| 1/1/2007 | 3/3/2009 | 217 | 47150 | 5500 | 0 | 0 | 5500 | 49500 | 0 | 0 Active | |
| 10/1/2007 | | 519 | 47150 | 9000 | 0 | 1350 | 8500 | 47150 | 1350 | 0 Active | |

| Date 1 | Date 2 | | | | | | | | | | Status | End Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/28/2011 | 7/20/2011 | 114 | 53100 | 8500 | 0 | 0 | 53100 | 8500 | 14100 | 0 | Active | 09-02-2010 |
| 1/1/2007 | 10/1/2007 | 273 | 48565 | 8500 | 0 | 0 | 48565 | 8500 | 1935 | 1214.13 | Active | |
| 1/2/2007 | 10/15/2007 | 286 | 47150 | 8500 | 0 | 0 | 48500 | 8500 | 0 | 0 | Inactive | |
| 7/14/2008 | 12/15/2008 | 154 | 48500 | 7500 | 0 | 1000 | 48500 | 7500 | 1000 | 0 | Active | |
| 5/14/2007 | 7/20/2011 | 1528 | 50500 | 7500 | 0 | 0 | 63900 | 6500 | 3300 | 0 | Active | |
| 3/6/2007 | 2/16/2008 | 347 | 47150 | 7500 | 0 | 0 | 50500 | 5500 | 3350 | 0 | Active | |
| 1/1/2007 | 12/13/2007 | 346 | 47150 | 7500 | 0 | 0 | 47150 | 5500 | 0 | 0 | Inactive | 12-13-2007 |
| 3/6/2007 | 10/1/2007 | 209 | 47150 | 7500 | 0 | 0 | 48500 | 5500 | 0 | 2357.5 | Inactive | 10-01-2009 |
| 1/30/2008 | 3/1/2008 | 31 | 50500 | 5500 | 0 | 0 | 50500 | 5500 | 0 | 0 | Inactive | 10-01-2009 |
| 1/1/2007 | 6/1/2008 | 517 | 49500 | 5500 | 0 | 0 | 50500 | 8500 | 0 | 0 | Inactive | 09-03-2009 |
| 4/1/2010 | 7/20/2011 | 475 | 65000 | 9000 | 0 | 0 | 65000 | 9000 | 2200 | 0 | Active | |
| 3/15/2010 | 7/20/2011 | 492 | 62000 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 | Active | |
| 7/2/2010 | 8/23/2010 | 52 | 53100 | 7500 | 0 | 0 | 53100 | 7500 | 0 | 0 | Active | |
| 6/22/2009 | 7/20/2011 | 758 | 51500 | 9000 | 0 | 0 | 53100 | 9000 | 14100 | 1178.75 | Active | |
| 1/1/2007 | 6/30/2007 | 180 | 47150 | 6500 | 0 | 0 | 47150 | 9000 | 1350 | 0 | Active | |
| 11/20/2008 | 6/12/2009 | 204 | 49500 | 9000 | 0 | 0 | 49500 | 8500 | 0 | 0 | Active | |
| 6/4/2007 | 12/17/2007 | 196 | 48500 | 8500 | 0 | 0 | 48500 | 9000 | 14100 | 0 | Active | |
| 6/15/2008 | 7/20/2011 | 1129 | 48500 | 8500 | 0 | 0 | 55200 | 6500 | 0 | 0 | Active | |
| 9/1/2010 | 7/20/2011 | 322 | 51500 | 9000 | 0 | 1600 | 53100 | 9000 | 14100 | 0 | Active | |
| 7/1/2009 | 7/30/2009 | 29 | 51500 | 9000 | 0 | 0 | 51500 | 9000 | 0 | 0 | Active | |
| 11/16/2009 | 7/20/2011 | 611 | 51500 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 | Active | |
| 1/1/2007 | 9/29/2007 | 271 | 48565 | 5500 | 0 | 0 | 48565 | 5500 | 0 | 2428.25 | Inactive | 09-28-2007 |
| 9/29/2007 | 9/29/2007 | 0 | 48565 | 5500 | 2428.25 | 0 | 48565 | 5500 | 0 | 2428.25 | Inactive | 09-28-2007 |
| 9/14/2009 | 7/20/2011 | 674 | 51500 | 9000 | 0 | 0 | 53100 | 9000 | 14100 | 0 | Active | |
| 3/1/2010 | 8/21/2010 | 173 | 51500 | 7500 | 0 | 0 | 51500 | 7500 | 1600 | 0 | Active | |
| 9/3/2009 | 7/20/2011 | 685 | 49500 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 | Active | |
| 3/31/2008 | 5/8/2009 | 403 | 48500 | 7500 | 0 | 0 | 49500 | 7500 | 0 | 0 | Inactive | 06-29-2010 |
| 8/12/2008 | 7/20/2011 | 1072 | 51500 | 9000 | 0 | 0 | 53100 | 9000 | 14100 | 0 | Active | |
| 1/1/2007 | 10/1/2007 | 273 | 49500 | 8500 | 2475 | 1000 | 49500 | 8500 | 1000 | 2475 | Inactive | 09-30-2007 |
| 10/1/2007 | 10/1/2007 | 0 | 49500 | 6500 | 0 | 0 | 55200 | 6500 | 1000 | 2475 | Inactive | 09-30-2007 |
| 4/28/2010 | 7/20/2011 | 448 | 55200 | 6500 | 0 | 0 | 49500 | 6500 | 0 | 0 | Active | |
| 5/2/2007 | 7/26/2007 | 85 | 48500 | 7500 | 0 | 0 | 48500 | 7500 | 0 | 0 | Active | |
| 12/31/2007 | 2/8/2009 | 405 | 48500 | 7500 | 0 | 0 | 49500 | 7500 | 0 | 0 | Active | |
| 8/29/2009 | 7/20/2011 | 690 | 49500 | 9000 | 0 | 0 | 55200 | 9000 | 3000 | 0 | Inactive | |
| 7/9/2007 | 7/14/2008 | 371 | 48500 | 8500 | 0 | 0 | 51500 | 8500 | 0 | 0 | Active | 12-11-2009 |
| 7/2/2009 | 8/1/2009 | 30 | 51500 | 9000 | 0 | 0 | 48500 | 9000 | 0 | 0 | Inactive | |
| 3/24/2007 | 1/26/2008 | 308 | 48500 | 8500 | 0 | 0 | 48500 | 8500 | 0 | 0 | Inactive | |
| 4/28/2007 | 10/6/2008 | 527 | 50500 | 8500 | 0 | 0 | 50500 | 8500 | 0 | 0 | Active | |
| 1/12/2007 | 8/1/2007 | 201 | 47150 | 7500 | 0 | 0 | 47150 | 7500 | 11500 | 0 | Active | 02-26-2010 |
| 6/16/2008 | 7/20/2011 | 1129 | 50500 | 8500 | 0 | 0 | 63900 | 9000 | 3300 | 0 | Active | 03-25-2010 |
| 8/4/2010 | 7/20/2011 | 350 | 51500 | 6500 | 0 | 12400 | 63900 | 7500 | 3300 | 0 | Active | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/1/2011 | 7/20/2011 | 1265 | 48500 | 5500 | 0 | 0 | 55200 | 6500 | 0 | 0 Active | 07-01-2008 |
| 1/1/2007 | 1/12/2008 | 376 | 49500 | 5500 | 0 | 0 | 50500 | 5500 | 0 | 0 Active | 07-09-2010 |
| 1/1/2007 | 7/2/2008 | 548 | 47150 | 5500 | 0 | 0 | 48500 | 6500 | 1000 | 0 Inactive | |
| 3/21/2011 | 4/28/2011 | 38 | 53100 | 9000 | 1500 | 0 | 53100 | 9000 | 0 | 0 Active | |
| 12/1/2008 | 3/23/2009 | 112 | 60500 | 7500 | 0 | 0 | 62000 | 7500 | 0 | 0 Inactive | |
| 1/15/2007 | 11/15/2007 | 304 | 49500 | 5500 | 0 | 0 | 49500 | 5500 | 1000 | 1237.5 Active | |
| 7/7/2008 | 6/10/2009 | 338 | 49500 | 6500 | 0 | 0 | 49500 | 6500 | 0 | 0 Active | |
| 10/1/2007 | 7/29/2008 | 302 | 50500 | 8500 | 0 | 0 | 50500 | 9000 | 1000 | 0 Active | |
| 2/22/2010 | 9/30/2010 | 220 | 62000 | 9000 | 0 | 0 | 62000 | 9000 | 1900 | 0 Active | |
| 1/1/2007 | 4/21/2008 | 476 | 47150 | 5500 | 3600 | 0 | 50500 | 5500 | 0 | 0 Active | |
| 11/15/2010 | 3/19/2011 | 124 | 49500 | 8500 | 0 | 0 | 53100 | 8500 | 0 | 0 Active | |
| 7/14/2008 | 1/2/2010 | 537 | 49500 | 6500 | 0 | 0 | 50500 | 6500 | 0 | 0 Active | |
| 6/19/2007 | 9/1/2007 | 74 | 50500 | 8500 | 0 | 0 | 49500 | 8500 | 0 | 0 Inactive | 04-27-2011 |
| 3/5/2007 | 9/14/2007 | 193 | 47150 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 Active | |
| 1/1/2009 | 6/11/2011 | 891 | 49500 | 6500 | 0 | 0 | 55200 | 5500 | 0 | 0 Active | |
| 5/9/2007 | 2/16/2008 | 283 | 50500 | 5500 | 1000 | 0 | 49500 | 5500 | 0 | 0 Active | |
| 11/10/2008 | 7/20/2011 | 982 | 48500 | 9000 | 0 | 0 | 49500 | 9000 | 0 | 0 Active | |
| 12/1/2007 | 2/14/2009 | 441 | 48500 | 8500 | 0 | 0 | 55200 | 9000 | 0 | 0 Inactive | |
| 8/31/2007 | 5/2/2010 | 90 | 49500 | 9000 | 1000 | 0 | 49500 | 9000 | 0 | 0 Inactive | |
| 11/10/2008 | 7/20/2011 | 1419 | 48500 | 8500 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | 11-16-2010 |
| 9/28/2009 | 8/13/2009 | 276 | 48500 | 9000 | 0 | 0 | 47150 | 9000 | 0 | 0 Active | 11-16-2010 |
| 6/12/2007 | 8/12/2007 | 660 | 49500 | 8500 | 0 | 0 | 55200 | 8500 | 0 | 0 Active | |
| 4/13/2009 | 7/20/2011 | 61 | 47150 | 8500 | 0 | 0 | 47150 | 8500 | 0 | 0 Active | |
| 9/8/2009 | 7/20/2011 | 828 | 56100 | 8500 | 0 | 0 | 56100 | 6500 | 11100 | 0 Active | |
| 3/3/2008 | 7/20/2011 | 680 | 51500 | 6500 | 0 | 0 | 53100 | 6500 | 14100 | 0 Active | |
| 1/1/2007 | 7/20/2011 | 1234 | 50500 | 8500 | 0 | 0 | 63900 | 9000 | 3300 | 0 Active | |
| 1/1/2007 | 3/1/2007 | 1661 | 52500 | 8500 | 0 | 0 | 63900 | 9000 | 3300 | 0 Active | |
| 10/15/2007 | 6/28/2008 | 59 | 47150 | 8500 | 0 | 0 | 47150 | 8500 | 0 | 0 Active | |
| 9/29/2008 | 10/18/2008 | 257 | 50500 | 9000 | 0 | 0 | 50500 | 9000 | 0 | 0 Active | |
| 2/16/2010 | 7/20/2011 | 19 | 51500 | 9000 | 0 | 0 | 51500 | 9000 | 3300 | 0 Active | |
| 11/10/2008 | 2/11/2009 | 519 | 51500 | 9000 | 0 | 0 | 63900 | 9000 | 0 | 0 Active | |
| 10/15/2007 | 7/20/2011 | 93 | 51500 | 6000 | 0 | 0 | 51500 | 6000 | 14100 | 0 Inactive | |
| 1/1/2007 | 9/27/2008 | 1374 | 50500 | 8500 | 0 | 0 | 53100 | 9000 | 1000 | 0 Inactive | |
| 9/27/2008 | 9/27/2008 | 635 | 47150 | 9000 | 1000 | 0 | 50500 | 9000 | 1000 | 495 Active | 09-26-2008 |
| 1/1/2007 | 9/1/2007 | 0 | 50500 | 9000 | 0 | 0 | 50500 | 8500 | 1000 | 0 Active | 09-26-2008 |
| 11/2/2009 | 7/20/2011 | 243 | 49500 | 8500 | 0 | 0 | 49500 | 9000 | 1474 | 0 Active | |
| 9/1/2010 | 7/20/2011 | 625 | 73700 | 9000 | 0 | 0 | 73700 | 9000 | 14100 | 2357.5 Inactive | |
| 1/1/2007 | 6/20/2007 | 322 | 53100 | 6500 | 0 | 0 | 53100 | 6500 | 1350 | 0 Active | 06-19-2007 |
| 3/2/2009 | 4/27/2009 | 170 | 47150 | 8500 | 0 | 0 | 47150 | 8500 | 0 | 0 Active | |
| 3/19/2007 | 4/13/2009 | 56 | 49500 | 7500 | 0 | 0 | 49500 | 7500 | 0 | 0 Active | |
| | | 756 | 49500 | 5500 | 0 | 0 | 51500 | 6500 | 0 | 0 Active | |

| 10/16/2009 | 12/1/2010 | 411 | 51500 | 7500 | | 0 | 51500 | 7500 | 12400 | 0 Active | 09-28-2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/3/2008 | 6/27/2009 | 236 | 48500 | 9000 | 3000 | 0 | 51500 | 9000 | | 0 Inactive | 04-11-2008 |
| 10/8/2007 | 4/12/2008 | 187 | 50500 | 8500 | | 0 | 50500 | 8500 | | 0 Inactive | 04-11-2008 |
| 4/12/2008 | 4/12/2008 | 0 | 50500 | 8500 | | 0 | 50500 | 8500 | | 0 Inactive | |
| 8/13/2009 | 7/20/2011 | 706 | 49500 | 6500 | | 0 | 55200 | 6500 | | 0 Active | |
| 12/31/2007 | 4/10/2008 | 101 | 50500 | 7500 | | 0 | 50500 | 7500 | | 0 Active | |
| 6/15/2009 | 7/20/2011 | 765 | 51500 | 9000 | | 0 | 63900 | 9000 | 3300 | 0 Active | |
| 7/2/2009 | 5/29/2010 | 331 | 51500 | 9000 | | 0 | 51500 | 9000 | | 0 Active | |
| 12/2/2009 | 6/1/2010 | 181 | 51500 | 6500 | | 0 | 51500 | 6500 | 1600 | 0 Active | |
| 1/5/2010 | 5/3/2010 | 118 | 51500 | 8500 | | 0 | 51500 | 8500 | 1600 | 0 Active | |
| 11/1/2010 | 7/20/2011 | 261 | 49500 | 2000 | 3600 | 0 | 55200 | 9000 | | 0 Active | |
| 3/22/2010 | 7/20/2011 | 485 | 51500 | 9000 | | 0 | 55200 | 9000 | 3300 | 0 Active | |
| 9/27/2010 | 7/20/2011 | 296 | 62000 | 9000 | 1900 | 0 | 63900 | 9000 | | 0 Active | |
| 7/29/2007 | 2/14/2009 | 566 | 47150 | 8500 | | 0 | 49500 | 9000 | 3300 | 0 Active | |
| 3/14/2011 | 7/20/2011 | 128 | 53100 | 9000 | | 0 | 55200 | 9000 | | 0 Active | |
| 9/20/2010 | 10/1/2010 | 11 | 51500 | 5500 | | 0 | 51500 | 5500 | 12400 | 0 Active | |
| 2/19/2007 | 8/24/2007 | 186 | 47150 | 5500 | | 0 | 50500 | 6500 | | 0 Active | |
| 1/1/2007 | 6/28/2007 | 178 | 49500 | 9000 | 12400 | 0 | 49500 | 9000 | 1000 | 495 Inactive | 06-27-2007 |
| 2/1/2011 | 7/20/2011 | 1265 | 51500 | 9000 | | 0 | 51500 | 9000 | | 0 Active | |
| 9/25/2009 | 10/1/2009 | 6 | 51500 | 8500 | 10500 | 0 | 63900 | 9000 | 10500 | 0 Active | |
| 10/2/2008 | 7/20/2011 | 656 | 51500 | 8500 | | 0 | 55200 | 9000 | 3300 | 0 Active | |
| 3/17/2008 | 7/20/2011 | 1220 | 48500 | 9000 | | 0 | 55200 | 8500 | | 0 Inactive | |
| 6/9/2008 | 7/1/2009 | 387 | 47150 | 8500 | | 0 | 48500 | 8500 | | 0 Active | |
| 2/21/2009 | 5/9/2009 | 77 | 51500 | 7500 | | 0 | 51500 | 9000 | | 0 Active | 02-05-2010 |
| 7/26/2010 | 2/1/2011 | 190 | 63500 | 9000 | | 0 | 63900 | 9000 | | 0 Active | |
| 4/5/2010 | 6/1/2010 | 57 | 51500 | 6500 | 400 | 0 | 51500 | 7500 | 1600 | 0 Active | |
| 3/15/2010 | 4/25/2010 | 41 | 51500 | 6500 | | 0 | 51500 | 9000 | | 0 Active | |
| 4/15/2009 | 6/1/2009 | 47 | 51500 | 6500 | | 0 | 51500 | 6500 | | 0 Active | |
| 6/29/2009 | 1/9/2010 | 194 | 51500 | 6500 | | 0 | 51500 | 6500 | 12400 | 0 Active | |
| 4/10/2010 | 7/13/2010 | 94 | 51500 | 8500 | | 0 | 51500 | 6500 | 1600 | 0 Active | |
| 10/5/2009 | 8/27/2010 | 326 | 51500 | 5500 | | 0 | 50500 | 6500 | 1000 | 0 Active | |
| 9/24/2007 | 8/4/2008 | 315 | 48500 | 6500 | | 0 | 49500 | 8500 | | 0 Active | |
| 11/3/2008 | 2/9/2009 | 98 | 49500 | 5500 | | 0 | 55200 | 6500 | | 0 Active | |
| 2/1/2008 | 7/20/2011 | 1265 | 47150 | 5500 | | 0 | 49500 | 6500 | | 0 Inactive | |
| 7/9/2007 | 9/18/2007 | 71 | 47150 | 5500 | 1500 | 0 | 51600 | 5500 | 1500 | 0 Active | |
| 2/18/2008 | 9/7/2009 | 567 | 48500 | 7500 | | 0 | 47150 | 7500 | | 0 Active | |
| 5/10/2010 | 11/8/2010 | 182 | 49500 | 9000 | | 0 | 49500 | 9000 | | 0 Active | 12-24-2009 |
| 3/6/2007 | 2/11/2008 | 342 | 47150 | 7500 | | 0 | 50500 | 7500 | 3300 | 0 Active | |
| 6/18/2007 | 8/13/2007 | 56 | 50500 | 8500 | | 0 | 50500 | 8500 | | 0 Active | |
| 6/23/2008 | 7/20/2011 | 1122 | 49,450 | 9000 | 2,050 | 0 | 63900 | 9000 | 3300 | 0 Active | |
| 7/1/2011 | 7/20/2011 | 19 | 55200 | 8500 | | 0 | 55200 | 8500 | | 0 Active | |

| Date1 | Date2 | # | Bal1 | Sub1 | Add1 | Z | Bal2 | Sub2 | Add2 | Status | Date3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/4/2009 | 10/24/2009 | 173 | 49500 | 9000 | 0 | 0 | 49500 | 9000 | 0 | 0 Active | |
| 11/1/2008 | 4/2/2011 | 882 | 48500 | 6500 | 0 | 0 | 53100 | 6500 | 0 | 0 Active | |
| 8/18/2008 | 7/20/2011 | 1066 | 48500 | 8500 | 1000 | 0 | 55200 | 8500 | 0 | 0 Active | |
| 3/2/2010 | 7/20/2011 | 505 | 49500 | 8500 | 1000 | 0 | 55200 | 8500 | 0 | 0 Active | |
| 2/25/2008 | 9/5/2008 | 193 | 48500 | 5500 | 0 | 0 | 48500 | 5500 | 1000 | 0 Active | |
| 3/14/2011 | 7/20/2011 | 128 | 53100 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 Active | |
| 7/5/2011 | 7/20/2011 | 15 | 55200 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 Active | |
| 7/21/2010 | 7/22/2010 | 1 | 62000 | 7500 | 1900 | 0 | 62000 | 7500 | 1900 | 0 Active | |
| 7/28/2010 | 7/20/2011 | 357 | 62000 | 7500 | 1900 | 0 | 63900 | 7500 | 3300 | 0 Active | |
| 10/26/2009 | 7/20/2011 | 632 | 49500 | 5500 | 0 | 0 | 55200 | 5500 | 0 | 0 Active | |
| 8/5/2008 | 3/14/2009 | 221 | 49500 | 6500 | 0 | 0 | 49500 | 6500 | 0 | 0 Active | |
| 4/15/2007 | 6/2/2007 | 48 | 50500 | 8500 | 0 | 0 | 50500 | 8500 | 14100 | 0 Inactive | 02-08-2008 |
| 7/6/2010 | 7/20/2011 | 379 | 72000 | 2000 | 0 | 0 | 72000 | 2000 | 0 | 0 Active | |
| 4/23/2007 | 9/6/2007 | 136 | 50500 | 5500 | 0 | 0 | 50500 | 5500 | 1000 | 0 Active | |
| 11/26/2007 | 9/1/2008 | 280 | 48500 | 5500 | 0 | 0 | 48500 | 5500 | 1000 | 0 Active | |
| 4/24/2007 | 9/6/2008 | 501 | 47150 | 6500 | 0 | 0 | 48500 | 6500 | 0 | 0 Inactive | 05-28-2010 |
| 8/2/2007 | 9/6/2007 | 35 | 47150 | 5500 | 0 | 0 | 47150 | 5500 | 5500 | 0 Active | |
| 1/1/2007 | 10/15/2007 | 287 | 45000 | 8500 | 0 | 0 | 45000 | 8500 | 3300 | 2250 Inactive | 06-11-2010 |
| 6/25/2007 | 7/20/2011 | 1486 | 48500 | 6500 | 0 | 0 | 63900 | 6500 | 0 | 0 Active | |
| 11/1/2008 | 2/28/2009 | 119 | 49500 | 6500 | 0 | 0 | 49500 | 6500 | 0 | 0 Active | |
| 9/1/2010 | 2/16/2011 | 168 | 51500 | 6500 | 0 | 0 | 53100 | 6500 | 0 | 0 Active | |
| 1/1/2011 | 3/7/2008 | 431 | 52000 | 8500 | 0 | 0 | 52000 | 8500 | 1350 | 0 Active | |
| 2/22/2011 | 7/20/2011 | 148 | 67500 | 7500 | 1600 | 0 | 67500 | 7500 | 0 | 0 Active | 03-09-2008 |
| 10/1/2007 | 3/4/2009 | 520 | 48500 | 5500 | 2000 | 0 | 51500 | 5500 | 3300 | 0 Active | 03-01-2011 |
| 6/25/2007 | 10/1/2007 | 98 | 48500 | 8500 | 0 | 0 | 48500 | 8500 | 0 | 0 Inactive | |
| 6/9/2008 | 7/20/2011 | 1136 | 51500 | 5500 | 0 | 0 | 63900 | 5500 | 0 | 0 Active | |
| 8/16/2007 | 1/2/2011 | 1235 | 49500 | 8500 | 9000 | 2575 | 49500 | 8500 | 3600 | 0 Inactive | |
| 3/23/2009 | 1/9/2010 | 292 | 49500 | 7500 | 0 | 0 | 48500 | 7500 | 0 | 0 Active | |
| 4/5/2010 | 7/3/2010 | 89 | 48500 | 2000 | 0 | 0 | 49500 | 2000 | 0 | 0 Active | |
| 4/23/2007 | 10/22/2007 | 182 | 47150 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 Active | 10-15-2009 |
| 4/23/2007 | 10/16/2009 | 907 | 49500 | 5500 | 0 | 0 | 49500 | 5500 | 0 | 0 Active | 10-15-2009 |
| 10/16/2009 | 10/16/2009 | 0 | 47150 | 6500 | 0 | 0 | 49500 | 6500 | 0 | 0 Inactive | |
| 3/2/2007 | 5/19/2007 | 78 | 48500 | 5500 | 0 | 0 | 47150 | 5500 | 0 | 0 Active | |
| 11/30/2007 | 11/23/2009 | 724 | 47150 | 5500 | 0 | 0 | 49500 | 5500 | 1000 | 0 Active | |
| 8/13/2007 | 9/24/2007 | 42 | 48500 | 5500 | 0 | 0 | 47150 | 5500 | 0 | 0 Active | |
| 12/17/2007 | 11/24/2008 | 343 | 48500 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 Active | |
| 10/22/2007 | 7/20/2011 | 1367 | 49500 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 7/2/2009 | 7/20/2011 | 748 | 47150 | 8500 | 0 | 0 | 55200 | 8500 | 0 | 0 Active | |
| 5/19/2009 | 8/1/2010 | 1157 | 49500 | 8500 | 0 | 0 | 49500 | 8500 | 3600 | 0 Active | |
| 12/23/2009 | 10/1/2007 | 221 | 47150 | 5500 | 0 | 0 | 47150 | 5500 | 3350 | 0 Active | |
| 1/1/2007 | 10/1/2007 | 273 | 47150 | 5500 | 0 | 0 | 47150 | 5500 | 3350 | 1178.75 Active | |

Case 8:11-cv-01123-JLS-AN   Document 1   Filed 07/27/11   Page 137 of 169   Page ID #:137

| Date | Date | Qty | Value | Value | | | Value | Value | | Value | Value | Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/23/2010 | 3/25/2011 | 214 | 63900 | 6500 | 0 | 0 | 6500 | 63900 | 0 | 6500 | 63900 | 0 Active | |
| 2/4/2008 | 6/14/2008 | 131 | 50500 | 5500 | 0 | 0 | 5500 | 50500 | 0 | 5500 | 50500 | 0 Active | |
| 3/19/2007 | 7/14/2007 | 117 | 49500 | 5500 | 0 | 0 | 5500 | 50500 | 0 | 5500 | 50500 | 0 Inactive | 07-13-2007 |
| 7/14/2007 | 7/14/2007 | 0 | 50500 | 5500 | 0 | 0 | 5500 | 50500 | 0 | 5500 | 50500 | 0 Inactive | 07-13-2007 |
| 4/20/2009 | 2/1/2011 | 652 | 51500 | 9000 | 0 | 0 | 9000 | 63900 | 0 | 9000 | 63900 | 0 Active | |
| 7/21/2008 | 3/1/2011 | 953 | 49500 | 9000 | 0 | 0 | 9000 | 53100 | 0 | 9000 | 53100 | 0 Active | |
| 5/9/2011 | 7/20/2011 | 72 | 55200 | 9000 | 0 | 0 | 9000 | 55200 | 0 | 8500 | 55200 | 0 Inactive | 08-27-2010 |
| 8/16/2007 | 9/12/2007 | 27 | 47150 | 8500 | 0 | 0 | 8500 | 47150 | 0 | 5500 | 47150 | 0 Active | |
| 5/1/2008 | 4/22/2009 | 356 | 55000 | 5500 | 0 | 0 | 5500 | 55000 | 0 | 9000 | 55000 | 0 Active | |
| 1/4/2010 | 3/22/2010 | 77 | 55000 | 9000 | 0 | 0 | 9000 | 55000 | 10700 | 6500 | 55000 | 0 Active | |
| 8/9/2010 | 7/20/2011 | 345 | 55000 | 6500 | 0 | 0 | 6500 | 56500 | 2000 | 9000 | 56500 | 0 Active | |
| 3/28/2010 | 7/20/2011 | 479 | 55000 | 9000 | 0 | 0 | 9000 | 66500 | 1500 | 9000 | 66500 | 0 Active | |
| 3/1/2010 | 7/6/2010 | 127 | 55000 | 6500 | 0 | 0 | 6500 | 55000 | 14000 | 6500 | 55000 | 0 Active | |
| 11/29/2010 | 12/15/2010 | 16 | 70000 | 6500 | 0 | 14000 | 6500 | 70000 | 0 | 6500 | 70000 | 0 Inactive | 06-07-2011 |
| 5/15/2007 | 3/23/2009 | 678 | 50500 | 5500 | 0 | 0 | 5500 | 51500 | 0 | 9000 | 51500 | 0 Inactive | 01-30-2009 |
| 5/19/2008 | 1/31/2009 | 257 | 47150 | 8500 | 0 | 0 | 8500 | 49500 | 0 | 9000 | 49500 | 0 Inactive | 01-30-2009 |
| 1/31/2009 | 1/31/2009 | 0 | 49500 | 9000 | 0 | 0 | 9000 | 49500 | 0 | 9000 | 49500 | 0 Inactive | 12-02-2009 |
| 5/25/2009 | 7/4/2009 | 40 | 48500 | 9000 | 0 | 0 | 9000 | 48500 | 0 | 6500 | 48500 | 0 Active | |
| 2/1/2008 | 4/5/2010 | 794 | 47150 | 5500 | 0 | 0 | 5500 | 49500 | 3300 | 7500 | 49500 | 0 Active | |
| 5/4/2009 | 1/9/2010 | 250 | 48500 | 7500 | 0 | 0 | 7500 | 48500 | 0 | 6500 | 48500 | 0 Active | |
| 4/19/2010 | 7/20/2011 | 457 | 51500 | 6500 | 0 | 0 | 6500 | 63900 | 3300 | 6500 | 63900 | 0 Active | |
| 3/2/2007 | 1/17/2009 | 687 | 47150 | 5500 | 0 | 0 | 5500 | 51500 | 0 | 9000 | 51500 | 0 Active | |
| 3/21/2011 | 7/20/2011 | 121 | 63900 | 9000 | 0 | 0 | 9000 | 63900 | 3300 | 9000 | 63900 | 0 Active | |
| 5/23/2011 | 7/20/2011 | 58 | 67200 | 9000 | 0 | 0 | 9000 | 67200 | 0 | 6000 | 67200 | 0 Active | |
| 4/1/2011 | 6/20/2011 | 80 | 63900 | 9000 | 0 | 0 | 9000 | 63900 | 14100 | 9000 | 63900 | 0 Active | |
| 7/28/2008 | 4/28/2009 | 274 | 49500 | 6000 | 0 | 0 | 6000 | 49500 | 0 | 9000 | 49500 | 0 Inactive | 04-06-2010 |
| 2/1/2011 | 7/20/2011 | 169 | 53100 | 9000 | 0 | 0 | 9000 | 53100 | 0 | 9000 | 53100 | 0 Active | |
| 8/6/2007 | 9/6/2007 | 31 | 48500 | 5500 | 0 | 0 | 5500 | 48500 | 0 | 8500 | 48500 | 0 Active | |
| 6/21/2010 | 12/2/2010 | 164 | 53100 | 8500 | 0 | 0 | 8500 | 63900 | 12000 | 5500 | 63900 | 0 Active | |
| 1/30/2008 | 6/1/2008 | 123 | 60500 | 5500 | 0 | 0 | 5500 | 60500 | 1000 | 6500 | 60500 | 0 Active | |
| 1/21/2010 | 7/20/2011 | 545 | 49500 | 6500 | 0 | 0 | 6500 | 55200 | 0 | 9000 | 55200 | 0 Active | |
| 8/1/2009 | 7/20/2011 | 718 | 55000 | 9000 | 0 | 0 | 9000 | 56500 | 1600 | 9000 | 56500 | 0 Active | |
| 1/1/2007 | 12/9/2008 | 708 | 49500 | 8500 | 0 | 0 | 8500 | 50500 | 0 | 6500 | 50500 | 0 Inactive | 04-27-2009 |
| 4/20/2009 | 4/28/2009 | 8 | 51500 | 9000 | 0 | 0 | 9000 | 51500 | 14100 | 7500 | 51500 | 0 Inactive | 04-27-2009 |
| 2/16/2009 | 4/20/2009 | 63 | 51500 | 9000 | 0 | 0 | 9000 | 51500 | 0 | 5500 | 51500 | 0 Inactive | 06-02-2010 |
| 2/10/2010 | 8/5/2010 | 176 | 51500 | 7500 | 0 | 0 | 7500 | 51500 | 0 | 6500 | 51500 | 0 Active | |
| 5/9/2007 | 11/23/2009 | 929 | 50500 | 5500 | 0 | 0 | 5500 | 51500 | 0 | 9000 | 51500 | 0 Active | |
| 8/25/2008 | 10/10/2008 | 46 | 49500 | 6500 | 0 | 0 | 6500 | 49500 | 0 | 9000 | 49500 | 0 Active | |
| 12/14/2007 | 7/20/2011 | 1314 | 48500 | 8500 | 0 | 0 | 8500 | 53100 | 0 | 8500 | 53100 | 0 Active | |
| 8/25/2008 | 10/31/2008 | 67 | 49500 | 9000 | 0 | 0 | 9000 | 49500 | 14100 | 9000 | 49500 | 0 Active | |
| 1/11/2010 | 7/20/2011 | 555 | 51500 | 9000 | 0 | 0 | 9000 | 55200 | 0 | 9000 | 55200 | 0 Active | |

| Start | End | | | | | | | | | | Status | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/16/2008 | 7/20/2011 | 1129 | 47150 | 8500 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 5/8/2007 | 11/26/2007 | 202 | 48500 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 | Active | |
| 9/3/2007 | 2/2/2008 | 152 | 48500 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 | Active | |
| 7/9/2007 | 6/28/2008 | 355 | 48500 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 | Active | |
| 6/20/2007 | 11/3/2009 | 867 | 48500 | 5500 | 0 | 0 | 49500 | 5500 | 2000 | 0 | Active | |
| 2/1/2008 | 12/23/2010 | 1056 | 47150 | 5500 | 0 | 0 | 51600 | 6500 | 1500 | 0 | Active | |
| 3/28/2011 | 7/20/2011 | 114 | 53100 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 | Active | |
| 5/24/2010 | 7/20/2011 | 422 | 51000 | 7500 | 0 | 0 | 55200 | 7500 | 0 | 0 | Active | |
| 5/26/2008 | 3/11/2009 | 289 | 47150 | 5500 | 0 | 0 | 49500 | 6500 | 0 | 0 | Active | |
| 8/25/2008 | 7/20/2010 | 1059 | 49500 | 5500 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 11/26/2007 | 6/1/2009 | 553 | 50500 | 8500 | 0 | 0 | 51500 | 9000 | 0 | 0 | Active | |
| 7/13/2009 | 3/1/2010 | 231 | 51500 | 9000 | 0 | 0 | 62000 | 9000 | 3300 | 0 | Active | |
| 4/11/2011 | 7/20/2010 | 100 | 63900 | 9000 | 0 | 0 | 63900 | 9000 | 0 | 0 | Active | |
| 7/9/2009 | 1/7/2010 | 182 | 49500 | 9000 | 0 | 0 | 49500 | 9000 | 0 | 0 | Active | |
| 4/26/2010 | 8/14/2010 | 110 | 55000 | 6500 | 0 | 0 | 55000 | 6500 | 1500 | 0 | Inactive | 02-09-2011 |
| 4/6/2011 | 7/20/2010 | 105 | 53100 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 | Active | |
| 10/19/2009 | 5/1/2010 | 194 | 48500 | 6500 | 0 | 0 | 48500 | 6500 | 2500 | 0 | Active | |
| 5/6/2010 | 8/12/2010 | 98 | 53100 | 6500 | 0 | 0 | 53100 | 6500 | 0 | 0 | Inactive | 10-29-2010 |
| 4/19/2010 | 7/20/2010 | 457 | 67500 | 6500 | 0 | 0 | 67500 | 6500 | 0 | 0 | Active | |
| 1/1/2007 | 8/3/2007 | 214 | 55000 | 8500 | 0 | 0 | 55000 | 8500 | 0 | 0 | Active | |
| 5/27/2009 | 7/20/2011 | 784 | 55000 | 7500 | 0 | 0 | 55000 | 8500 | 3300 | 550 | Active | |
| 6/26/2009 | 8/23/2010 | 58 | 63900 | 9000 | 0 | 0 | 63900 | 9000 | 0 | 0 | Active | |
| 2/1/2008 | 4/1/2009 | 425 | 47150 | 7150 | 0 | 0 | 48500 | 6500 | 0 | 0 | Active | 11-20-2009 |
| 10/11/2010 | 7/4/2011 | 266 | 51000 | 5500 | 0 | 0 | 52600 | 6500 | 0 | 0 | Inactive | |
| 7/2/2009 | 7/20/2011 | 748 | 49500 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 1/1/2007 | 12/19/2007 | 352 | 48000 | 8500 | 0 | 0 | 48000 | 8500 | 2500 | 0 | Active | 07-27-2010 |
| 3/20/2008 | 7/28/2010 | 860 | 50500 | 8500 | 0 | 0 | 51500 | 9000 | 1600 | 1200 | Inactive | 07-27-2010 |
| 1/1/2007 | 1/1/2008 | 365 | 54000 | 8500 | 0 | 0 | 54000 | 8500 | 0 | 0 | Inactive | |
| 3/26/2008 | 4/25/2008 | 30 | 54000 | 8500 | 0 | 0 | 54000 | 8500 | 0 | 0 | Active | |
| 5/26/2009 | 7/20/2011 | 785 | 63000 | 7500 | 0 | 0 | 63900 | 9000 | 5316 | 0 | Active | |
| 3/2/2009 | 9/30/2009 | 212 | 49500 | 9000 | 0 | 0 | 49500 | 9000 | 0 | 0 | Active | |
| 12/31/2009 | 8/28/2010 | 240 | 49500 | 9000 | 0 | 0 | 55200 | 9000 | 1500 | 0 | Active | |
| 1/19/2011 | 7/20/2011 | 182 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 7/19/2010 | 7/20/2011 | 530 | 58,000 | 9,000 | 0 | 0 | 58000 | 9000 | 0 | 0 | Active | |
| 11/19/2007 | 5/10/2008 | 173 | 47150 | 5500 | 0 | 0 | 47150 | 5500 | 0 | 0 | Active | |
| 11/19/2007 | 5/31/2008 | 194 | 47150 | 5500 | 0 | 0 | 47150 | 5500 | 0 | 0 | Inactive | 03-19-2010 |
| 11/26/2007 | 1/12/2008 | 47 | 50500 | 5500 | 0 | 0 | 50500 | 5500 | 0 | 0 | Active | 02-19-2010 |
| 5/5/2008 | 4/21/2009 | 351 | 50500 | 5500 | 0 | 0 | 51500 | 6500 | 0 | 0 | Active | |
| 2/23/2009 | 4/27/2009 | 63 | 51500 | 7500 | 0 | 0 | 51500 | 7500 | 0 | 0 | Active | |
| 9/1/2010 | 1/1/2011 | 122 | 53100 | 6500 | 0 | 0 | 53100 | 6500 | 0 | 0 | Inactive | 02-08-2011 |
| 1/1/2007 | 10/1/2007 | 273 | 49500 | 5500 | 0 | 0 | 49500 | 5500 | 1000 | 1237.5 | Inactive | 05-07-2010 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/30/2008 | 2/16/2008 | 17 | 50500 | 5500 | 0 | 0 | 50500 | 5500 | 0 | 0 Inactive | 05-07-2010 |
| 5/26/2008 | 7/20/2011 | 1150 | 50500 | 8500 | 0 | 0 | 63900 | 9000 | 3300 | 0 Active | |
| 2/1/2010 | 7/20/2011 | 534 | 49500 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 4/18/2011 | 7/20/2011 | 93 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 7/28/2008 | 7/20/2011 | 1087 | 49500 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 Active | |
| 4/26/2010 | 10/9/2010 | 166 | 51500 | 6500 | 0 | 0 | 51500 | 6500 | 12400 | 0 Active | |
| 8/1/2009 | 11/26/2010 | 482 | 55000 | 8500 | 0 | 0 | 55000 | 8500 | 11500 | 0 Active | |
| 7/7/2008 | 4/27/2009 | 294 | 49500 | 8500 | 0 | 0 | 49500 | 8500 | 0 | 0 Active | |
| 4/6/2009 | 7/20/2011 | 835 | 48500 | 8500 | 0 | 0 | 55200 | 8500 | 0 | 0 Active | |
| 10/15/2008 | 11/24/2008 | 40 | 49500 | 6500 | 0 | 0 | 49500 | 6500 | 0 | 0 Active | |
| 1/11/2010 | 2/7/2011 | 392 | 49500 | 9000 | 0 | 0 | 53100 | 9000 | 0 | 0 Active | |
| 4/1/2011 | 6/1/2011 | 61 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Inactive | 09-09-2010 |
| 12/14/2009 | 5/8/2009 | 145 | 49500 | 9000 | 0 | 1000 | 49500 | 9000 | 1000 | 0 Inactive | 01-07-2011 |
| 8/1/2008 | 9/30/2008 | 60 | 50500 | 9000 | 0 | 1000 | 50500 | 9000 | 1600 | 0 Inactive | 01-07-2011 |
| 12/25/2008 | 5/10/2010 | 501 | 50500 | 8500 | 0 | 0 | 50500 | 8500 | 0 | 0 Active | |
| 11/24/2010 | 1/24/2011 | 61 | 53100 | 8500 | 0 | 500 | 53100 | 8500 | 0 | 0 Active | |
| 7/1/2010 | 7/20/2011 | 384 | 55200 | 6500 | 0 | 0 | 50500 | 6500 | 0 | 0 Active | |
| 10/20/2008 | 5/31/2009 | 223 | 51500 | 9000 | 0 | 0 | 51500 | 9000 | 0 | 0 Active | |
| 6/10/2010 | 7/18/2010 | 38 | 63900 | 9000 | 0 | 0 | 63900 | 9000 | 14100 | 0 Active | |
| 9/30/2008 | 7/20/2011 | 1023 | 53100 | 9000 | 0 | 0 | 53100 | 9000 | 0 | 0 Active | |
| 2/4/2008 | 5/11/2009 | 462 | 49500 | 8500 | 0 | 0 | 48500 | 9000 | 0 | 0 Active | |
| 11/3/2008 | 11/28/2009 | 390 | 47150 | 8500 | 0 | 0 | 51500 | 9000 | 0 | 0 Inactive | 04-29-2010 |
| 8/16/2010 | 7/20/2011 | 338 | 51500 | 7500 | 0 | 0 | 63900 | 7500 | 3300 | 0 Active | |
| 11/10/2007 | 7/20/2011 | 1348 | 63900 | 8500 | 0 | 0 | 47150 | 9000 | 0 | 0 Active | |
| 6/30/2008 | 10/30/2009 | 487 | 47150 | 9000 | 0 | 0 | 50500 | 9000 | 0 | 0 Active | |
| 4/4/2011 | 4/5/2011 | 1 | 50500 | 9000 | 0 | 0 | 63900 | 9000 | 0 | 0 Active | |
| 4/11/2011 | 7/20/2011 | 100 | 63900 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 Active | |
| 9/8/2008 | 7/20/2011 | 1045 | 63900 | 9000 | 0 | 0 | 53100 | 9000 | 14100 | 0 Active | |
| 11/1/2009 | 5/17/2010 | 197 | 51500 | 2000 | 0 | 0 | 51500 | 2000 | 1600 | 0 Active | |
| 5/26/2010 | 2/20/2010 | 635 | 47150 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 Active | |
| 2/21/2011 | 2/21/2011 | 0 | 64000 | 7500 | 0 | 0 | 64000 | 7500 | 0 | 0 Active | |
| 2/21/2011 | 7/20/2011 | 149 | 64000 | 7500 | 0 | 0 | 64000 | 7500 | 3200 | 0 Active | |
| 11/9/2010 | 7/20/2011 | 618 | 48500 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 Active | |
| 1/13/2011 | 2/11/2011 | 29 | 53100 | 5500 | 0 | 0 | 53100 | 9000 | 0 | 0 Active | |
| 3/14/2011 | 7/20/2011 | 128 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 1/24/2011 | 7/20/2011 | 177 | 55200 | 9000 | 0 | 0 | 53100 | 9000 | 0 | 0 Active | |
| 4/11/2011 | 4/27/2011 | 16 | 63900 | 6500 | 0 | 0 | 63900 | 6500 | 1350 | 0 Inactive | 08-04-2010 |
| 5/26/2008 | 12/13/2008 | 201 | 47150 | 9000 | 0 | 0 | 47150 | 9000 | 0 | 0 Active | |
| 8/3/2011 | 1/24/2011 | 539 | 51000 | 6500 | 0 | 0 | 48500 | 6500 | 0 | 0 Active | |
| 10/23/2010 | 7/20/2011 | 270 | 55200 | 7500 | 0 | 0 | 53100 | 7500 | 0 | 0 Active | |
| 11/2/2009 | 6/19/2010 | 229 | 51500 | 6500 | 0 | 0 | 51500 | 6500 | 1600 | 0 Inactive | 06-18-2010 |

| Date 1 | Date 2 | | | | | | | | | | Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/19/2009 | 3/14/2009 | 54 | 49500 | 6500 | 0 | 0 | 0 | 49500 | 6500 | 0 | 0 Active | |
| 5/1/2009 | 5/2/2010 | 366 | 49500 | 6500 | 0 | 0 | 0 | 49500 | 6500 | 3600 | 0 Active | |
| 3/17/2008 | 5/1/2008 | 45 | 48500 | 5500 | 0 | 0 | 0 | 48500 | 5500 | 0 | 0 Active | |
| 11/28/2010 | 11/29/2010 | 1 | 51000 | 2000 | 0 | 0 | 0 | 51000 | 2000 | 0 | 0 Active | |
| 11/3/2008 | 7/20/2011 | 989 | 55200 | 6500 | 0 | 0 | 0 | 48500 | 6500 | 0 | 0 Active | |
| 10/2/2009 | 7/20/2011 | 656 | 55200 | 8500 | 0 | 0 | 0 | 49500 | 8500 | 0 | 0 Active | |
| 2/9/2009 | 7/20/2011 | 891 | 55200 | 2000 | 0 | 0 | 0 | 48500 | 2000 | 0 | 0 Active | |
| 11/10/2008 | 7/20/2011 | 982 | 52600 | 8500 | 0 | 0 | 0 | 48500 | 8500 | 0 | 0 Active | |
| 11/2/2009 | 12/9/2009 | 37 | 62000 | 6500 | 0 | 0 | 0 | 62000 | 6500 | 0 | 0 Active | |
| 12/22/2008 | 7/20/2011 | 940 | 55200 | 7500 | 0 | 0 | 0 | 49500 | 7500 | 0 | 0 Active | |
| 11/10/2008 | 10/5/2009 | 329 | 48500 | 9000 | 0 | 0 | 0 | 48500 | 9000 | 0 | 0 Active | |
| 11/29/2010 | 1/3/2011 | 35 | 53100 | 6500 | 0 | 0 | 0 | 53100 | 6500 | 0 | 0 Active | |
| 3/15/2010 | 10/1/2010 | 200 | 51500 | 6500 | 0 | 0 | 0 | 51500 | 6500 | 1600 | 0 Active | |
| 6/3/2008 | 1/19/2009 | 230 | 49500 | 5500 | 0 | 0 | 0 | 48500 | 5500 | 0 | 0 Active | |
| 1/25/2010 | 7/20/2011 | 541 | 55200 | 9000 | 0 | 0 | 0 | 49500 | 9000 | 0 | 0 Active | |
| 5/19/2008 | 8/9/2008 | 82 | 47150 | 8500 | 0 | 0 | 0 | 47150 | 8500 | 1350 | 0 Active | |
| 6/6/2011 | 7/20/2011 | 44 | 63900 | 6500 | 0 | 3300 | 0 | 63900 | 6500 | 3300 | 0 Active | |
| 1/20/2010 | 7/1/2010 | 162 | 51500 | 7500 | 0 | 0 | 0 | 51500 | 7500 | 1600 | 0 Inactive | 11-05-2010 |
| 8/2/2010 | 11/6/2010 | 96 | 53100 | 7500 | 0 | 0 | 0 | 53100 | 7500 | 0 | 0 Inactive | 11-05-2010 |
| 10/10/2008 | 12/23/2008 | 74 | 49500 | 6500 | 0 | 0 | 0 | 49500 | 6500 | 0 | 0 Inactive | 11-20-2009 |
| 6/28/2010 | 7/20/2011 | 387 | 55200 | 6500 | 0 | 0 | 0 | 53100 | 6500 | 0 | 0 Active | |
| 9/13/2010 | 7/20/2011 | 310 | 52600 | 7500 | 0 | 0 | 0 | 51000 | 7500 | 0 | 0 Active | |
| 11/3/2008 | 7/20/2011 | 989 | 63900 | 9000 | 0 | 0 | 0 | 51500 | 9000 | 3300 | 0 Active | |
| 8/30/2010 | 7/20/2011 | 324 | 53100 | 6500 | 0 | 0 | 0 | 53100 | 6500 | 14100 | 0 Active | |
| 5/5/2011 | 7/20/2011 | 72 | 55200 | 9000 | 0 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 7/4/2011 | 7/20/2011 | 16 | 58000 | 9000 | 0 | 0 | 0 | 58000 | 9000 | 0 | 0 Active | |
| 11/4/2010 | 7/20/2011 | 261 | 63900 | 6500 | 0 | 12400 | 0 | 63900 | 6500 | 3300 | 0 Active | |
| 6/1/2011 | 7/20/2011 | 49 | 55200 | 9000 | 0 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 5/25/2010 | 12/21/2010 | 210 | 53100 | 2000 | 0 | 0 | 0 | 53100 | 2000 | 0 | 0 Active | |
| 3/7/2011 | 1/5/2009 | 135 | 53100 | 6500 | 0 | 0 | 0 | 53100 | 6500 | 14100 | 0 Active | |
| 6/4/2008 | 7/20/2011 | 215 | 50500 | 5500 | 0 | 0 | 0 | 50500 | 5500 | 0 | 0 Active | |
| 4/4/2011 | 7/20/2011 | 107 | 53100 | 6500 | 0 | 0 | 0 | 53100 | 6500 | 0 | 0 Active | |
| 6/21/2010 | 7/20/2011 | 394 | 53100 | 8500 | 0 | 0 | 0 | 53100 | 8500 | 14100 | 0 Active | |
| 2/7/2011 | 7/20/2011 | 163 | 55200 | 9000 | 0 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 12/23/2009 | 7/20/2011 | 574 | 55200 | 6500 | 0 | 0 | 0 | 51500 | 6500 | 0 | 0 Active | |
| 3/6/2010 | 1/10/2011 | 310 | 51500 | 9000 | 0 | 0 | 0 | 51500 | 9000 | 0 | 0 Active | |
| 1/10/2011 | 6/1/2011 | 142 | 53100 | 6500 | 0 | 0 | 0 | 53100 | 6500 | 0 | 0 Inactive | 02-11-2008 |
| 1/1/2007 | 2/12/2008 | 407 | 60500 | 5500 | 0 | 0 | 0 | 60000 | 0 | 0 | 0 Active | |
| 3/14/2011 | 7/20/2011 | 128 | 63900 | 6500 | 0 | 0 | 0 | 63900 | 6500 | 3300 | 0 Active | |
| 2/23/2009 | 4/1/2009 | 37 | 51500 | 9000 | 0 | 0 | 0 | 51500 | 9000 | 0 | 0 Active | |
| 1/4/2010 | 7/20/2011 | 562 | 53100 | 9000 | 0 | 0 | 0 | 51500 | 9000 | 14100 | 0 Active | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/3/2009 | 7/20/2011 | 716 | 51500 | 6500 | 0 | 0 | 53100 | 6500 | 14100 | 0 | Active | 06-04-2010 |
| 2/14/2011 | 7/20/2011 | 156 | 51000 | 6500 | 0 | 0 | 52600 | 6500 | 0 | 0 | Active | |
| 8/4/2008 | 10/18/2008 | 75 | 51500 | 9000 | 0 | 0 | 51500 | 9000 | 0 | 0 | Inactive | |
| 11/23/2009 | 12/23/2009 | 30 | 51500 | 9000 | 0 | 0 | 51500 | 9000 | 0 | 0 | Active | 04-29-2011 |
| 6/7/2010 | 7/20/2011 | 408 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 3/1/2011 | 7/20/2011 | 141 | 53100 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 | Active | |
| 2/11/2008 | 6/28/2008 | 138 | 48500 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 | Inactive | |
| 8/18/2008 | 1/3/2009 | 138 | 49500 | 6500 | 0 | 0 | 49500 | 6500 | 0 | 0 | Active | |
| 9/13/2010 | 5/30/2011 | 259 | 51000 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 | Active | 09-22-2008 |
| 9/2/2009 | 7/20/2011 | 686 | 51500 | 6500 | 0 | 0 | 63900 | 6500 | 3300 | 0 | Active | 09-22-2008 |
| 1/1/2007 | 4/15/2008 | 470 | 61500 | 6500 | 0 | 0 | 61500 | 6500 | 0 | 0 | Inactive | |
| 8/25/2008 | 9/23/2008 | 29 | 61500 | 7500 | 500 | 0 | 61500 | 7500 | 500 | 0 | Inactive | |
| 5/27/2009 | 7/20/2011 | 784 | 49500 | 7500 | 0 | 0 | 55200 | 7500 | 0 | 0 | Active | 11-24-2010 |
| 6/2/2008 | 2/9/2010 | 617 | 48500 | 8500 | 0 | 0 | 48500 | 9000 | 0 | 0 | Inactive | 11-24-2010 |
| 3/2/2010 | 11/25/2010 | 268 | 49500 | 9000 | 3600 | 0 | 49500 | 9000 | 3600 | 0 | Inactive | 11-24-2010 |
| 11/25/2010 | 11/25/2010 | 0 | 49500 | 9000 | 5500 | 0 | 49500 | 9000 | 5500 | 0 | Inactive | 12-31-2010 |
| 8/16/2010 | 1/1/2011 | 138 | 51000 | 9000 | 5500 | 0 | 51000 | 9000 | 5500 | 0 | Inactive | 12-31-2010 |
| 1/1/2011 | 1/1/2011 | 0 | 48500 | 9000 | 0 | 0 | 48500 | 5500 | 0 | 0 | Inactive | 05-02-2008 |
| 10/22/2007 | 12/28/2007 | 67 | 51500 | 5500 | 0 | 0 | 51500 | 5500 | 0 | 0 | Active | |
| 6/16/2008 | 3/18/2010 | 640 | 50500 | 5500 | 0 | 0 | 50500 | 5500 | 0 | 0 | Active | |
| 10/15/2007 | 3/10/2008 | 147 | 51000 | 6500 | 0 | 0 | 51000 | 6500 | 0 | 0 | Active | |
| 7/26/2010 | 2/7/2011 | 196 | 49500 | 9000 | 0 | 0 | 49500 | 9000 | 0 | 0 | Inactive | |
| 9/15/2008 | 10/23/2010 | 768 | 49500 | 9000 | 3600 | 0 | 49500 | 9000 | 3600 | 0 | Inactive | 10-22-2010 |
| 10/23/2010 | 10/23/2010 | 0 | 49500 | 8500 | 0 | 0 | 63900 | 8500 | 3600 | 0 | Active | 10-22-2010 |
| 11/2/2009 | 7/20/2011 | 625 | 51500 | 9000 | 0 | 0 | 79310 | 9000 | 3300 | 0 | Active | 12-23-2010 |
| 9/1/2010 | 12/24/2010 | 114 | 53100 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 | Inactive | |
| 1/31/2011 | 7/20/2011 | 170 | 53100 | 8500 | 0 | 0 | 53100 | 8500 | 0 | 0 | Active | |
| 7/21/2010 | 7/20/2011 | 364 | 53100 | 8500 | 0 | 0 | 53100 | 8500 | 14100 | 0 | Active | |
| 9/8/2009 | 2/1/2010 | 146 | 49500 | 9000 | 0 | 0 | 49500 | 9000 | 0 | 0 | Inactive | |
| 1/27/2011 | 5/14/2011 | 107 | 53100 | 9000 | 0 | 0 | 53100 | 9000 | 0 | 0 | Inactive | 05-13-2011 |
| 5/14/2011 | 5/14/2011 | 0 | 53100 | 9000 | 0 | 0 | 53100 | 9000 | 0 | 0 | Inactive | 05-13-2011 |
| 6/14/2011 | 7/20/2011 | 36 | 55200 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 | Active | 05-13-2011 |
| 1/25/2011 | 7/20/2011 | 541 | 62000 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 | Active | |
| 8/2/2010 | 7/20/2011 | 352 | 53100 | 7500 | 0 | 0 | 55200 | 7500 | 0 | 0 | Active | |
| 7/6/2010 | 7/6/2010 | 379 | 53100 | 2000 | 0 | 0 | 55200 | 2000 | 0 | 0 | Active | |
| 1/21/2011 | 3/1/2011 | 39 | 53100 | 7500 | 0 | 0 | 53100 | 7500 | 0 | 0 | Active | |
| 10/4/2010 | 12/7/2010 | 64 | 53100 | 9000 | 0 | 0 | 53100 | 9000 | 0 | 0 | Active | |
| 2/14/2011 | 7/20/2011 | 156 | 53100 | 9000 | 0 | 0 | 53100 | 9000 | 0 | 0 | Active | |
| 3/3/2008 | 5/10/2008 | 68 | 48500 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 | Active | |
| 5/10/2008 | 7/20/2011 | 359 | 53100 | 6500 | 0 | 0 | 53100 | 6500 | 14100 | 0 | Active | |
| 7/26/2010 | 7/20/2011 | 107 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/30/2008 | 5/31/2008 | 122 | 48500 | 5500 | 0 | 0 | 48500 | 5500 | 0 | 0 Inactive | 01-28-2011 |
| 6/1/2010 | 7/20/2011 | 414 | 53100 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 Active | |
| 1/3/2011 | 7/20/2011 | 198 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 9/15/2008 | 7/20/2011 | 1038 | 49500 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 5/11/2009 | 7/20/2011 | 800 | 49500 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 9/1/2010 | 7/20/2011 | 322 | 51000 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 Active | |
| 1/22/2007 | 9/2/2009 | 954 | 56000 | 8500 | 0 | 0 | 56000 | 8500 | 0 | 0 Active | |
| 10/12/2009 | 7/2/2010 | 263 | 55000 | 7500 | 0 | 0 | 55000 | 7500 | 0 | 0 Active | |
| 1/1/2009 | 7/1/2009 | 181 | 70000 | 9000 | 0 | 0 | 70000 | 9000 | 0 | 0 Active | |
| 9/20/2010 | 7/20/2011 | 303 | 63900 | 2000 | 0 | 0 | 63900 | 2000 | 3300 | 0 Active | |
| 7/26/2010 | 7/20/2011 | 359 | 51000 | 6500 | 0 | 0 | 52600 | 6500 | 0 | 0 Active | |
| 4/1/2009 | 8/31/2010 | 517 | 71000 | 9000 | 0 | 0 | 71000 | 9000 | 13000 | 0 Active | |
| 8/1/2009 | 7/20/2011 | 718 | 55000 | 9000 | 0 | 0 | 66500 | 8500 | 2000 | 0 Active | |
| 2/12/2007 | 2/11/2009 | 730 | 52000 | 5500 | 0 | 0 | 52000 | 5500 | 0 | 0 Inactive | 02-10-2009 |
| 9/21/2010 | 7/20/2011 | -302 | 67000 | 9000 | 0 | 0 | 67000 | 9000 | 200 | 0 Active | |
| 2/21/2007 | 9/1/2007 | 192 | 63000 | 7500 | 0 | 0 | 63000 | 7500 | 0 | 0 Inactive | 04-30-2008 |
| 1/1/2008 | 5/1/2008 | 121 | 63000 | 8500 | 0 | 0 | 63000 | 8500 | 0 | 0 Inactive | 04-30-2008 |
| 5/2/2011 | 7/20/2011 | 79 | 55200 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 1/30/2008 | 6/28/2008 | 150 | 50500 | 5500 | 0 | 0 | 50500 | 5500 | 0 | 0 Inactive | 07-16-2009 |
| 1/8/2011 | 7/20/2011 | 193 | 63900 | 2000 | 0 | 0 | 63900 | 6000 | 3300 | 0 Active | |
| 2/16/2010 | 1/3/2011 | 321 | 51500 | 6500 | 0 | 0 | 53100 | 6500 | 0 | 0 Active | |
| 7/26/2010 | 7/20/2011 | 359 | 53100 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 Active | |
| 2/1/2010 | 1/1/2011 | 334 | 55000 | 6500 | 0 | 0 | 55000 | 6500 | 0 | 0 Active | |
| 6/14/2010 | 5/23/2011 | 343 | 53100 | 9000 | 0 | 0 | 53100 | 9000 | 3300 | 0 Active | |
| 4/9/2007 | 7/20/2011 | 1563 | 56000 | 5500 | 0 | 0 | 63900 | 6500 | 3300 | 0 Active | |
| 7/10/2010 | 7/20/2011 | 375 | 70000 | 9000 | 0 | 0 | 70000 | 9000 | 1400 | 0 Active | |
| 8/11/2010 | 4/8/2011 | 240 | 53100 | 2000 | 0 | 0 | 53100 | 6500 | 0 | 0 Active | |
| 3/21/2011 | 7/20/2011 | 121 | 63900 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 Inactive | 01-14-2011 |
| 10/6/2008 | 10/6/2008 | 0 | 68000 | 9000 | 0 | 0 | 68000 | 9000 | 0 | 0 Inactive | 01-14-2011 |
| 10/16/2008 | 2/17/2009 | 124 | 68,000 | 9,000 | 0 | 0 | 68,000 | 9,000 | 14100 | 0 Active | |
| 9/20/2010 | 7/20/2011 | 303 | 53100 | 7500 | 0 | 0 | 53100 | 7500 | 3300 | 0 Active | |
| 4/28/2010 | 7/20/2011 | 448 | 63900 | 6500 | 0 | 0 | 63900 | 6500 | 0 | 0 Active | |
| 7/6/2010 | 7/20/2011 | 379 | 55200 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 9/7/2009 | 11/17/2009 | 71 | 51000 | 9000 | 0 | 0 | 49500 | 9000 | 0 | 0 Active | |
| 12/21/2009 | 7/20/2011 | 576 | 49500 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Inactive | 11-19-2009 |
| 1/19/2010 | 9/26/2009 | 250 | 49500 | 9000 | 0 | 0 | 49500 | 9000 | 0 | 0 Active | |
| 8/10/2009 | 7/20/2011 | 709 | 49500 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 12/8/2008 | 12/13/2010 | 735 | 51600 | 9000 | 0 | 0 | 51600 | 9000 | 0 | 0 Active | |
| 2/2/2010 | 12/18/2010 | 684 | 49500 | 9000 | 0 | 0 | 49500 | 9000 | 1500 | 0 Active | |
| 11/5/2007 | 3/4/2009 | 485 | 66000 | 5500 | 0 | 0 | 66000 | 5500 | 3600 | 0 Active | |
| 9/8/2009 | 7/1/2010 | 296 | 51500 | 7500 | 0 | 0 | 51500 | 7500 | 12400 | 0 Active | |

|  |  |  |  |  |  |  |  |  |  | 12-31-2009 | 12-31-2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/14/2011 | 7/20/2011 | 67 | 52600 | 6500 | 0 | 0 | 52600 | 6500 | 52600 | 0 | 0 Active |
| 6/1/2010 | 7/20/2011 | 414 | 49500 | 9000 |  | 0 | 55200 | 9000 | 55200 | 0 | 0 Active |
| 6/6/2011 | 7/20/2011 | 44 | 55200 | 5500 |  | 0 | 55200 | 5500 | 55200 | 0 | 0 Active |
| 9/28/2009 | 7/20/2011 | 660 | 51500 | 9000 | 1500 | 0 | 63900 | 9000 | 63900 | 3300 | 0 Active |
| 2/2/2011 | 7/20/2011 | 168 | 53100 | 7500 |  | 0 | 53100 | 7500 | 53100 | 14100 | 0 Active |
| 12/7/2009 | 7/20/2011 | 590 | 51500 | 9000 |  | 0 | 53100 | 9000 | 53100 | 14100 | 0 Active |
| 8/24/2009 | 7/20/2011 | 695 | 51500 | 9000 |  | 0 | 53100 | 9000 | 53100 | 14100 | 0 Active |
| 5/16/2011 | 7/11/2010 | 65 | 66500 | 6500 |  | 0 | 66500 | 6500 | 66500 | 2000 | 0 Active |
| 1/18/2010 | 7/20/2011 | 164 | 55000 | 9000 | 2000 | 0 | 55500 | 9000 | 55500 | 11500 | 0 Active |
| 1/5/2009 | 7/28/2008 | 926 | 51500 | 9000 |  | 0 | 55200 | 9000 | 55200 | 0 | 0 Inactive |
| 12/3/2007 | 4/5/2009 | 238 | 66000 | 2000 |  | 0 | 66000 | 2000 | 66000 | 0 | 0 Inactive |
| 8/19/2008 | 7/20/2011 | 229 | 66000 | 6000 |  | 0 | 55200 | 6000 | 55200 | 11200 | 0 Active |
| 4/18/2011 | 9/21/2010 | 93 | 53100 | 7500 |  | 0 | 56000 | 7500 | 56000 | 0 | 0 Active |
| 7/29/2008 | 7/20/2011 | 1086 | 56000 | 9000 |  | 0 | 63900 | 9000 | 63900 | 3300 | 0 Active |
| 6/1/2010 | 1/8/2011 | 112 | 63900 | 6500 |  | 0 | 63900 | 6500 | 63900 | 0 | 0 Active |
| 4/8/2010 | 4/30/2011 | 468 | 51500 | 2000 |  | 0 | 53100 | 2000 | 53100 | 0 | 0 Active |
| 9/27/2010 | 7/20/2011 | 103 | 53100 | 6500 |  | 0 | 63900 | 6500 | 63900 | 0 | 0 Active |
| 12/20/2010 | 7/20/2011 | 131 | 63900 | 6500 |  | 0 | 67200 | 6500 | 67200 | 0 | 0 Active |
| 6/20/2011 | 6/18/2011 | 30 | 67200 | 9000 |  | 0 | 61500 | 9000 | 61500 | 3300 | 0 Active |
| 2/8/2010 | 7/20/2011 | 527 | 61500 | 9000 |  | 0 | 63900 | 9000 | 63900 | 3300 | 0 Active |
| 5/31/2011 | 6/29/2009 | 50 | 51500 | 5500 |  | 0 | 51500 | 5500 | 51500 | 14100 | 0 Active |
| 6/29/2009 | 7/20/2011 | 719 | 63900 | 5500 |  | 0 | 63900 | 6500 | 63900 | 14100 | 0 Active |
| 3/20/2011 | 11/1/2010 | 122 | 63900 | 6500 |  | 0 | 53100 | 9000 | 53100 | 3300 | 0 Active |
| 11/1/2010 | 1/22/2011 | 261 | 53100 | 9000 |  | 0 | 53100 | 8500 | 53100 | 0 | 0 Active |
| 1/22/2011 | 5/31/2010 | 544 | 51500 | 8500 |  | 0 | 63900 | 8500 | 63900 | 1900 | 0 Active |
| 5/31/2010 | 5/1/2011 | 415 | 53100 | 8500 |  | 0 | 53100 | 9000 | 53100 | 0 | 0 Active |
| 2/11/2011 | 5/1/2011 | 79 | 53100 | 9000 |  | 0 | 53100 | 6500 | 53100 | 3300 | 0 Active |
| 5/1/2011 | 9/11/2010 | 0 | 62000 | 6500 |  | 0 | 62000 | 9000 | 62000 | 3300 | 0 Active |
| 7/6/2009 | 1/3/2011 | 432 | 63900 | 9000 |  | 0 | 55200 | 9000 | 55200 | 3300 | 0 Active |
| 1/3/2011 | 9/27/2010 | 198 | 63900 | 9000 |  | 0 | 63900 | 6500 | 63900 | 0 | 0 Active |
| 9/27/2010 | 7/20/2011 | 296 | 63900 | 6500 |  | 0 | 63900 | 6500 | 63900 | 3300 | 0 Active |
| 8/2/2010 | 12/29/2010 | 352 | 55000 | 6500 |  | 0 | 63900 | 6500 | 63900 | 3300 | 0 Active |
| 6/22/2010 | 5/16/2011 | 555 | 63900 | 6,500 |  | 0 | 63,900 | 9000 | 63,900 | 0 | 0 Active |
| 2/21/2011 | 7/20/2011 | 84 | 63900 | 9000 |  | 0 | 63900 | 9000 | 63900 | 3300 | 0 Active |
| 7/18/2011 | 7/20/2011 | 2 | 67200 | 9000 |  | 0 | 67200 | 9000 | 67200 | 0 | 0 Active |
| 7/12/2010 | 7/30/2011 | 373 | 53100 | 6500 |  | 0 | 53100 | 6500 | 53100 | 3300 | 0 Active |
| 5/10/2010 | 7/20/2011 | 436 | 53100 | 9000 |  | 0 | 53100 | 9000 | 53100 | 3300 | 0 Active |
| 5/11/2009 | 7/20/2011 | 800 | 51500 | 9000 |  | 0 | 55200 | 9000 | 55200 | 0 | 0 Active |
| 8/5/2010 | 10/30/2010 | 56 | 55200 | 8500 |  | 0 | 63900 | 8500 | 63900 | 0 | 0 Active |
| 1/2/2009 | 7/21/2009 | 86 | 63900 | 9000 |  | 0 | 52500 | 9000 | 52500 | 0 | 0 Active |
|  |  | 565 |  | 8500 |  |  |  | 8500 |  |  |  |

| Date 1 | Date 2 | ID | Amt 1 | Rate 1 | | | Amt 2 | Rate 2 | Extra | | Status | Deactivated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/2/2009 | 6/1/2011 | 699 | 51500 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | 02-26-2010 |
| 2/15/2010 | 3/5/2010 | 18 | 51500 | 7500 | 0 | 0 | 51500 | 7500 | 0 | 0 | Active | |
| 8/17/2009 | 2/27/2010 | 194 | 65000 | 9000 | 0 | 0 | 65000 | 9000 | 0 | 0 | Inactive | |
| 2/15/2011 | 7/20/2011 | 520 | 68000 | 6500 | 0 | 0 | 68000 | 6500 | 0 | 0 | Active | |
| 5/23/2011 | 7/20/2011 | 58 | 67200 | 7500 | 0 | 0 | 67200 | 7500 | 0 | 0 | Active | |
| 1/18/2010 | 7/20/2011 | 548 | 51500 | 7500 | 0 | 0 | 53100 | 9000 | 14100 | 0 | Active | |
| 1/25/2010 | 6/26/2010 | 152 | 51500 | 7500 | 0 | 0 | 51500 | 7500 | 1600 | 0 | Active | |
| 6/7/2010 | 7/20/2011 | 408 | 63900 | 7500 | 0 | 0 | 63900 | 7500 | 3300 | 0 | Active | |
| 11/17/2008 | 7/20/2011 | 975 | 71500 | 8500 | 0 | 0 | 71500 | 8500 | 1430 | 0 | Active | |
| 12/14/2009 | 12/28/2009 | 14 | 75000 | 9000 | 0 | 0 | 75000 | 9000 | 0 | 0 | Active | |
| 7/4/2011 | 7/20/2011 | 16 | 55200 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 4/4/2011 | 7/20/2011 | 107 | 51000 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 | Active | |
| 3/30/2011 | 7/20/2011 | 112 | 51000 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 | Active | |
| 5/14/2010 | 7/20/2011 | 268 | 56500 | 9000 | 0 | 0 | 56500 | 9000 | 0 | 0 | Active | |
| 1/25/2010 | 7/20/2011 | 541 | 56600 | 9000 | 0 | 0 | 57732 | 9000 | 0 | 0 | Active | |
| 12/20/2010 | 7/20/2011 | 212 | 53100 | 7500 | 0 | 0 | 53100 | 7500 | 14100 | 0 | Active | |
| 9/28/2009 | 10/17/2009 | 19 | 66500 | 5500 | 0 | 0 | 66500 | 5500 | 0 | 0 | Inactive | 10-16-2009 |
| 6/6/2011 | 7/20/2011 | 44 | 67200 | 9000 | 0 | 0 | 67200 | 9000 | 0 | 0 | Active | |
| 3/21/2011 | 6/4/2011 | 75 | 51000 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 4/25/2011 | 7/20/2011 | 86 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 1/31/2011 | 2/21/2011 | 21 | 63900 | 9000 | 0 | 0 | 63900 | 9000 | 0 | 0 | Active | |
| 7/18/2011 | 7/20/2011 | 2 | 67200 | 9000 | 0 | 0 | 67200 | 9000 | 0 | 0 | Active | |
| 11/29/2010 | 7/20/2011 | 233 | 63900 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 | Active | |
| 5/21/2010 | 4/1/2011 | 315 | 72000 | 9000 | 0 | 0 | 72000 | 9000 | 0 | 0 | Inactive | 03-31-2011 |
| 7/5/2011 | 7/20/2011 | 15 | 55200 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 1/6/2010 | 7/20/2011 | 560 | 62000 | 9000 | 0 | 0 | 63900 | 9000 | 3300 | 0 | Active | |
| 6/20/2011 | 7/20/2011 | 30 | 55200 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 12/7/2009 | 7/20/2011 | 590 | 65000 | 8500 | 0 | 0 | 65000 | 8500 | 2200 | 0 | Active | |
| 6/6/2011 | 7/20/2011 | 44 | 55200 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 11/29/2010 | 3/18/2011 | 109 | 53100 | 9000 | 0 | 0 | 53100 | 9000 | 0 | 0 | Active | |
| 5/1/2011 | 7/20/2011 | 80 | 55200 | 7500 | 0 | 0 | 55200 | 7500 | 0 | 0 | Active | |
| 2/28/2011 | 7/20/2011 | 142 | 53100 | 6600 | 0 | 0 | 53100 | 6600 | 0 | 0 | Active | |
| 1/1/2011 | 7/20/2011 | 200 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 | Active | |
| 3/3/2011 | 7/20/2011 | 139 | 51000 | 8500 | 0 | 0 | 55200 | 8500 | 0 | 0 | Active | |
| 11/17/2010 | 3/1/2011 | 104 | 61000 | 9000 | 0 | 0 | 61000 | 9000 | 0 | 0 | Inactive | 04-26-2011 |
| 3/18/2011 | 4/27/2011 | 40 | 61000 | 7500 | 0 | 0 | 61000 | 7500 | 0 | 0 | Inactive | 04-26-2011 |
| 1/11/2010 | 7/20/2011 | 555 | 57000 | 8500 | 0 | 0 | 57000 | 8500 | 0 | 0 | Active | |
| 3/14/2011 | 4/14/2011 | 31 | 56500 | 8500 | 0 | 0 | 56500 | 8500 | 0 | 0 | Active | |
| 3/7/2011 | 4/11/2011 | 35 | 56500 | 6500 | 0 | 0 | 56500 | 6500 | 0 | 0 | Active | |
| 1/25/2010 | 7/20/2011 | 541 | 68000 | 8500 | 0 | 0 | 68000 | 6500 | 0 | 0 | Active | |
| 4/20/2011 | 7/20/2011 | 91 | 63900 | 6500 | 0 | 0 | 63900 | 6500 | 3300 | 0 | Active | |

| Date 1 | Date 2 | Num | Value 1 | | | | Value 2 | | | Status | Date 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/17/2011 | 7/20/2011 | 184 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 2/8/2010 | 10/1/2010 | 235 | 59200 | 9000 | 0 | 0 | 59200 | 9000 | 0 | 0 Active | |
| 2/8/2010 | 7/20/2011 | 527 | 51500 | 9000 | 0 | 0 | 51200 | 9000 | 0 | 0 Active | |
| 6/13/2011 | 7/20/2011 | 37 | 55200 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 3/21/2011 | 7/20/2011 | 121 | 51000 | 6500 | 0 | 0 | 55200 | 6500 | 0 | 0 Active | |
| 6/20/2011 | 7/20/2011 | 30 | 55200 | 8500 | 0 | 0 | 55200 | 8500 | 0 | 0 Active | |
| 12/13/2010 | 7/20/2011 | 219 | 53100 | 7500 | 0 | 0 | 53100 | 7500 | 0 | 0 Active | |
| 4/1/2011 | 7/20/2011 | 110 | 53100 | 9000 | 0 | 0 | 55200 | 9000 | 14100 | 0 Active | |
| 3/22/2010 | 7/20/2011 | 485 | 69000 | 9000 | 0 | 0 | 69000 | 9000 | 0 | 0 Active | |
| 9/15/2010 | 5/24/2011 | 251 | 71100 | 9000 | 0 | 0 | 71100 | 9000 | 0 | 0 Inactive | 05-23-2011 |
| 7/5/2011 | 7/20/2011 | 15 | 55200 | 9000 | 0 | 0 | 55200 | 9000 | 0 | 0 Active | |
| 3/15/2010 | 4/21/2010 | 37 | 68000 | 6500 | 0 | 0 | 68000 | 6500 | 0 | 0 Inactive | 09-10-2010 |
| 4/11/2011 | 7/20/2011 | 100 | 70000 | 9000 | 0 | 0 | 70000 | 9000 | 0 | 0 Active | |
| 4/7/2010 | 7/20/2011 | 469 | 60200 | 9000 | 0 | 0 | 60200 | 9000 | 0 | 0 Active | |
| 1/24/2011 | 6/18/2011 | 145 | 66000 | 9000 | 0 | 0 | 67200 | 9000 | 0 | 0 Inactive | 06-17-2011 |
| 4/26/2010 | 8/2/2010 | 98 | 71000 | 9000 | 0 | 0 | 71000 | 9000 | 0 | 0 Active | |
| 4/26/2010 | 1/10/2011 | 259 | 56000 | 6500 | 0 | 0 | 56000 | 6500 | 0 | 0 Active | |
| 5/17/2010 | 7/20/2011 | 429 | 66000 | 9000 | 0 | 0 | 66000 | 9000 | 1200 | 0 Active | |
| 5/20/2010 | 7/20/2011 | 426 | 63500 | 6500 | 0 | 0 | 63500 | 6500 | 3700 | 0 Active | |
| 7/7/2010 | 3/2/2011 | 238 | 51000 | 2000 | 0 | 0 | 51000 | 2000 | 0 | 0 Active | |
| 7/5/2010 | 7/20/2011 | 380 | 52600 | 2000 | 0 | 0 | 51000 | 2000 | 0 | 0 Active | |
| 12/20/2010 | 7/20/2011 | 212 | 70000 | 6500 | 0 | 0 | 70000 | 6500 | 0 | 0 Active | |
| 6/3/2010 | 2/1/2011 | 243 | 55000 | 7500 | 0 | 0 | 55000 | 7500 | 0 | 0 Active | |
| 7/1/2010 | 7/20/2011 | 384 | 52600 | 6500 | 0 | 0 | 55000 | 6500 | 0 | 0 Active | |
| 6/21/2010 | 7/9/2010 | 18 | 71,500 | 8500 | 0 | 0 | 71,500 | 8,500 | 0 | 0 Active | |
| 6/21/2010 | 7/20/2011 | 394 | 65500 | 8500 | 0 | 0 | 65500 | 8500 | 1700 | 0 Active | |
| 5/2/2011 | 7/20/2011 | 79 | 71000 | 9000 | 0 | 0 | 71000 | 9000 | 0 | 0 Active | |
| 7/6/2010 | 7/20/2011 | 379 | 70000 | 8500 | 0 | 0 | 70000 | 8500 | 0 | 0 Active | |
| 6/21/2010 | 3/10/2011 | 262 | 63900 | 9000 | 0 | 0 | 63900 | 9000 | 0 | 0 Active | |
| 5/12/2011 | 5/23/2011 | 11 | 63900 | 9000 | 3300 | 3300 | 63900 | 9000 | 3300 | 0 Active | |
| 6/1/2011 | 6/1/2011 | 49 | 63900 | 9000 | 3300 | 3300 | 63900 | 9000 | 3300 | 0 Active | |
| 1/6/2011 | 3/14/2011 | 67 | 66000 | 9000 | 0 | 0 | 66000 | 9000 | 0 | 0 Active | |
| 11/17/2010 | 7/20/2011 | 245 | 51000 | 9000 | 0 | 0 | 52600 | 9000 | 0 | 0 Active | |
| 7/19/2010 | 7/20/2011 | 366 | 58000 | 6500 | 0 | 0 | 58000 | 6500 | 0 | 0 Active | |
| 7/14/2011 | 7/20/2011 | 6 | 70000 | 9000 | 0 | 0 | 70000 | 9000 | 0 | 0 Active | |
| 7/26/2010 | 7/20/2011 | 359 | 58000 | 6500 | 0 | 0 | 58000 | 6500 | 0 | 0 Active | |
| 11/1/2010 | 4/13/2011 | 163 | 51000 | 6500 | 0 | 0 | 51000 | 6500 | 0 | 0 Inactive | 04-12-2011 |
| 8/16/2010 | 7/20/2011 | 338 | 58000 | 9000 | 0 | 0 | 58000 | 9000 | 0 | 0 Active | |
| 9/1/2010 | 7/20/2011 | 322 | 59000 | 7500 | 0 | 0 | 59000 | 7500 | 0 | 0 Active | |
| 5/27/2011 | 7/20/2011 | 54 | 67200 | 9000 | 0 | 0 | 67200 | 9000 | 0 | 0 Active | |
| 8/16/2010 | 7/20/2011 | 338 | 60000 | 6500 | 0 | 0 | 60000 | 6500 | 0 | 0 Active | |

| Date 1 | Date 2 | Qty | | | Amount | Rate | | | Amount | Rate | | Status | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/1/2010 | 7/20/2011 | 322 | 0 | 0 | 72000 | 6500 | 0 | 0 | 72000 | 6500 | 0 | Active | |
| 8/30/2010 | 7/20/2011 | 324 | 0 | 0 | 59000 | 9000 | 0 | 0 | 59000 | 9000 | 0 | Active | |
| 9/7/2010 | 3/21/2011 | 195 | 0 | 0 | 70000 | 8500 | 0 | 0 | 70000 | 8500 | 0 | Active | |
| 5/16/2011 | 7/20/2011 | 65 | 0 | 0 | 70000 | 8500 | 0 | 0 | 70000 | 8500 | 0 | Active | |
| 10/11/2010 | 7/20/2011 | 282 | 0 | 0 | 68000 | 9000 | 0 | 0 | 68000 | 9000 | 0 | Active | |
| 11/17/2010 | 7/20/2011 | 245 | 0 | 0 | 60000 | 9000 | 0 | 0 | 60000 | 9000 | 0 | Active | |
| 11/15/2010 | 7/20/2011 | 247 | 0 | 0 | 61000 | 7500 | 0 | 0 | 61000 | 7500 | 0 | Active | |
| 2/22/2011 | 7/20/2011 | 148 | 0 | 0 | 61000 | 7500 | 0 | 0 | 61000 | 7500 | 0 | Inactive | 03-04-2011 |
| 11/15/2010 | 3/5/2011 | 110 | 0 | 0 | 67095 | 7500 | 0 | 0 | 67095 | 7500 | 0 | Inactive | 03-14-2011 |
| 1/24/2011 | 3/15/2011 | 50 | 0 | 0 | 54000 | 9000 | 0 | 0 | 54000 | 9000 | 0 | Active | |
| 12/16/2010 | 7/20/2011 | 216 | 0 | 0 | 71000 | 7500 | 0 | 0 | 71000 | 7500 | 0 | Active | |
| 2/7/2011 | 7/20/2011 | 163 | 0 | 0 | 53000 | 6500 | 0 | 0 | 52600 | 6500 | 0 | Active | |
| 2/14/2011 | 7/20/2011 | 156 | 0 | 0 | 70000 | 7500 | 0 | 0 | 70000 | 7500 | 0 | Active | |
| 4/1/2011 | 4/4/2011 | 3 | 0 | 0 | 81000 | 6500 | 0 | 0 | 81000 | 6500 | 0 | Active | |
| 3/23/2011 | 7/20/2011 | 119 | 0 | 0 | 71000 | 7500 | 0 | 0 | 71000 | 7500 | 0 | Active | |
| 4/25/2011 | 7/20/2011 | 86 | 0 | 0 | 71000 | 9000 | 0 | 0 | 71000 | 9000 | 0 | Active | |
| 4/25/2011 | 7/20/2011 | 86 | 0 | 0 | 63000 | 9000 | 0 | 0 | 63000 | 9000 | 0 | Active | |
| 4/27/2011 | 7/20/2011 | 84 | 0 | 0 | 68000 | 9000 | 0 | 0 | 68000 | 9000 | 0 | Active | |
| 5/11/2011 | 7/20/2011 | 70 | 0 | 0 | 71000 | 6500 | 0 | 0 | 71000 | 6500 | 0 | Active | |
| 5/16/2011 | 6/6/2011 | 21 | 0 | 0 | 67200 | 9000 | 0 | 0 | 67200 | 9000 | 0 | Active | |
| 5/23/2011 | 7/20/2011 | 58 | 0 | 0 | 71000 | 9000 | 0 | 0 | 71000 | 9000 | 0 | Active | |
| 6/20/2011 | 7/20/2011 | 30 | 0 | 0 | 68500 | 6500 | 0 | 0 | 68500 | 6500 | 0 | Active | |

# EXHIBIT C

EXHIBIT C - Page 133

1  MORGAN, LEWIS & BOCKIUS LLP
   CARRIE A. GONELL, State Bar No. 257163
2  cgonell@morganlewis.com
   MARIA O. GUTIERREZ, State Bar No. 209995
3  maria.gutierrez@morganlewis.com
   5 Park Plaza, Suite 1750
4  Irvine, CA 92614
   Tel: 949.399.7000
5  Fax: 949.399.7001

6  Attorneys for Defendant
   COGNIZANT TECHNOLOGY SOLUTIONS U.S.
7  CORPORATION

8                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                              COUNTY OF ORANGE

10

11 JOHN THOMAS, an individual California    Case No. 30-2011-00484761-CU-OE-CXC
   resident, on behalf of himself and all others
12 similarly situated,                      Assigned For All Purposes To:
                                            Hon. Ronald L. Bauer
13               Plaintiff,
14        vs.
15                                          **DEFENDANT COGNIZANT TECHNOLOGY**
   COGNIZANT TECHNOLOGY                     **SOLUTIONS U.S. CORPORATION'S**
16 SOLUTIONS U.S. CORPORATION, a            **ANSWER TO COMPLAINT**
   Delaware corporation and DOES 1 through
17 100, inclusive,                          Complaint Filed:    June 16, 2011
                                            Trial Date:         None Set
18               Defendants.
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS &
  BOCKIUS LLP
 ATTORNEYS AT LAW
     IRVINE

DB2/ 22557076.1                      ANSWER TO COMPLAINT

EXHIBIT C - Page 134

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
**07/26/2011** at 03:28:00 PM
Clerk of the Superior Court
By Rebecca Bojorques,Deputy Clerk

Defendant COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION ("COGNIZANT" or "DEFENDANT"), by and through its undersigned counsel, hereby answers the allegations contained in the Class Action Complaint for Damages ("Complaint") brought by Plaintiff as follows:

## GENERAL DENIAL

Pursuant to Section 431.30(d) of the California Code of Civil Procedure, Defendant generally denies each and every allegation set forth in the Complaint. Defendant further denies, generally and specifically, that Plaintiff, or any member of the putative class he seeks to represent, is entitled to the relief requested, or that Plaintiff, or any member of the putative class, has been or will be damaged in any sum, or at all, by reason of any act or omission on the part of Defendant, or any of its past or present agents, representatives, or employees acting in the course and scope of their employment.

## DEFENSES

Defendant also asserts the following Defenses, without admitting any obligations regarding who bears the burden of proof or persuasion as to any one of them:

## FIRST DEFENSE

### (Failure to State a Cause of Action)

1.    The Complaint and each purported cause of action contained therein fail to state facts sufficient to constitute a cause of action.

## SECOND DEFENSE

### (Standing)

2.    The named Plaintiff fails to satisfy the prerequisites for class certification and, therefore, lacks standing and cannot represent the interest of others as to each purported claim.

## THIRD DEFENSE

### (Uncertainty)

3.    Plaintiff's claims, and the claims of each member of the putative class alleged in the Complaint, are barred in whole or in part because the Complaint is uncertain in that the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

-2-

ANSWER TO COMPLAINT

DB2/ 22557076.1

EXHIBIT C - Page 135

purported class definition is ambiguous and conclusory.

## FOURTH DEFENSE

### (Statutes of Limitations)

4.      Plaintiff's claims, and the claims of each member of the putative class alleged in the Complaint, or some of them, are barred in whole or in part by the applicable statutes of limitations, including, but not limited to, California Code of Civil Procedure §§ 338, 339, 340 and 343; California Business and Professions Code § 17208; and California Labor Code § 203.

## FIFTH DEFENSE

### (Failure to Exhaust Internal and Administrative Remedies/Preconditions)

5.      The claims of Plaintiff and each member of the putative class alleged in the Complaint, or some of them, are barred for failure to exhaust internal and/or administrative remedies and/or preconditions.

## SIXTH DEFENSE

### (Estoppel)

6.      The claims of Plaintiff and each member of the putative class alleged in the Complaint, or some of them, are barred in whole or in part by the doctrine of estoppel.

## SEVENTH DEFENSE

### (Waiver)

7.      The claims of Plaintiff and each member of the putative class alleged in the Complaint, or some of them, are barred in whole or in part because such claims have been waived, discharged, and/or abandoned.

## EIGHTH DEFENSE

### (Penalties Unjust, Arbitrary, and Oppressive, or Confiscatory)

8.      Plaintiff, and each member of the putative class alleged in the Complaint, or some of them, are not entitled to recover any civil penalties because, under the circumstances of this case, any such recovery would be unjust, arbitrary and oppressive, or confiscatory.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

-3-

DB2/ 22557076.1

EXHIBIT C - Page 136

## NINTH DEFENSE

### (Consent)

9.    The Complaint, and each purported cause of action contained therein, are barred to the extent Plaintiff, or members of the putative class alleged in the Complaint, consented to any alleged activity or conduct.

## TENTH DEFENSE

### (Accord and Satisfaction, Payment)

10.    The claims of Plaintiff and each member of the putative class alleged in the Complaint, or some of them, are barred in whole or in part by the principles of accord and satisfaction, and payment.

## ELEVENTH DEFENSE

### (Exempt Status)

11.    Plaintiff and each member of the putative class alleged in the Complaint are exempt from the overtime requirements of the California Labor Code and the applicable Industrial Welfare Commission wage order or wage orders, including, but not limited to, the executive, administrative, professional, computer software employee, and/or outside sales exemptions, or some combination of these exemptions.

## TWELFTH DEFENSE

### (No Waiting Time Penalties)

12.    The Complaint fails to state a claim for waiting time penalties under California Labor Code Section 203 in that some members of the purported class did not resign or were not discharged prior to the filing of this action and/or to the extent that no such penalties can continue after the commencement of an action for the penalties.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

-4-

ANSWER TO COMPLAINT

DB2/ 22557076.1

EXHIBIT C - Page 137

## THIRTEENTH DEFENSE

### (No Entitlement to Jury Trial—Certain Claims)

13.   Plaintiff and the members of the putative class alleged in the Complaint are not entitled to a trial by jury of certain of their claims, including their claims under the California Business and Professions Code §§ 17200, et seq.

## FOURTEENTH DEFENSE

### (De Minimis)

14.   The Complaint, and each purported cause of action contained therein, are barred in whole or in part by the *de minimis* doctrine.

## FIFTEENTH DEFENSE

### (Release)

15.   The claims of Plaintiff and certain members of the putative class alleged in the Complaint are barred in whole or in part because said claims have been released by the individuals in question.

## SIXTEENTH DEFENSE

### (Laches)

16.   Plaintiff's claims, and the claims of each member of the putative class alleged in the Complaint, or some of them, are barred in whole or in part by the doctrine of laches.

## SEVENTEENTH DEFENSE

### (Unclean Hands)

17.   Plaintiff's claims, and the claims of each member of the putative class alleged in the Complaint, or some of them, are barred in whole or in part by their unclean hands and/or inequitable or wrongful conduct.

## EIGHTEENTH DEFENSE

### (Due Process/Class Certification)

18.   Certification of a class action would constitute a denial of Defendant's due process rights in violation of the Fourteenth Amendment and the California Constitution.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

-5-

DB2/ 22557076.1

EXHIBIT C - Page 138

### NINETEENTH DEFENSE

#### (Not Appropriate for Class Action)

19.     The Complaint, and each purported cause of action contained therein, are not proper for treatment as a class or collective action because, among other reasons: (a) Plaintiff is an inadequate representative of the purported class; (b) Plaintiff's counsel will not fairly and adequately represent the purported class; (c) Plaintiff cannot establish commonality of claims; (d) Plaintiff cannot establish typicality of claims; and (e) the individualized nature of Plaintiff's claims makes class treatment inappropriate.

### TWENTIETH DEFENSE

#### (Numerosity)

20.     The Complaint fails to the extent it asserts a class action, because the putative class Plaintiff purports to represent, the existence of which is expressly denied, lacks numerosity.

### TWENTY-FIRST DEFENSE

#### (Action Unconstitutional)

21.     Plaintiff's purported cause of action for violation of California Business and Professions Code Section 17200 is barred because provisions of Section 17200 violate the provisons of the United States and California Constitutions, including, but not limited to, the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

### TWENTY-SECOND DEFENSE

#### (Avoidable Consequences)

22.     The claims of Plaintiff and members of the putative class alleged in the Complaint are barred, or recovery reduced, because: (a) Defendant took reasonable steps to prevent and correct the conduct alleged in the Complaint; (b) Plaintiff and members of the putative class unreasonably failed to use the preventive and corrective measures that Defendant provided; and (c) reasonable use of Defendant's procedures would have prevented at least some of the harm that Plaintiff and members of the putative class allegedly suffered, if any.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

-6-

ANSWER TO COMPLAINT

DB2/ 22557076.1

EXHIBIT C - Page 139

### TWENTY-THIRD DEFENSE

#### (Failure to Mitigate)

23.     The monetary claims of Plaintiff and members of the putative class alleged in the Complaint are barred, in whole or in part, because they have not appropriately or adequately mitigated their damages, if any.

### TWENTY-FOURTH DEFENSE

#### (Adequate Remedy At Law)

24.     The claims of Plaintiff and members of the putative class alleged in the Complaint are barred in light of the fact that Plaintiff and any such putative class members have an adequate remedy at law.

### TWENTY-FIFTH DEFENSE

#### (Conduct Reasonable and In Good Faith/Not Willful)

25.     If Defendant is found to have failed to pay any amount due to Plaintiff, or any member of the putative class alleged in the Complaint, which allegations Defendant denies, Defendant acted at all times on the basis of a good faith and reasonable belief that it had complied fully with all California wage and hour laws.

### TWENTY-SIXTH DEFENSE

#### (Not Willful)

26.     Plaintiff, and any member of the putative class alleged in the Complaint, are barred from recovering penalties pursuant to California Labor Code Sections 203 because: (a) Plaintiff has failed to plead facts sufficient to support allegations of willfulness; and (b) neither Defendant nor any agent or employee of Defendant acted willfully in failing to pay wages allegedly due to Plaintiff or members of the putative class alleged in the Complaint.

### TWENTY-SEVENTH DEFENSE

#### (Due Process/Excessive Fine)

27.     Although Defendant denies that it has committed or has responsibility for any act that could support the recovery of civil penalties in this lawsuit, if and to the extent any such act

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

-7-

ANSWER TO COMPLAINT

DB2/ 22557076.1

EXHIBIT C - Page 140

or responsibility is found, recovery of civil penalties against Defendant is unconstitutional under numerous provisions of the United States Constitution and the California Constitution, including the excessive fines clause of the Eighth Amendment, the due process clauses of the Fifth Amendment and Section 1 of the Fourteenth Amendment, the self-incrimination clause of the Fifth Amendment, and other provisions of the United States Constitution, and the excessive fines clause of Section 17 of Article 1, the due process clause of Section 7 of Article I, the self-incrimination clause of Section 15 of Article 1, and other provisions of the California Constitution.

## TWENTY-EIGHTH DEFENSE

### (Constitutional Right to Equal Protection)

28.    An award of penalties against Defendant would be an unconstitutional denial of Defendant's rights to equal protection under both the United States and California Constitutions.

## TWENTY-NINTH DEFENSE

### (No Violation of Underlying State Law)

29.    Defendant is not liable for a violation of unlawful business practices pursuant to California Business and Professions Code Section §§ 17200, et seq., because it is not liable to Plaintiff or the members of the putative class alleged in the Complaint for any alleged violation of any underlying state laws.

## THIRTIETH DEFENSE

### (Improper Remedies)

30.    The claims of Plaintiff and the members of the putative class alleged in the Complaint seek improper remedies that may not be recovered pursuant to Business & Professions Code §§ 17200 et seq. and Labor Code § 203.

## THIRTY-FIRST DEFENSE

### (Just and Proper Exercise of Managerial Discretion)

31.    The claims of Plaintiff, and those similarly situated, are barred in that Defendant's actions were a just and proper exercise of management discretion and business judgment, which

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

-8-

ANSWER TO COMPLAINT

DB2/ 22557076.1

EXHIBIT C - Page 141

were undertaken for a fair and honest reason regulated by good faith under the circumstances then existing.

<div align="center">

**THIRTY-SECOND DEFENSE**

**(Attorneys' Fees and Costs Unwarranted)**

</div>

32.    The Complaint fails to state facts sufficient to support an award of attorneys' fees or costs.

<div align="center">

**THIRTY-THIRD DEFENSE**

**(Reservation of Rights)**

</div>

33.    Defendant reserves the right to assert additional defenses as discovery proceeds and it becomes aware of additional facts and circumstances that provide the basis for additional defenses.

WHEREFORE, Defendant prays for judgment as follows:

1.    That the Court deny Plaintiff's request to certify this action as a class action;

2.    The Plaintiff take nothing by the Complaint;

3.    That Plaintiff's Complaint be dismissed with prejudice;

4.    That judgment be entered against Plaintiff and in favor of Defendant;

5.    That Defendant be awarded its costs of suit incurred herein;

6.    That Defendant be awarded its attorneys' fees incurred by this action, including, but not limited to, pursuant to California Labor Code § 218.5; and

7.    That the Court grant such other and further relief as it deems just and proper.

Dated: July 26, 2011

MORGAN, LEWIS & BOCKIUS LLP

By _____

Carrie A. Gonell
Attorneys for Defendant
COGNIZANT TECHNOLOGY
SOLUTIONS U.S. CORPORATION

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

-9-

1

## PROOF OF SERVICE

2

*Thomas v. Cognizant Technology Solutions U.S. Corporation*
OCSC Case No. 30-2011-00484761-CU-OE-CXC

3

4          I am a resident of the State of California, County of Orange; I am over the age of eighteen
years and not a party to the within action; my business address is 5 Park Plaza, Suite 1750, Irvine,
California 92614.

5

6          On July 26, 2011, I served on the interested parties in this action the within document(s)
entitled:

7

### DEFENDANT COGNIZANT TECHNOLOGY SOLUTIONS
### U.S. CORPORATION'S ANSWER TO COMPLAINT

8

9       [ ]      **BY FAX:  (C.C.P. § 1013(a),(e); CRC 2008)** - by transmitting via electronic
facsimile the document(s) listed above to the fax number(s) set forth below on this
date before 5:00 p.m.; I also caused the fax machine to print such record(s) of the
transmission.

10

11

12      [X]      **BY MAIL:  (C.C.P. § 1013(a))** - by placing the document(s) listed above in a
sealed envelope with postage thereon fully prepaid, in the United States mail at
Irvine, California addressed as set forth below.  I am readily familiar with the
firm's practice of collection and processing correspondence for mailing.  Under that
practice it would be deposited with the U.S. Postal Service on that same day with
postage thereon fully prepaid in the ordinary course of business.  I am aware that
on motion of the party served, service is presumed invalid if postal cancellation
date or postage meter date is more than one day after date of deposit for mailing in
affidavit.

13

14

15

16

17

18      [ ]      **BY OVERNIGHT MAIL (C.C.P. § 1013(c))** - By **FEDERAL EXPRESS**,
following ordinary business practices for collection and processing of
correspondence with said overnight mail service, and said envelope(s) will be
deposited with said overnight mail service on said date in the ordinary course of
business.

19

20

21      [ ]      **BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED** – By placing true
copy(ies) thereof in sealed envelope(s) with Certified Mail, Return Receipt
Requested, postage thereon fully prepaid and by causing such envelope(s) to be
deposited in the mail at 5 Park Plaza, Suite 1750, Irvine, California 92614.

22

23

24      [ ]      **BY ELECTRONIC SERVICE (C.C.P. § 1010.6(a)(6))** - the parties listed below
were served electronically with the document(s) listed above by e-mailed PDF files
on July 26, 2011.  The transmission was reported as complete and without error.
My electronic notification address is 5 Park Plaza, Suite 1750, Irvine, California
92614.  My e-mail address is dghani@morganlewis.com.

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 22579605.1

PROOF OF SERVICE

EXHIBIT C - Page 143

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5 | Jose R. Garay, Esq.<br>JOSE GARAY, APLC<br>2030 Main Street, Suite 1300<br>Irvine, CA 92618<br>Telephone: 949.260.9193<br>Facsimile:  949.260.9194<br>jgaray@computerovertime.com | Attorneys for Plaintiff JOHN THOMAS |
| 6<br>7<br>8<br>9 | Christopher J. Hamner, Esq.<br>HAMNER LAW OFFICES, LP<br>15760 Ventura Boulevard, Suite 860<br>Encino, CA 91436<br>Telephone:  818.386.0444<br>Facsimile:  818.386.0050<br>chamner@hamnerlaw.com | |

10     [ X ]   **STATE:**  I declare under penalty of perjury, under the laws of the State of
11 California, that the above is true and correct.

12     Executed on July 26, 2011, at Irvine, California.

13                                                    _Diane Ghani_
14                                                    Diane Ghani

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Irvine

-2-

PROOF OF SERVICE

DB2/ 22579605.1

EXHIBIT C - Page 144

# EXHIBIT "D"

1    MORGAN, LEWIS & BOCKIUS LLP
     CARRIE A. GONELL, SBN 257163
2    cgonell@morganlewis.com
     MARIA O. GUTIERREZ, SBN 209995
3    maria.gutierrez@morganlewis.com
     5 Park Plaza, Suite 1750
4    Irvine, CA 92614
     Tel: 949.399.7000
5    Fax: 949.399.7001

6    Attorneys for Defendant
     COGNIZANT TECHNOLOGY SOLUTIONS
7    U.S. CORPORATION

8             UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11    JOHN THOMAS, an individual        Case No.
     California resident, on behalf of himself
12    and all others similarly situated,     **DECLARATION OF CARRIE**
                                      **GONELL IN SUPPORT OF**
13               Plaintiff,         **DEFENDANT COGNIZANT**
                                      **TECHNOLOGY SOLUTIONS'**
14               vs.             **NOTICE OF REMOVAL**

15    COGNIZANT TECHNOLOGY
     SOLUTIONS U.S. CORPORATION, a
16    Delaware corporation and DOES 1
     through 100, inclusive,
17

18             Defendants.

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 22579871.1

Case No. _____
DEFENDANT'S DISCLOSURE STATEMENT
PURSUANT TO FED. R. CIV. P. 7.1
EXHIBIT D - page 146

## **DECLARATION OF CARRIE GONELL**

I, Carrie Gonell, declare as follows:

1.      I have personal knowledge of and am competent to testify to the facts set forth herein, and would testify competently to them if called to do so.

2.      I am an attorney with Morgan, Lewis & Bockius, counsel for Defendant Cognizant Technology Solutions U.S. Corporation ("Cognizant").

3.      I make this declaration in support of Cognizant's Notice of Removal.

4.      My office received data regarding the salaries and dates of employment of the putative class members in this case, which is attached as Exhibit C to the Declaration of Misty Pederson filed concurrently herewith.

5.      A weekly salary for each of the 551 potential class members listed on Exhibit C to the Declaration of Misty Pederson was calculated by taking the annual salary paid to each of these employees as of June 16, 2007, or at the time he or she first started working in California, and dividing by 52. This weekly salary was divided by 40 hours per week to yield an hourly rate, and then multiplied by 1.5 to get the overtime rate. Further, the number of work weeks for each employee was calculated based on the dates he or she worked in California as reflected in Exhibit C to the Declaration of Misty Pederson. Next, the number of weeks each employee worked in California was multiplied by the employee's overtime rate, and the sum of these products is a total of $1,287,769.94.

6.      With respect to the meal and rest period causes of action, the hourly start rate of each of the 551 potential class members was multiplied by the number of work weeks for each potential class member, and the sum of these products is a total of $858,513.29.

7.      The daily rate of pay for the 102 former employees is based on the ending annual salary at the time of the employee's termination (dividing the annual salary by 52, and then by 40 hours per week, and the multiplying by 8 hours per day). Multiplying this daily rate by 30 (or the number of days since the employee's

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 22579871.1

Case No. _____
DEFENDANT'S DISCLOSURE STATEMENT
PURSUANT TO FED. R. CIV. P. 7.1
EXHIBIT D - page 147

1  termination, if the employee was terminated in the last month), yields a total of

2  $1,081,483.56.

3      8.     Based on the information provided in Exhibit C to the Declaration of

4  Misty Pederson, one hundred and fifteen (115) of the 551 potential class members

5  received 41 or more pay checks.  Each of them has a potential claim of $4,000, for

6  a total of $460,000.  For the remaining 436 employees, there are 436 initial pay

7  periods, at $50 each, for a total of $21,800.  Using the potential class member start

8  and end dates, the product of 5984 subsequent pay periods multiplied by $100 is

9  $598,400.  The total of these numbers is $1,080,200.

10      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the

11  laws of the United States and the State of California that the foregoing is true and

12  correct.  Executed at Irvine, California on July 27, 2011.

15  Carrie Gonell

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 22579871.1

3

EXHIBIT D - page 148

# PROOF OF SERVICE

*Thomas v. Cognizant Technology Solutions, et al.*

I am a resident of the State of California, County of Orange; I am over the age of eighteen years and not a party to the within action; my business address is 5 Park Plaza, Suite 1750, Irvine, California 92614.

On July 27, 2011, I served on the interested parties in this action the within document(s) entitled:

### DEFENDANT'S NOTICE OF REMOVAL TO UNITED STATES DISTRICT COURT

[  ]   **BY FAX: -** by transmitting via electronic facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.; I also caused the fax machine to print such record(s) of the transmission.

[ X ]   **BY MAIL: -** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Irvine, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[  ]   **BY OVERNIGHT MAIL -** By **FEDERAL EXPRESS**, following ordinary business practices for collection and processing of correspondence with said overnight mail service, and said envelope(s) will be deposited with said overnight mail service on said date in the ordinary course of business.

[  ]   **BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED** – By placing true copy(ies) thereof in sealed envelope(s) with Certified Mail, Return Receipt Requested, postage thereon fully prepaid and by causing such envelope(s) to be deposited in the mail at 5 Park Plaza, Suite 1750, Irvine, California 92614.

[  ]   **BY ELECTRONIC SERVICE -** the parties listed below were served electronically with the document(s) listed above by e-mailed PDF files on July 27, 2011. The transmission was reported as complete and without error. My electronic notification address is 5 Park Plaza, Suite 1750, Irvine, California 92614. My e-mail address is pmartin@morganlewis.com.

DB2/21431363.1

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

1

2  [ ]  **BY E-FILE** – I caused such documents to be transmitted by e-file with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

3

4

| | |
|---|---|
| Jose R. Garay, Esq.<br>JOSE GARAY, APLC<br>2030 Main Street, Suite 1300<br>Irvine, CA 92618<br>Telephone: 949.260.9193<br>Facsimile: 949.260.9194<br>jgaray@computerovertime.com | *Attorneys for Plaintiff JOHN THOMAS* |
| Christopher J. Hamner, Esq.<br>HAMNER LAW OFFICES, LP<br>15760 Ventura Boulevard, Suite 860<br>Encino, CA 91436<br>Telephone: 818.386.0444<br>Facsimile: 818.386.0050<br>chamner@hamnerlaw.com | *Attorneys for Plaintiff JOHN THOMAS* |

13

14  [ X ]  **FEDERAL:** I declare that I am employed in the office of a member of the Bar of this Court at whose direction this service was made.

15  Executed on July 27, 2011, at Irvine, California.

16

17  _____
                                    Patricia Martin

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV11- 1123 JST (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

COPY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐ ) | DEFENDANTS |
|---|---|
| JOHN THOMAS, an individual California resident, on behalf of himself and all others similarly situated, | COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, a Delaware corporation and DOES 1 through 100, inclusive, |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Carrie A. Gonell, SBN 257163<br>Maria O. Gutierrez, SBN 209995<br>Morgan, Lewis & Bockius LLP<br>5 Park Plaza, Suite 1750<br>Irvine, CA 92614<br>949.399.7000 | |

| II. BASIS OF JURISDICTION (Place an X in one box only.) | III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only<br>(Place an X in one box for plaintiff and one for defendant.) | | |
|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff    ☐ 3 Federal Question (U.S. Government Not a Party) | | PTF DEF | PTF DEF |
| | Citizen of This State ☒ 1 ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 ☐ 4 |
| ☐ 2 U.S. Government Defendant    ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State ☐ 2 ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 ☒ 5 |
| | Citizen or Subject of a Foreign Country ☐ 3 ☐ 3 | Foreign Nation | ☐ 6 ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No      ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT (Place an X in one box only.)**

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 550 Civil Rights | ☒ 790 Other Labor Litigation |
| | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | | | | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | | ☐ 362 Personal Injury- Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | | ☐ 861 HIA (1395ff) |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 862 Black Lung (923) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | | | ☐ 640 R.R. & Truck | ☐ 864 SSID Title XVI |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 865 RSI (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | | ☐ 660 Occupational Safety/Health | FEDERAL TAX SUITS |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus- Alien Detainee | | | |
| | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | |

SACV11-1123 JST(ANx)

| FOR OFFICE USE ONLY: | Case Number: |
|---|---|

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).   IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No  [ ] Yes
If yes, list case number(s):

**VIII(b).   RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [X] No  [ ] Yes
If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  [ ] A. Arise from the same or closely related transactions, happenings, or events; or
  [ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or
  [ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or
  [ ] D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
  [ ] Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
  [ ] Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Delaware |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
  **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _Carrie A. Gonell_   Date July 27, 2011

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## PROOF OF SERVICE

*Thomas v. Cognizant Technology Solutions, et al.*

I am a resident of the State of California, County of Orange; I am over the age of eighteen years and not a party to the within action; my business address is 5 Park Plaza, Suite 1750, Irvine, California 92614.

On July 27, 2011, I served on the interested parties in this action the within document(s) entitled:

### CIVIL CASE COVER SHEET

[  ]    **BY FAX: -** by transmitting via electronic facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.; I also caused the fax machine to print such record(s) of the transmission.

[ X ]    **BY MAIL: -** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Irvine, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[  ]    **BY OVERNIGHT MAIL -** By **FEDERAL EXPRESS**, following ordinary business practices for collection and processing of correspondence with said overnight mail service, and said envelope(s) will be deposited with said overnight mail service on said date in the ordinary course of business.

[  ]    **BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED –** By placing true copy(ies) thereof in sealed envelope(s) with Certified Mail, Return Receipt Requested, postage thereon fully prepaid and by causing such envelope(s) to be deposited in the mail at 5 Park Plaza, Suite 1750, Irvine, California 92614.

[  ]    **BY ELECTRONIC SERVICE -** the parties listed below were served electronically with the document(s) listed above by e-mailed PDF files on July 27, 2011. The transmission was reported as complete and without error. My electronic notification address is 5 Park Plaza, Suite 1750, Irvine, California 92614. My e-mail address is pmartin@morganlewis.com.

DB2/21431363.1

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

PROOF OF SERVICE

1

2

3

       [   ]    **BY E-FILE** – I caused such documents to be transmitted by e-file with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

4

| | |
|---|---|
| 5   Jose R. Garay, Esq.<br>JOSE GARAY, APLC<br>6   2030 Main Street, Suite 1300<br>Irvine, CA 92618<br>7   Telephone: 949.260.9193<br>Facsimile: 949.260.9194<br>8   jgaray@computerovertime.com | *Attorneys for Plaintiff JOHN THOMAS* |
| 9   Christopher J. Hamner, Esq.<br>HAMNER LAW OFFICES, LP<br>10   15760 Ventura Boulevard, Suite 860<br>Encino, CA 91436<br>11   Telephone: 818.386.0444<br>Facsimile: 818.386.0050<br>12   chamner@hamnerlaw.com | *Attorneys for Plaintiff JOHN THOMAS* |

13

14      [ X ] **FEDERAL:** I declare that I am employed in the office of a member of the Bar of this Court at whose direction this service was made.

15

16      Executed on July 27, 2011, at Irvine, California.

17

18                              Patricia Martin

19

20

21

22

23

24

25

26

27

28

DB2/21431363.1

-2-

PROOF OF SERVICE